# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Joan B. Gottschall | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 03 C 4433 | **DATE** | 8/5/2004 |
| **CASE TITLE** | Patterson vs. Burge | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
      ☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] **ENTER ORDER.** For the reasons stated in the attached memorandum opinion and order, defendants' motions to dismiss [45-1], [47-1], [91-1] are granted in part and denied in part. Defendant Troy's motion to dismiss [91-1] is denied in its entirety. In addition, plaintiff's motion to file instanter an oversized response [54-1] is denied as moot, as a duplicate motion [53-1] was granted by the court on 2/11/04. Defendants shall answer plaintiff's complaint on or before September 7, 2004.

(11) ■ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | | | |
|---|---|---|---|---|---|
| | No notices required. | | number of notices | | **Document Number** |
| | Notices mailed by judge's staff. | | | | |
| | Notified counsel by telephone. | | AUG 0 9 2004 | | |
| X | Docketing to mail notices. | | date docketed | | 115 |
| | Mail AO 450 form. | | docketing deputy initials | | |
| | Copy to judge/magistrate judge. | | | | |
| RJ/KB | courtroom deputy's initials | | date mailed notice | | |
| | | | mailing deputy initials | | |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION



AUG 0 9 2004

Aaron Patterson,                                    )
                                                    )
                        Plaintiff,                  )
                                                    )    Case No. 03 C 4433
            v.                                      )
                                                    )    Honorable Joan B. Gottschall
Former Chicago Police Lt. Jon Burge #338;           )
former CPD Sgt. John Byrne #1453; former            )
CPD Detectives James Pienta #10063;                 )
William Marley #9886; Raymond                       )
Madigan #1471; William Pedersen #8553;              )
Daniel McWeeny #14367; and Joseph                   )
Danzyl #12568; Assistant Cook County                )
State's Attorney Peter Troy, former Assistant)
Cook County State's Attorney William Lacy; )
Cook County State's Attorney Richard                )
Devine; Chicago Police Superintendent Terry)
Hillard; former Chicago Police Superinten-          )
dent Leroy Martin; former OPS Director              )
Gayle Shines; former counsel to the Super-          )
intendent Thomas Needham; the City of               )
Chicago; Cook County, Illinois and its Cook )
County State's Attorneys' Office,                   )
                                                    )
                        Defendants.                 )


MEMORANDUM OPINION AND ORDER

        After being convicted for the 1986 murders of Rafaela and Vincent Sanchez and

spending 13 years on death row, plaintiff Aaron Patterson was pardoned by Illinois

Governor George Ryan on January 10, 2003. Patterson filed this civil action in June

of 2003, asserting that defendants, individually and in conspiracy, violated his rights

under the United States Constitution and Illinois state law when they knowingly filed

false charges and framed him for the Sanchez murders, tortured and beat him at Chicago Police Department's Area 2 headquarters, fabricated his "confession" and falsified inculpatory evidence, coerced witnesses to testify against him, gave perjured testimony, published defamatory statements regarding his guilt, and obstructed justice and suppressed exculpatory evidence throughout his suppression hearing, trial, and post-conviction proceedings. Now before the court are defendants' motions to dismiss Patterson's complaint and all of the fourteen claims contained therein.

## I. BACKGROUND

The following facts are taken from Patterson's first amended complaint and are regarded as true for the purposes of this motion. *See Thompson v. Illinois Dep't of Prof'l Regulation*, 300 F.3d 750, 753 (7th Cir. 2002).

On April 19, 1986, Chicago Police Department officers discovered the dead bodies of Rafaela and Vincent Sanchez in their apartment at 8849 South Burley. Officers and defendants Lt. Jon Burge, Sgt. John Byrne, Detectives James Pienta, William Marley, Daniel McWeeny, Joseph Danzl (collectively, "Area 2 defendants"), and other Area 2 detectives were assigned to investigate the Sanchez murders. On April 21, Danzl allegedly coerced and intimidated 16 year-old Marva Hall, whose uncle was a suspect in the murders, into falsely implicating Patterson. On April 22, Burge and another Area 2 detective took a different suspect, Michael Arbuckle, into custody at Area 2 headquarters. Burge allegedly told Arbuckle that they "really wanted to get Aaron Patterson" and wanted Arbuckle to say that Patterson was involved in the murders. When Arbuckle refused to implicate Patterson and asked for his lawyer,

Burge threatened him with electrocution and lethal injection and told him that they would get Arbuckle to "cooperate one way or another." Still, Arbuckle denied his and Patterson's involvement.

On or about April 23, McWeeny, Byrne and other Area 2 detectives on the case were informed by several persons that Willie Washington and his brother killed Rafael and Vincent Sanchez. Nevertheless, for the next week, Byrne, McWeeny, and other Area 2 detectives searched unsuccessfully for Patterson. On April 30, Patterson was arrested on an outstanding warrant by Chicago Police Department officers from the Fourth District. Defendants Pienta, Marley, and Pedersen were called to transport Patterson from the Fourth District police station to Area 2. During the ride, Pienta allegedly told Patterson that if he had arrested him, he would have killed him.

At Area 2 Patterson was placed in an interview room, handcuffed to the wall, and questioned by Area 2 detectives about the Sanchez murders for about an hour. Patterson denied any involvement. He was then taken to 11th and State before being returned to the interview room at Area 2. After brief questioning, Pienta told Patterson that he was "tired of this bullshit," left the room, and came back with a grey typewriter cover. When Patterson refused to implicate himself in the murders, the Area 2 defendants, including Pienta, Marley, and Pedersen, handcuffed him behind his back, turned out the lights, and repeatedly beat him in the chest and suffocated him by holding the typewriter cover over his face and ears for at least a minute. Pienta continued to urge Patterson to "cooperate," and when he refused, the Area 2 defendants again turned out the lights and suffocated Patterson with the plastic cover. The second

-3-

time, the "bagging" and beating lasted for over two minutes. Patterson found the abuse unbearable and told the detectives he would "say anything you say" if they would stop the suffocation and beating.

After Patterson agreed to cooperate, the Area 2 defendants left the room to get a state's attorney from the felony review division to take his statement. While alone in the room, Patterson used a paper clip to scratch into the interview room bench that he was "suffocated with plastic" and that his statement to the police was false. Defendant Burge returned with an Assistant State's Attorney ("ASA") who said that Burge told him Patterson wanted to make a statement. After Burge left the room at Patterson's request, Patterson told the ASA that he had nothing to say. The ASA left and told Burge that Patterson refused to confess. Burge then returned to the room, told Patterson "you're fucking up," placed his handgun on the table in front of Patterson, and said "we told you if you don't do what we tell you to, you're going to get something worse than before – it will have been a snap compared to what you will get." He also told Patterson that if he revealed the torture, "it's your word against ours and who are they going to believe, you or us." Burge then told Patterson that they could do anything they wanted to him.

Next, defendant Peter Troy, an ASA with the State's Attorney's Office ("SAO"), entered the interview room with Area 2 defendant Madigan. Initially, Patterson agreed to make a statement in exchange for phone privileges, but he refused to sign the statement Troy had written out after the Area 2 defendants terminated his calls. In an attempt to make Patterson sign the statement, Troy and Madigan physically

attacked Patterson. McWeeny entered the room at this time, professing not to be involved in the prior beatings and suffocation, and urged Patterson to cooperate because the other defendants "could do something serious to him if he didn't." As a result of this coercion and under threat of continued torture, Patterson said he would agree with whatever the Area 2 defendants and Troy said had happened.

Around the same time, defendant Pienta arrested Eric Caine, Patterson's co-defendant in the Sanchez murder prosecution. Caine was interrogated and beaten and told that if he did not make a statement he would get the same treatment as Patterson. Caine initially gave a statement, but when he tried to repudiate it Madigan hit Caine with his open hand over his ear and cheekbone, causing a loud pop and rupturing his ear drum. Caine screamed in pain; he later gave and signed a court-reported statement prepared by the Area 2 defendants which falsely implicated Patterson in the murders.

The Area 2 defendants, together with SAO defendants Troy and William Lacy, allegedly fabricated oral admissions and reduced these "admissions" to false reports implicating Patterson and Caine in the Sanchez murders. Defendants communicated these false reports to the prosecuting attorneys, who used them at Patterson's suppression hearing and at trial. Defendants also testified falsely about the fabricated admissions and the torture and abuse which produced them throughout Patterson's prosecution. No physical evidence linking Patterson to the murders was ever discovered, though a bloody fingerprint that was not Patterson's was found at the scene and not introduced at trial. Patterson was convicted for the Sanchez murders on the

basis of his false confession and the testimony of Marva Hall and defendants. Patterson was sentenced to death, and after his conviction was affirmed on appeal, spent over 13 years incarcerated on death row until his pardon in January of 2003.

After his conviction but before Patterson filed his motion for a new trial, the Chicago Police Department's Office of Professional Standards ("OPS") completed an investigation into allegations that suspects held in custody at Area 2 had been tortured by the Area 2 defendants and others. In November of 1990 the OPS issued a secret report which was forwarded to then superintendent of the Chicago Police Department Leroy Martin. In the report OPS found that from 1973 to 1985 there was a practice of systematic abuse of suspects at Area 2 and that certain Area 2 command personnel, including defendants Burge and Martin, were aware of such abuse and encouraged it, either by actively participating in it or by failing to take action to stop it. The report named both Burge and Byrne as major "players" in the pattern and practice of torture and recommended that Burge be fired for his participation in Andrew Wilson's torture.

In 1991 the Illinois Supreme Court denied Patterson's motion for a new trial, which argued for his release based on his having been tortured and framed for the Sanchez murders. While Patterson's post-conviction appeals were pending before the Illinois appellate courts, superintendent Martin and the Area 2 defendants delayed, obstructed, and otherwise undermined the OPS investigation and report by withholding evidence that there was systematic abuse of suspects at Area 2. In particular, Martin allegedly knew of and suppressed evidence of torture implicating the Area 2 defendants from the inception of the OPS investigation until the report and its

-6-

related findings were ordered produced by court order in February of 1992. Further, Martin and then OPS director Gail Shines refused to investigate numerous other allegations of torture and abuse at Area 2, including those made by Patterson, Stanley Howard, and Melvin Jones.

From 1988 to 1996 the City of Chicago hired defendant Richard Devine, then a private attorney, and his law firm to represent Burge, Byrne, and other Area 2 defendants against charges brought in federal court and Police Board Proceedings that they tortured Andrew Wilson and other criminal suspects. During his representation of Burge, Byrne, and other Area 2 defendants Devine was allegedly informed of a wealth of compelling evidence that his clients were centrally involved in a pattern and practice of torturing suspects, including Patterson, and made numerous litigation decisions designed to protect his clients from criminal, civil, and administrative liability in the face of that evidence. In 1994 Patterson filed a post-conviction petition which alleged that he was entitled to a new motion to suppress hearing and a new trial on the basis of newly discovered torture evidence that previously had been suppressed. In 1997 Devine became the State's Attorney of Cook County and acting in this capacity oversaw the post-conviction proceedings of numerous persons who allegedly had been tortured and abused by Area 2 defendants, some of whom were Devine's former clients.

In 1998, Thomas Needham, then counsel and administrative assistant to Chicago Police Department Superintendent Terry Hillard, conspired with Hillard to suppress evidence of the Area 2 defendants' participation in torture at Area 2. Specifically, Hillard an d Needham allegedly obstructed OPS investigations and

overturned findings of OPS reports concluding that the torture had occurred and that the Area 2 defendants were largely responsible. Moreover, Shines, Hillard, and Needham withheld the torture evidence and OPS files from criminal defendants, including Patterson, who had allegedly been abused at Area 2.

In a televised interview in December of 1999 defendant Byrne made defamatory statements concerning Patterson's protestations of his innocence and claims of torture at Area 2, including that Patterson was "without a doubt" "guilty of the [Sanchez] murders" and that "the detectives who worked with him would not" and did not torture suspects. On January 10, 2003, then Governor of Illinois George Ryan granted Patterson and three other death row victims allegedly tortured by Burge and other Area 2 detectives pardons on the basis of innocence. In granting the pardons Governor Ryan announced that "the category of horrors was hard to believe," and the evidence showed that the four men – Patterson, Madison Hobley, Leroy Orange, and Stanley Howard – had been "beaten and tortured and convicted on the basis of confessions they allegedly provided." In response, State's Attorney Devine publicly condemned the pardons of the four men, whom he referred to as "evil" and "convicted murderers," as "outrageous" and "unconscionable." Devine also threatened to challenge the validity of the pardons in court. Further, ASA Troy made defamatory statements about Patterson, including that he saw no evidence of torture at Area 2 and that Patterson was guilty of the murders.

As a result of the misconduct of Area 2 defendants Burge, Byrne, Pienta, Marley, Pedersen, McWeeny, Madigan, and Danzl, SAO defendants Devine, Troy, and Lacy, and defendants Hillard, Shines, Martin, and Needham, individually and in conspiracy, Patterson claims that he was wrongfully tortured, charged, and convicted for the Sanchez murders in violation of his federal constitutional rights, and that he suffered compensable injuries under Illinois state law. Patterson's complaint enumerates 14 separate charges against various defendants, namely: Count I, § 1983 claim for deprivation of his right to fair trial and wrongful conviction in violation of due process; Count II, § 1983 claim for false imprisonment; Count III, § 1983 claim for coercive investigation; Count IIIA, § 1983 claim for torture and abuse; Count IV, § 1983 claim for deprivation of access to courts; Count V, § 1983 *Monell* claim against the City of Chicago; Count VI, § 1983 *Monell* claim against Cook County and the Cook County State's Attorney's Office; Count VII, state law claim for false imprisonment; Count VIII, state law claim for malicious prosecution; Count IX, state law claim for intentional infliction of emotional distress ("IIED"); Count X, state law claim for defamation; Count XI, state law conspiracy claim; Count XII, state law respondeat superior claim; and Count XIII, state law claim for indemnification under 745 ILCS 10/9-102.

## II. DISCUSSION

By their individual and combined motions, defendants seek to dismiss every one of Patterson's 14 claims against them. In considering the motions the court accepts as true all well-pleaded facts and draws all reasonable inferences from those allegations

-9-

in Patterson's favor. *Hernandez v. City of Goshen*, 324 F.3d 535, 537 (7th Cir. 2003). The federal notice pleading standard requires only that "a complaint state the plaintiff's legal claim, . . . together with some indication . . . of time and place." *Thomson v. Washington*, 329 F.3d 969, 970-71 (7th Cir. 2004). So long as Patterson's complaint contains "enough to allow the court and the defendant[s] to understand the gravamen of [his] complaint," and the facts as alleged show a legitimate entitlement to relief, his claims will not be dismissed. *McCormick v. City of Chicago*, 230 F.3d 319, 323-24 (7th Cir. 2000) (internal quotations omitted). *See also Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002).

It cannot seriously be disputed in this case that Patterson's complaint contains "enough" to inform the court and defendants of his grievance. Patterson minces no words in accusing defendants of framing, torturing, maliciously prosecuting, wrongfully convicting, and falsely imprisoning him on death row for murders he did not commit. Taking these allegations as true, as the court must at this time, it is clear that Patterson has suffered violations of his rights that are actionable under federal and state law. What is less clear, however, is which rights were violated under which laws by which defendants. The answer to this question matters profoundly, but it need not be pleaded with as much detail as defendants' arguments imply.

Defendants seek to dismiss all of Patterson's claims as untimely, collaterally estopped, or not actionable. Ordinarily the first two of these are impermissible grounds for dismissing a complaint, as statutes of limitations and issue preclusion are

affirmative defenses. *United States Gypsum Co. v. Indiana Gas Co.*, 350 F.3d 623, 626 (7th Cir. 2003); *Leavell v. Kieffer*, 189 F.3d 492 (7th Cir. 1999). Complaints need not plead specific facts or defeat affirmative defenses to survive a motion to dismiss, *Gomez v. Toledo*, 446 U.S. 635 (1980), though a plaintiff "may plead himself out of court by alleging (and thus admitting) the ingredients of a defense," *Gypsum*, 350 F.3d at 626. *See also Walker v. Thompson*, 288 F.3d 1005 (7th Cir. 2002).

There is a real difference between admitting a defense, *e.g.*, stating that an injury occurred on a certain date which is beyond the limitations period, and failing to overcome a defense, *e.g.*, omitting facts that would preclude application of collateral estoppel. Here, Patterson has alleged some facts relating to the accrual of his injuries that make defendants' statute of limitations defenses ripe for review. In contrast, the court cannot rule on defendants' collateral estoppel arguments without considering facts and evidence outside the pleadings. Because Patterson's accusations span the nearly 17 years of this case's long procedural history and implicate a pattern and practice of wrongdoing by defendants in this and other cases currently being litigated, the court declines at this time to dismiss any of Patterson's claims against any of the defendants[1] as collaterally estopped.[2]

---

[1] The court's decision also applies to defendant Troy's separately filed motion to dismiss on the grounds of collateral estoppel, which is hereby denied.

[2] This is the same approach taken by Judge Aspen in the related case of *Hobley v. Burge*, No. 03 C 3678, 2004 WL 1243929, at * 3 n.5 (N.D. Ill. June 3, 2004) ("by declining to consider at this juncture the material outside of the complaint and declining to rule on this issue at this stage, we will ensure that all parties will be given reasonable opportunity to present all material" relevant to the

Defendants advance two additional arguments that merit the court's attention before turning to Patterson's individual claims. First, SAO defendants Troy, Lacy, and Devine contend that this court lacks subject matter jurisdiction over the state law claims against them. Specifically, they argue that at all times relevant to this action they were state officials acting within the scope of their employment, and Illinois law mandates that actions against state employees be brought in the Court of Claims. *See Senn Park Nursing Cntr. v. Miller*, 470 N.E.2d 1029, 1039 (Ill. 1984). But the Court of Claims' jurisdiction is not exclusive "when it is alleged that the State's agent acted in violation of statutory or constitutional law, or in excess of his authority." *Healy v. Vaupel*, 549 N.E.2d 1240, 1247 (Ill. 1990). That is exactly the case here: in his claims for false imprisonment, malicious prosecution, intentional infliction of emotional distress, defamation, and conspiracy, Patterson accuses the SAO defendants of acting intentionally and maliciously in violation of Illinois state law. The court is satisfied that these allegations, if proven, would establish that the SAO defendants acted outside the scope of their authority as state's attorneys, meaning that the state law charges do not belong in the Court of Claims. *See Welch v. Illinois Supreme Ct.*, 751 N.E.2d 1187, 1195 (Ill. App. Ct. 2001) ("Malice, if well pleaded, is outside the scope of a State employee's authority and must be brought in the circuit court and not the Court of Claims."); *Nelson v. Murphy*, 44 F.3d 504, 505 (7th Cir. 1995).

---

issue of collateral estoppel) (internal citations omitted).

Second, defendants Byrne, Martin, Shines, Hillard, and Needham argue that the claims against them ought to be dismissed because Patterson "utterly failed to allege that Byrne [or Martin, Shines, Hillard, or Needham] did anything that would support those claims." This contention is utterly without merit. Patterson specifically names and accuses each of these defendants of committing numerous violations of federal and state law and of conspiring with the other individual defendants to deprive Patterson of his rights and cause him grievous injuries. Federal notice pleading rules do not require Patterson to provide detailed explanations of how each particular defendant caused each of his injuries. The court believes the allegations in Patterson's complaint are more than adequate to put this court and defendants Byrne, Martin, Shines, Hillard, and Needham on notice of the claims against them.

## A.    Count I – §1983 Claim for Deprivation of Right to Fair Trial

The first of Patterson's thirteen claims asserts a violation of his right under the Fifth and Fourteenth Amendments not to be deprived of liberty without due process of law. Patterson claims that all of the individual defendants caused his wrongful charging, prosecution, and conviction "by fabricating and coercing the false admissions which formed the basis for Plaintiff's charging, prosecution and conviction," "by withholding from prosecutors, judges, and defense attorneys involved in Plaintiff's prosecution the fact that these admissions were false, fabricated, and coerced," "by suppressing additional exculpatory torture findings and evidence, as well as other exculpatory evidence," "by giving a false and incomplete version of events to prosecutors," "by writing false reports and giving false testimony," and "by improperly

influencing the judges hearing Plaintiff's case." Defendants voice several objections to this claim: first, that no material evidence was suppressed, as is required under *Brady v. Maryland*, 373 U.S. 83 (1963), to establish a deprivation of the right to a fair trial; second, that Patterson's "due process" claim is really one for malicious prosecution, which *Newsome v. McCabe*, 256 F.3d 747, 751 (7th Cir. 2001) (*"Newsome I"*), held is not actionable under § 1983; third, that defendants are absolutely immune from liability for their allegedly perjured testimony, *see Briscoe v. LaHue*, 460 U.S. 325, 335-36 (1983); fourth, that SAO defendants Troy and Lacy are immune from liability for all charges of wrongdoing against them in their capacity as prosecutors; and fifth, that SAO defendant Devine cannot be held individually liable because he too is shielded by prosecutorial immunity and was not personally involved in Patterson's prosecution.

### 1. Suppression of evidence

The court turns first to defendants' contention that evidence of Patterson's coerced and falsified confession cannot support a due process claim because neither the confession nor the context in which it was obtained was ever "suppressed." Defendants' argument takes too narrow a view of both Patterson's allegations and the guarantee of due process promised by the United States Constitution. The due process clause safeguards the liberty of citizens against deprivation through official actions, particularly in cases where the state "has contrived a conviction through the pretense of a trial which in truth is but used as a means of depriving a defendant of liberty through a deliberate deception of court and jury by the presentation of testimony

known to be perjured." *Mooney v. Holohan*, 294 U.S. 340, 342 (1935). "Equally offensive to the Constitutional guarantees of liberty" and therefore also a violation of due process "are confessions wrung from an accused by overpowering his will, whether through physical violence or the more subtle forms of coercion commonly known as 'the third degree'." *Hysler v. Florida*, 315 U.S. 411, 413 (1942) (citing *Brown v. Mississippi*, 297 U.S. 278, 286-87 (1936). These are the fundamental principles from which the Supreme Court in *Brady* derived its rule prohibiting the state from suppressing exculpatory evidence, *see* 373 U.S. at 86-88, and it is this constitutional understanding of due process that informs this court's analysis of Patterson's claims in Count I.

As interpreted by the courts, a colorable due process claim under § 1983 must allege that defendants obstructed justice or withheld information or evidence necessary to ensure the fair and impartial trial guaranteed by the constitution. *Ienco v. City of Chicago*, 286 F.3d 994 (7th Cir. 2002); *Brady*, 373 U.S. at 87. In practical terms, a *Brady* violation has three components: (1) the evidence at issue must be favorable to the accused, meaning either exculpatory or impeaching; (2) the evidence must have been suppressed by the state, either willfully or inadvertently; and (3) prejudice must have ensued. *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999). Though *Brady* identifies a trial right of the accused, the government's offending conduct may occur before, *Manning v. Miller*, 355 F.3d 1028, 1033 (7th Cir. 2004), during, *Newsome v. McCabe*, 319 F.3d 301, 304-5 (7th Cir. 2003) ("*Newsome II*"), or after, *Buckley v. Fitzsimmons*, 509 U.S. 259, 269 (1993), the criminal trial.

In arguing to dismiss Count I defendants focus on Patterson's allegations that defendants violated his due process rights by coercing and fabricating his confession and withholding that fact from prosecutors, judges, and defense counsel. Defendants argue that Patterson was present during his own interrogation and therefore knew of and had access to the same allegedly exculpatory evidence as the state; since the prosecution has no duty to disclose what the accused already knows, no *Brady* violation occurred. *Gauger v. Hendle*, 349 F.3d 354, 360 (7th Cir. 2003); *Buie v. McAdory*, 341 F.3d 623 (7th Cir. 2003). Defendants do not misstate the law as applied to a case like *Gauger* where the alleged *Brady* violation is based entirely on evidence obtained during the state's interrogation of the accused, but additional factual allegations in Patterson's complaint make this a very different case than *Gauger*. Most notably, in addition to charging defendants with hiding the fact that his confession was coerced and fabricated – an allegation which by itself might not state a *Brady* claim after *Gauger* – Patterson accuses defendants of obstructing justice and violating his right to a fair trial through actions they took outside the interrogation room.

Patterson's complaint states that defendants tortured him, fabricated his "confession," gave perjured testimony at his suppression hearing and trial, and knowingly used the power of the state to bring charges against him and obtain his conviction for murders they knew he did not commit. Additionally, he claims that all of the defendants acted in concert to effectuate a pattern and practice of torture and frame-ups at Area 2, and that he was not aware of this evidence until it was made

public by court order in other proceedings. Patterson further alleges that defendants at all times knowingly suppressed both the actual truth of his innocence and their roles in framing him for the Sanchez murders from state prosecutors, judges, and the people of Illinois. Taken as true, these allegations contain all the elements of a *Brady* violation and sufficiently charge a deprivation of constitutionally guaranteed due process rights. First, evidence that the defendants who interrogated, charged, and prosecuted Patterson committed numerous other acts of torture and malfeasance, including suppressing evidence other than Patterson's own abuse and coerced confession, is exculpatory and therefore favorable to Patterson. Second, Patterson alleges that defendants willfully suppressed this evidence and their efforts to frame him for the murders from the prosecutors, judges, and defense counsel before, during, and after Patterson's trial. Third, defendants' suppression of this evidence prejudiced Patterson by causing him to be convicted for a crime he did not commit and by continuing to deny him relief in post-conviction proceedings. These allegations support Patterson's claim that he suffered a deprivation of his constitutional right to a fair trial.

### 2. Characterization of defendants' misconduct

Defendants attempt to avoid liability under § 1983 by arguing that Patterson's allegations are "nothing more than a recast of his Fourth Amendment false imprisonment claim" and "essentially a § 1983 malicious prosecution claim," neither of which is actionable after *Newsome I*, 256 F.3d at 250 ("[T]he existence of a tort claim under state law knocks out any constitutional theory of malicious prosecution."). The

court rejects both contentions. As a matter of law, it is still possible after *Newsome I* and *Ienco* to state a § 1983 claim based on the Fourth Amendment, *McCullah v. Gadert*, 344 F.3d 655, 659 (7th Cir. 2003), and on the due process clause of the Fifth and Fourteenth Amendments, *Newsome II*, 319 F.3d at 304. Whether the facts of this case support a Fourth Amendment claim for false imprisonment will be addressed by the court below, but it is enough for now to say that the court views Patterson's allegations that defendants withheld evidence of widespread torture and abuse by defendants and others at Area 2, obstructed Patterson's criminal investigation, and fabricated the evidence used to convict him as implicating his due process right to a fair trial. *See Manning*, 355 F.3d at 1031 ("For plaintiffs seeking redress for being 'framed' for a crime it is a difficult task to form the complaint . . . [and] depends on how this court allows [plaintiff] to characterize his claim."); *Newsome v. McCabe,* 260 F.3d 824, 825 (7th Cir. 2001) (denial of petition for reh'g en banc) ("if the right characterization of the defendants' conduct is that they deliberately withheld information, seeking to misdirect or mislead the prosecutors and the defense, then there is a genuine constitutional problem").

Though *Newsome I* prohibits plaintiffs from attempting an "end run" around its rule "by combining what are essentially claims for false arrest under the Fourth Amendment and state law malicious prosecution into a sort of hybrid substantive due process claim under the Fourteenth Amendment," *McCann v. Mangialardi*, 337 F.3d 782, 786 (7th Cir. 2003), it does not bar § 1983 claims arising under the language of the

constitution itself. *Newsome I*, 256 F.3d at 751; *Gauger*, 349 F.3d at 359 ("a false arrest claim, as distinct from a malicious prosecution claim . . . does not encounter a *Newsome* problem"). Here, Patterson complains of malicious prosecution under state law, but he also accuses defendants of violating his rights under the Fourth, Fifth, and Fourteenth Amendments of the United States Constitution. Defendants argue that *Parratt v. Taylor*, 451 U.S. 527 (1981), ought to foreclose all constitutional claims for which there is a parallel state remedy, but this expansive reading of *Parratt* has been rejected by the Seventh Circuit. *McCullah*, 344 F.3d at 660. The fact that Patterson's § 1983 claims for damages overlap with his state law claims for damages does not render his federal claims infirm. *Id. See also Zinermon v. Burch*, 494 U.S. 113, 124 (1990) ("Overlapping remedies are generally irrelevant to the question of the existence of a cause of action under § 1983.").

Patterson's accusations in Count I assert a deprivation of his right to a fair trial which is derived directly from the constitution's guarantee of due process; as such, the claims are not barred by *Newsome I*. 286 F.3d at 752 (allegation that prosecutors withheld material exculpatory details states "a due process claim in the original sense of that phrase"); *Ienco*, 286 F.3d at 999. *See also Newsome II*, 319 F.3d at 304 (finding that officers' manipulation of line-up would not by itself support damage award under § 1983, but obstruction of prosecutors' and defense counsel's ability to get at the truth in the criminal trial *does* support such an award) (emphasis in original).

### 3. Testimonial immunity for Area 2 defendants

Defendants argue that to the extent Patterson's due process claim is based on allegations that they testified falsely, they are absolutely immune from liability under *Briscoe v. LaHue*, 460 U.S. 325, 335-36 (1983). *See also Curtis v. Bembenek*, 48 F.3d 281, 285 (7th Cir. 1995). An exception to the rule of absolute testimonial immunity exists, however, for "complaining witnesses." *Cervantes v. Jones*, 188 F.3d 805, 809 (7th Cir. 1999). A complaining witness is one "who actively instigated or encouraged the prosecution of the plaintiff." *Curtis*, 48 F.3d at 286. Given Patterson's allegations that defendants "caused [his] wrongful charging, prosecution and conviction," they could qualify as complaining witnesses exempt from absolute testimonial immunity. But the determination of who qualifies as a complaining witness is highly fact-specific and best not resolved on a motion to dismiss. *Cervantes*, 188 F.3d at 810; *Ienco*, 286 F.3d at 1000 n.9 (declining to decide on appeal fact-intensive issue of whether complaining witness exception applies). At this stage, when viewed in a light favorable to Patterson, the allegations in the complaint suggest that defendants are complaining witnesses exempt from absolute testimonial immunity.

Defendants also argue that they are immune from liability for fabricating and failing to disclose their allegedly false testimony to prosecutors. *See House v. Bedford*, 956 F.2d 711, 720 (7th Cir. 1992) (witnesses cannot be held liable under § 1983 for conspiring to commit an immunized act). Here however Patterson's allegations encompass far more than defendants' perjured testimony or even defendants'

conspiracy to commit perjury at trial. Instead they reach defendants' obstruction of criminal proceedings, fabrication of evidence, and intentional misleading of prosecutors, judges, and defense counsel. "Neither the withholding of exculpatory information nor the initiation of constitutionally infirm criminal proceedings is protected by absolute immunity." *Ienco*, 286 F.3d at 1000. Therefore, no absolute testimonial immunity attaches to the actions of the officers outside of trial. *See Manning*, 355 F.3d at 1033 (where plaintiff established elements of *Brady* violation based on officers' conduct beyond scope of testimony at trial, officers not entitled to absolute immunity).

### 4. Prosecutorial immunity for SAO defendants Troy and Lacy

SAO defendants Troy and Lacy argue that they are entitled to absolute prosecutorial immunity because, other than allegations that they participated in the coercive interrogation and physical abuse of Patterson (allegations which they claim are barred by collateral estoppel), Patterson fails to allege that they committed any acts outside of their roles as prosecutors which violated his right to a fair trial. *See Imbler v. Pachtman*, 424 U.S. 409, 431 (1976) ("[I]n initiating a prosecution and presenting the State's case, the prosecutor is immune from a civil suit for damages under § 1983."). As an initial matter, the court has already decided that none of Patterson's claims, including that Troy and Lacy participated in his torture and coercive interrogation, will be dismissed at this time based on defendants' asserted defense of collateral estoppel. Thus, the court will consider the full spectrum of

Patterson's allegations in deciding whether prosecutorial immunity shields Troy and Lacy from liability for depriving Patterson of his right to a fair trial.

Courts are "quite sparing" in recognizing absolute immunity for prosecutors in § 1983 actions and require defendant prosecutors to carry the burden of showing that such immunity is justified in their particular case. *Buckley*, 509 U.S. at 269. Immunity does not rest on an individual's status as a prosecutor, but "is grounded in the nature of the functions he was performing in the case." *Houston v. Partee*, 978 F.3d 362, 366 (7th Cir. 1992). This "functional approach" to determining immunity "looks to the nature of the function performed, not the identity of the actor who performed it." *Buckley*, 509 U.S. at 269. "If a [prosecutor's] function was quasi-judicial, the [prosecutor] enjoys absolute immunity. If the function was administrative or investigatory, the [prosecutor] enjoys only qualified immunity. *Henderson v. Lopez*, 790 F.2d 44, 46 (7th Cir. 1986).

Patterson alleges that Troy and Lacy participated in his abusive interrogation, fabricated statements and admissions for him to sign, suppressed this and other exculpatory evidence, and lied about Patterson's involvement in the Sanchez murders to the prosecuting state's attorneys and judges before, during, and after the trial. Generally, prosecutors who cause constitutional deprivations through their evaluation of evidence presented to them by police may invoke absolute immunity in § 1983 suits, even if they know or suspect that the evidence was obtained through police misconduct. *See Hunt v. Noon*, 926 F.2d 689, 693 (7th Cir. 1991) (finding prosecutor who was called in to take murder suspect's confession after police allegedly beat suspect was

-22-

in to take murder suspect's confession after police allegedly beat suspect was absolutely immune from § 1983 suit even though suspect told prosecutor of abuse and showed him his bruises).  But in this case Patterson accuses Troy and Lacy not only of conspiring to suppress the fact of and evidence obtained from the Area 2 defendants' abusive interrogation, but also of actively participating with the Area 2 defendants in torturing him and fabricating his confession.  Specifically, he claims that Troy "physically attacked [him] in an attempt to coerce him into signing a false statement" that both defendants were aware of his torture and physical abuse and of threats to inflict further abuse if he did not sign the fabricated confession, and that both participated in it by allowing the abuse to continue and failing to stop it or report it to police supervisors.  These allegations suggest that Troy and Lacy were functioning as investigators rather than prosecutors and are therefore entitled only to the same qualified immunity as police officers performing similar tasks.  *See Buckley,* 509 U.S. at 273 ("When a prosecutor performs the investigative functions normally performed by a detective or police officer, it is 'neither appropriate nor justifiable that, for the same act, immunity should protect one and not the other.'") (quoting *Hampton v. Chicago,* 484 F.2d 602, 608 (7th Cir. 1973).  *See also Pippin v. Daley,* No. 88 C 150, 1988 WL 56177, at *2 (N.D. Ill. May 23, 1988) (finding assistant state's attorney who participated in coercive interrogation not entitled to absolute prosecutorial immunity because those acts were the function of an investigator rather than an advocate).

Though Troy and Lacy characterize their conduct during and after Patterson's interrogation as that of prosecutors interviewing a witness and evaluating evidence

presented to them by police officers in preparation for initiating criminal proceedings, the court must take the factual allegations in the complaint as true. Here the allegations put Troy and Lacy in the interview room with the police during the torture and fabrication of his confession and prior to his being indicted for the Sanchez murders.[3] On these facts Troy and Lacy were functioning as investigators rather than advocates for the state and are therefore not entitled to absolute immunity. *See, e.g., Buckley*, 509 U.S. at 274 (denying absolute immunity to prosecutors investigating evidence before convening special grand jury because "[a] prosecutor neither is, nor should consider himself to be, an advocate before he has probable cause to have anyone arrested"). Moreover, since Troy and Lacy were not acting as advocates for the state when they participated in Patterson's abusive interrogation and did not personally prosecute Patterson, they cannot claim immunity from their later *Brady* violations simply because of their status as state's attorneys. *See Houston*, 978 F.2d at 366 (rejecting argument that "absolute immunity indefinitely attaches to every Cook County State's Attorney once a prosecution begins").

---

[3] It is not clear from the complaint whether the torture and coercive investigation occurred before Patterson was arraigned – all that is pleaded is that after he was arrested and prior to the abuse Patterson "was taken to 11th and State" before being returned to the Area 2 interview room. Regardless, it is clear that the abusive interrogation occurred before a grand jury returned an indictment against Patterson for the Sanchez murders.

### 5. *Prosecutorial immunity & individual liability for SAO defendant Devine*

SAO defendant Devine contends that he cannot be held individually liable under § 1983 both because he is shielded by absolute immunity as a prosecutor and because Patterson failed to allege that Devine was personally involved in depriving Patterson of his right to a fair trial. The court finds both arguments unpersuasive. First, Devine cannot claim absolute prosecutorial immunity because he did not personally participate in Patterson's prosecution at trial (he did not assume the office of Illinois State's Attorney until 1996) or in any of his post-conviction proceedings. *See Houston,* 978 F.3d at 366; *Buckley,* 509 U.S. at 273 (prosecutorial acts that do not relate to an advocate's preparation for the initiation of a prosecution or for judicial proceedings are not entitled to absolute immunity).

Second, Devine's argument that he cannot be held individually liable for depriving Patterson of his right to a fair trial because "he was not in office when Patterson was indicted, when his trial occurred, or when the Illinois Supreme Court affirmed his conviction" misapprehends the nature of Patterson's due process claim. Patterson alleges that Devine acted under the color of his office as State's Attorney in suppressing exculpatory evidence and making defamatory statements which resulted in the denial of Patterson's right to fair post-conviction proceedings. A prosecutor who is not directly involved in the prosecution of a case still may be guilty of a *Brady* violation based on his suppression of exculpatory evidence during post-conviction proceedings. *See Houston,* 978 F.2d at 368. Here, Devine is accused of possessing and

suppressing "highly exculpatory torture evidence which was relevant to Plaintiff's ongoing attempt to free himself through post-conviction relief." Specifically, Patterson claims that Devine was "informed of a wealth of compelling evidence that [his former] clients, including Burge and Byrne, were centrally involved in a pattern and practice of torturing suspects, including plaintiff, at Area 2," and that Devine protected his former clients by "suppressing evidence which further established that his [former] clients, and other Area 2 and Area 3 detectives were central actors in a pattern and practice of torture and abuse which included Plaintiff." As discussed above, evidence of widespread torture and malfeasance by the Area 2 defendants qualifies as exculpatory under *Brady*, and Devine's knowing suppression of this evidence from prosecutors, judges, and defense counsel while Patterson's judicial proceedings were ongoing amounts to a violation of Patterson's due process rights.[4]

Devine is also accused of violating Patterson's constitutional rights by making public statements discrediting Patterson and others alleged to have been tortured by the Area 2 defendants while Patterson and others sought new suppression hearings, new trials, new sentences, pardons and/or clemency. Although defamation alone does not rise to the level of a constitutional violation, a § 1983 action may lie if the defamation results in the loss of a constitutionally protected interest. *Paul v. Davis*,

---

[4] The issue of the obligation of a lawyer who has been elected to a public prosecutorial position when the conduct of a former client is called into question in a manner which implicates his prosecutorial duties is an issue which has not been thoroughly addressed by the parties and on which the court does not at this point opine.

424 U.S. 693, 709 (1976) (defamation resulting in "alteration of legal status . . . justified the invocation of procedural safeguards"). Devine's defamatory statements in this case are alleged to have "adversely influenced the prosecuting attorneys who were continuing his prosecution and the judicial tribunals hearing his case." Such an allegation implicates Patterson's due process rights and elevates Devine's statements from defamation to a possible constitutional violation.

For the reasons stated above, the court finds that Patterson has adequately pleaded a § 1983 claim for deprivation of procedural due process under the Fifth and Fourteenth Amendments against all individual defendants. Defendants' motion to dismiss Count I is denied in its entirety.

**B.**     **Count II – §1983 Claim for False Imprisonment**

In Count II Patterson advances a claim for false imprisonment under § 1983, arguing that his continued imprisonment without probable cause for nearly 17 years – from interrogation to conviction to exoneration – violated his Fourth Amendment right to be free from unreasonable seizures. Though Justice Ginsburg championed this "continuing seizure" theory in her concurring opinion in *Albright v. Oliver*, 510 U.S. 266, 279 (1994), the approach has never gained traction in the Supreme Court or this circuit. The Seventh Circuit has held repeatedly that § 1983 claims for false imprisonment (and false arrest) may be based only on unlawful arrests and/or detentions occurring up to the point of arraignment. *See, e.g., Wiley*, 361 F.3d at 998 (7th Cir. 2004) (expressly rejecting "continuing seizure" approach); *Lee v. City of Chicago*, 330 F.3d 456, 463-64 (7th Cir. 2003) (same). This is because "[o]nce [a

criminal defendant is] arraigned, the prosecution is underway," *Wiley*, 361 F.3d at 998,

and while the Fourth Amendment protects against seizure without probable cause, it

does not protect against prosecution without probable cause, *Newsome I*, 256 F.3d at

750. Thus, the prevailing rule in this circuit is that existence of probable cause for an

arrest extinguishes any potential claim under § 1983 for false arrest or false

imprisonment. *Jones v. Webb*, 45 F.3d 178, 183 (7th Cir. 1995).

That said, dicta from the Seventh Circuit's recent decision in *Gauger* suggests

that the vitality of the "continuing seizure" approach to § 1983 actions based on the

Fourth Amendment is ripe for reconsideration after *Newsome I*. In *Gauger* the court

opined, "When a defendant is arrested and jailed on the basis of probable cause to

believe that he has committed a crime, and only later does police fraud enter the

picture with the effect of perpetuating the seizure without good cause, there is a

question not as yet authoritatively resolved whether the Fourth Amendment has been

violated." 349 F.3d at 359.[5] The facts here present an even stronger case for revisiting

the continuing seizure doctrine. Unlike in *Gauger*, where the criminal defendant was

arrested without probable cause but additional circumstantial evidence gathered at the

scene enabled detectives to provoke a confession from the defendant, Patterson was

arrested on a warrant for an unrelated crime and the Area 2 defendants allegedly used

torture and obstruction of the criminal investigation to fabricate evidence and frame

---

[5] The court admits to some confusion after reading this part of the Seventh
Circuit's opinion in *Gauger* since other cases decided just before (*Lee*) and after
(*Wiley*) *Gauger* seem, at least from this court's view, to hold authoritatively that the
continuing seizure doctrine is not viable.

Patterson for the Sanchez murders. Where the defendant in *Gauger* could rely on the Fourth Amendment to redress his unlawful arrest and suppress his subsequent involuntary confession, Patterson's § 1983 claim based on the Fourth Amendment is foreclosed because he was arrested on a valid, though unrelated, warrant. The Seventh Circuit is sensitive to the problem its approach has created. As the *Gauger* court stated, "[I]t is shocking to think that a police frame-up which lands a person on death row is not a constitutional tort, though every false arrest made without probable cause is." 349 F.3d at 359. This court, were it free to decide this motion in a way it believes would be conducive to the development of the law, would deny the motion and assess the claim at a later time on a fuller factual record. As the law exists today in this circuit, however, it has no such freedom. Patterson's § 1983 claim for false imprisonment cannot stand and defendants' motion to dismiss Count II is granted.

## C. Count III – § 1983 Claim for Coercive Investigation and Count IIIA – § 1983 Claim for Torture and Physical Abuse

Counts III and IIIA accuse defendants Burge, Byrne, Pienta, Marley, Pedersen, Madigan, McWeeny, Troy, and Lacy of using torture and excessive physical abuse to coerce Patterson to confess to the Sanchez murders in violation of his Fifth, Fourth, and Fourteenth Amendment rights. Specifically, Count III charges a violation of Patterson's right to be free from self-incrimination and Count IIIA charges a violation of his right to be free from unreasonable seizures. Defendants argue that these claims are time-barred as Patterson's alleged injuries accrued at the time of his interrogation. For civil rights claims brought under § 1983, state law determines the limitations

period and federal law governs when the claims accrue. *Wilson v. Garcia,* 471 U.S. 261, 280 (1985); *Wilson v. Giesen,* 956 F.2d 738, 740 (7th Cir. 1992). Thus, Patterson's § 1983 claims are subject to a two-year statute of limitations under Illinois law, *Gonzalez v. Entress,* 133 F.3d 551, 554 (7th Cir. 1998), and their accrual is governed by *Heck v. Humphrey,* 512 U.S. 477 (1994). Given the two-year limitations period and Patterson's allegation that he was arrested and interrogated in April of 1986, defendant's statute of limitations defense is ripe for review.

*Heck* holds that a damages claim which "necessarily demonstrates the invalidity of [a] conviction," 512 U.S. at 481-82, cannot be brought while the conviction stands. *See Gonzalez,* 133 F.3d at 552; *Gauger,* 349 F.3d at 360; *Wiley,* 361 F.3d at 996. Defendants urge the court to read *Heck* and its progeny as inapplicable to Fourth Amendment claims except in cases where the conviction rests *entirely* on fruits of the illegal arrest or seizure. From defendants' perspective, in any case where even a single additional piece of evidence supports the conviction, evidence improperly obtained as a result of a Fourth Amendment violation cannot be said to *necessarily* impugn the conviction, and the Fourth Amendment claim accrues at the time of the violation rather than when the conviction is nullified. But this interpretation of *Heck* was advanced and rejected by the Seventh Circuit in both *Gauger,* 349 F.3d at 361 ("not always but sometimes a successful challenge to a false arrest can indeed impugn the validity of the plaintiff's conviction"), and *Wiley,* 361 F.3d at 997 ("this general

approach must not be understood as a rule to be applied in every case . . . *Heck* may in fact occasionally bar a civil rights claim premised on" a Fourth Amendment violation).

In arguing that, despite *Heck,* the statute of limitations requires dismissal, defendants merge Patterson's Fifth Amendment claim in Count III for coercive interrogation with his Fourth Amendment claim in Count IIIA for torture and excessive force. Though the two claims share allegations of abuse and torture, they must be analyzed slightly differently in determining whether they survive the motion to dismiss. With respect to Patterson's allegation that his confession was involuntary, it is well settled that a conviction that is based on a false confession coerced by torture violates due process. *Brown v. Mississippi*, 297 U.S. 278 (1936). However, a coerced confession is subject to harmless error analysis, *Arizona v. Fulminante*, 499 U.S. 279, 303 (1991), and so *Heck* does not automatically toll the limitations period in every case where an involuntary confession was used to obtain a conviction. *See Simmons v. O'Brien,* 77 F.3d 1093, 1095 (8th Cir. 1996). Likewise, though it is possible that conduct of police officers that would violate the Fourth Amendment, such as planting evidence during a search or using excessive force to effectuate an arrest, might impugn the validity of a conviction, it is not always, or even usually, so. *See Gonzalez*, 133 F.3d at 553 (collecting cases).

Applying *Heck* to the facts of this case, the court concludes that Patterson's claims in Counts III and IIIA are timely. Patterson's complaint alleges that the only evidence used at trial to convict him for the Sanchez murders were his involuntary and

fabricated confession and the coerced and fabricated testimony of one other person, Marva Hall. There was no physical evidence linking him to the crime and no testimony other than Hall's and defendants' implicating him in the murders. Though defendants insist that Hall's testimony alone was enough to convict Patterson, he alleges that her testimony was procured by defendants' intimidation and that she recanted that testimony more than once. Moreover, the allegations of torture and abuse contained in Count IIIA are inextricably intertwined with the allegations of coercion in Count III which produced the critical evidence – a fabricated and involuntary confession – used to convict Patterson. *See Fulminante*, 499 U.S. at 287 ("the defendant's own confession is probably the most probative and damaging evidence that can be admitted against him") (White, J., dissenting in part).

Since Patterson's conviction rested almost entirely on his involuntary confession, and at most on his involuntary confession plus the coerced testimony of a 16 year-old girl, the court concludes that Patterson could not have challenged defendants' act of torturing him and fabricating his confession without necessarily implying the invalidity of his conviction. Under *Heck*, Patterson's § 1983 claims for coercive interrogation and torture did not accrue until his conviction was overturned in January of 2003. Since Patterson filed this suit on June 26, 2003, his claims in Counts III and IIIA are timely. Defendants' motion to dismiss Counts III and IIIA is denied.

**D.**     **Count IV – § 1983 Claim for Deprivation of Access to Courts**

Patterson's claim in Count IV alleges that defendants' obstruction of justice and suppression of evidence violated his right of access to courts guaranteed by the Fifth

and Fourteenth Amendments. There are essentially two categories of right of access claims: first are claims that systemic official action frustrates a plaintiff in preparing and filing suits at the present time; second are claims that official acts claimed to have denied access may have caused the loss or inadequate settlement of a meritorious case. *Christopher v. Harbury*, 536 U.S. 403, 413-14. (2002). In this case Patterson's allegations that defendants obstructed his criminal investigation and withheld exculpatory evidence necessary for him to pursue his constitutional claims in court belong in the second category. Defendants maintain that their actions did not deny Patterson access to the courts during his prosecution or after his conviction, and that even if the court were to find otherwise, the claim should be dismissed because Patterson fails to plead sufficiently the allegations underlying his right of access claim.

A right of access claim provides relief only to plaintiffs who can establish that they have been denied "adequate legal redress" for a predicate constitutional violation. *Harbury*, 536 U.S. at 419. In the context of an access claim, "adequate legal redress" means a full and fair opportunity to achieve relief on the underlying constitutional violation; it is not a guarantee of prompt and successful resolution of legal claims. For example, conspiracies to destroy or cover-up evidence of a crime that render a plaintiff's judicial remedies wholly inadequate or ineffective violate the right of access. *Bell v. Milwaukee*, 746 F.2d 1205, 1261 (7th Cir. 1984) ("The cover-up and resistance of the investigating police officers rendered hollow [the plaintiffs'] right to seek redress."). But where a plaintiff's predicate claim is merely *delayed* due to government misconduct, and the access claim can provide no more relief than can be achieved by

-33-

bringing the predicate claim, the access claim cannot lie. *Harbury*, 536 U.S. at 414-15 ("Whether an access claim turns on a litigating opportunity yet to be gained or an opportunity already lost, the very point of recognizing any access claim is to provide some effective vindication for a separate and distinct right to seek judicial relief for some wrong."). Thus, a complaint asserting an access to courts claim should state the underlying claim as if it was being independently pursued, and "should describe any remedy available under the access claim and presently unique to it." *Id.* at 417-18.

The allegations contained in Patterson's right of access claim are deficient, for they do not plead a short and plain statement of the underlying claims and do not establish that Patterson has been denied adequate legal redress for any legitimate claim. Count IV merely accuses defendants of obstructing the investigation and suppressing evidence necessary for Patterson to vindicate his constitutional rights in court without explaining how this conduct denied him his right to seek judicial redress. In another case this deficiency in pleading might be cured, but in this case it cannot. As explained above, Patterson's claims that he was denied his right to a fair trial, his right to be free from self-incrimination, and his right not to be tortured while in custody (unreasonably seized) are actionable (though the second two did not accrue until his conviction was overturned), and his Fourth Amendment claim for false imprisonment fails as a matter of law because he was arrested pursuant to a valid warrant, not simply because it might be time-barred. This means that even if Patterson's right of access claim was pleaded properly, he cannot assert that he was denied in the past any legitimate legal remedy that is not still available to him through

his remaining § 1983 claims. When the claim is right of access, justice delayed is not the equivalent of justice denied. Defendants' motion to dismiss Count IV is granted.

### E.    Counts V & VI – § 1983 *Monell* Claims

In Counts V and VI Patterson claims that all of the individual defendants' wrongful actions – including the institution, continuation, and suppression of a pattern and practice of torture, abuse, and wrongful prosecutions – were undertaken "pursuant to one or more interrelated *de facto* policies, practices and/or customs" of defendants City of Chicago, Cook County, and the Cook County State's Attorney's Office. Governmental entities are susceptible to suit under § 1983 "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts" constitutional injury. *Monell v. Dep't of Social Svcs.*, 436 U.S. 658, 695 (1978). A § 1983 *Monell* claim against a governmental entity will not lie, however, without a finding that at least one of its individual employees committed a constitutional tort. *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986).

The City of Chicago, Cook County, and Cook County State's Attorney's Office seek to dismiss the *Monell* claims against them for different reasons. The City of Chicago argues that since none of Patterson's § 1983 claims against the individual police officer defendants are actionable, his *Monell* claim against the City is without basis. This argument could prevail only if the court dismissed *all* of Patterson's § 1983 claims against the individual defendants, which the court has not done. Counts I, III,

and IIIA properly allege individual constitutional violations under § 1983, and Count V alleges that the misconduct of the individual defendants which caused Patterson's constitutional injury was undertaken pursuant to City policy. Thus, Patterson's *Monell* claim against the City of Chicago is sufficiently pleaded and defendant City of Chicago's motion to dismiss Count V is denied.

Next, Cook County argues that the court must dismiss the *Monell* claim against it because none of the individual defendants are under its control and it therefore cannot be held liable for their constitutional violations. Since the City employs all but three of the individual defendants, at issue here is whether SAO defendants Devine, Troy, and Lacy are state officials or Cook County officials. Patterson concedes that the Illinois Supreme Court has held state's attorneys to be state officials, *Ingemunson v. Hedges*, 549 N.E.2d 1269, 1271 (Ill. 1990), and that the Seventh Circuit has applied *Ingemunson* in subsequent *Monell* cases to find counties not liable for misconduct arising out of county state's attorney's offices, *see, e.g., Ryan v. County of DuPage*, 45 F.3d 1090, 1092 (7th Cir. 1995). Nevertheless, he insists that this court should "conduct its own evaluation of Illinois statutory and decisional law in the context" of this case and draw a different conclusion. In light of ample precedent concluding that state's attorneys are state officials and not county employees, *see, e.g., Garcia v. City of Chicago*, 24 F.3d 966, 969 (7th Cir. 1994), *Buckley v. County of Dupage*, No. 88 C 1939, 1996 U.S. Dist. LEXIS 162, at *24 (N.D. Ill. Jan. 9, 1996) (finding it "well established that the State's Attorney is a member of the executive branch and acts as

a state, rather than a county, officer"), the court is convinced that it need not break new legal ground on this issue. Because Cook County was not responsible for the actions of SAO defendants Devine, Troy, and Lacy, it cannot be sued for damages under *Monell*.

Finally, the Cook County State's Attorney's Office contends that the *Monell* claim against it must be dismissed because the Eleventh Amendment prohibits private litigants from suing the state or its agencies, such as the State's Attorney's Office, for damages. *See Garcia*, 24 F.3d at 969; *Hernandez v. Joliet Police Dep't*, 197 F.3d 256, 265 (7th Cir. 1999) (upholding award of sanctions against plaintiff for overlooking an obvious point of law – that the Eleventh Amendment bars suits against State's Attorney's Office – in filing suit against Will County State's Attorney's Office). Patterson offers no persuasive reason why this rule of law should not be applied here to bar his *Monell* claim against the Cook County State's Attorney's Office. Defendants Cook County's and the Cook County State's Attorney's Office's motion to dismiss Count VI is granted.

## F.   Count VII – IL False Imprisonment

In Count VII Patterson asserts a claim for false imprisonment under state law, which defendants contend is neither actionable nor timely. The tort of false imprisonment in Illinois consists of an unreasonable restraint of an individual's liberty, against his will, caused by the defendant without probable cause. *Meerbrey v. Marshall Field & Co.*, 564 N.E.2d 1222, 1231 (1990). As with federal law, in Illinois

the existence of probable cause to arrest defeats any claim for false arrest or false imprisonment. *Aboufariss v. City of De Kalb*, 713 N.E.2d 804, 809 (Ill. App. Ct. 1999); *Kincaid v. Ames Dept. Stores, Inc.*, 670 N.E.2d 1103, 1109 (Ill. App. Ct. 1996). Since Patterson does not dispute that he was arrested on a valid warrant supported by probable cause, he cannot pursue his state law claim for false imprisonment. Defendants' motion to dismiss Count VII is granted.

## G.     Count VIII – IL Malicious Prosecution

Patterson names all individual defendants in his state law claim for malicious prosecution, alleging that they "individually, jointly, and in conspiracy, initiated and continued a malicious prosecution without probable cause against Plaintiff." To state a claim for malicious prosecution under Illinois law, a plaintiff must plead: "(1) the commencement or continuance of an original criminal or civil judicial proceeding by the defendant; (2) the termination of the proceedings in favor of the plaintiff; (3) the absence of probable cause for such proceeding; (4) the presence of malice; and (5) damages resulting to the plaintiff." *Ritchey v. Maksin*, 376 N.E.2d 991, 993 (Ill. 1978). Importantly, the plaintiff must also "attribute the legal causation of the original criminal action against the plaintiff to defendants." *Geisberger v. Vella*, 379 N.E.2d 947, 948 (Ill. App. Ct. 1978) (affirming dismissal of claim for malicious prosecution where plaintiff did not sufficiently allege legal causation of original action to the defendants). If no logical connection can be drawn between the defendant's actions and the plaintiff's prosecution, then the malicious prosecution fails as a matter of law. *See*

-38-

the plaintiff's prosecution, then the malicious prosecution fails as a matter of law. *See Joiner v. Benton Community Bank*, 411 N.E.2d 229, 232 (Ill. 1980).

### 1. Defendants Martin, Shines, Hillard, and Needham

Defendants Martin, Shines, Hillard, and Needham argue that there are insufficient allegations in the complaint to support a finding that they were responsible for commencing or continuing any criminal proceedings against Patterson. In particular, they argue that they cannot be found to have been involved in the malicious prosecution because they did not assume their respective positions until after Patterson's arrest and conviction. However, actions by government officials which influence a plaintiff's post-conviction proceedings are not immune from suit. *Houston*, 978 F.2d at 368 (finding prosecutors' actions during plaintiff's post-conviction proceedings actionable as constitutional violation); *Newsome v. James*, 968 F. Supp. 1318, 1322 (N.D. Ill. 1997) (finding actionable malicious prosecution claim covering actions taken between time of plaintiff's arrest and acquittal). The question before the court is whether Patterson's allegations that Martin, Shines, Hillard, and Needham suppressed and altered exculpatory information in an investigative report concerning accusations of torture and abuse by Area 2 police officers, including the defendants in this case, establish that they caused or continued Patterson's prosecution.

The court will dismiss the malicious prosecution claim against Martin, Shines, Hillard, and Needham only if it is clear from the pleadings that Patterson's prosecution would have continued without their involvement. *Cervantes v. Jones*, 23 F. Supp. 2d

885, 889 (N.D. Ill 1998) (granting summary judgment for police chief on malicious prosecution claim where it was clear from the evidence that prosecuting attorney would have initiated charges without police chief's involvement). Although legal causation generally is attributed to the filing of a complaint, a defendant who was not initially a party to an action may be found to have commenced or continued the original action if he actively participated in the proceedings. *Frye v. O'Neill*, 520 N.E.2d 1233, 1240 (Ill. App. Ct. 1988) (stating that liability for malicious prosecution "is not confined to situation where the defendant signed a complaint against the plaintiff. Rather, liability extends to all persons who played a significant role in causing the prosecution."). Here Patterson asserts that Martin's, Shines's, Hillard's, and Needham's participation in suppressing exculpatory evidence and falsifying the findings of the investigation into police misconduct was active conduct that had a causal effect on the continuation of the proceedings against him. The court agrees.

Patterson's complaint alleges that Martin, Shines, Hillard, and Needham suppressed exculpatory evidence from prosecutors, judges, and defense counsel during Patterson's post-conviction proceedings that was pivotal to Patterson's attempts to obtain post-conviction relief. Specifically, he claims that Martin "delayed, obstructed, and otherwise undermined the OPS investigation, report, findings and conclusions; that Shines "suppressed findings of OPS investigators that . . . Area 2 detectives . . . tortured and abused six suspects . . . as well as the evidence which supported these findings"; and that Hillard and Needham obstructed justice by "overturning the OPS findings . . . and suppressing these OPS files." Further, Patterson alleges that the

findings contained in the altered OPS report were highly influential in the state's decision to continue the case against Patterson on the appellate level. Reading the complaint in the light most favorable to Patterson, it is reasonable to infer from these allegations that Martin, Shines, Hillard, and Needham were responsible for continuing the malicious prosecution against him.

### 2. *SAO defendants Troy and Lacy*

Troy and Lacy argue that they are absolutely immune from suit for Patterson's malicious prosecution because prosecutorial immunity protects their decision to present and advocate the state's case. As discussed above, a prosecutor is absolutely immune from suit for decisions he makes in evaluating evidence and deciding to initiate charges. *Imbler,* 424 U.S. at 431. In this case however Patterson does not attempt to hold Troy and Lacy accountable for their evaluation of evidence and decision to bring the case against him, but rather for their participation in his coercive interrogation and the fabrication of evidence. These allegations suggest that Troy and Lacy were functioning as investigators rather than prosecutors when they committed the violations which form the basis for Patterson's malicious prosecution claim. *See Buckley,* 509 U.S. at 274. Thus, Troy and Lacy are not entitled to absolute prosecutorial immunity for their actions.

Patterson's complaint states a claim for malicious prosecution under Illinois law against all of the individual defendants. Defendants' motion to dismiss Count VIII is denied.

**H.** **Count IX – IL Intentional Infliction of Emotional Distress (IIED)**

Patterson contends in Count IX that he suffered severe emotional distress as a result of defendants' intentional, extreme, and outrageous acts of torturing, humiliating, framing, wrongfully convicting, and falsely imprisoning him on death row for a crime he did not commit. Defendants do not contest the allegations, but argue only that the claim is untimely because IIED claims accrue on the date when defendants caused the distress. The court disagrees. The weight of case law in this district holds that a claim for IIED arising from malicious prosecution does not accrue until the state criminal proceedings are terminated. *See Hobley,* 2004 WL 1243929, at *9 (collecting cases). Thus, since state tort claims are subject to a one-year limitations period under Illinois law, 745 ILCS 10/8-101, *Booker v. Ward,* 94 F.3d 1052, 1056-57 (7th Cir. 1997), and Patterson filed his complaint within a year of receiving his pardon, his IIED claim is timely. Defendants' motion to dismiss Count IX is denied.

**I.** **Count X – IL Defamation**

The allegations in Count X state that SAO defendants Devine, Byrne, and Troy defamed Patterson by making false public statements implicating him in the Sanchez murders and accusing him of lying under oath about the murders and his torture. Defendant Byrne argues that the claim against him is untimely because defamation actions accrue when the defamatory statement is published, *Schweihs v. Burdick,* 96 F.3d 917, 920 (7th Cir. 1996); *Tom Olesker's Exciting World of Fashion, Inc. v. Dunn & Bradstreet, Inc.,* 334 N.E.2d 160, 164 (Ill. 1975), and Patterson's complaint alleges that Byrne published his statements in December of 1999. Taking this fact as true,

Patterson's defamation claim against Byrne is time-barred as it was brought in June of 2003, well outside the one-year limitations period.

Defendants Devine and Troy invoke their prosecutorial privilege to comment on ongoing state prosecutions as grounds for dismissing the defamation claims against them. Prosecutors in the Illinois State's Attorney's Office have an absolute privilege to comment on issues within the scope of their employment. *Ware v. Carey*, 75 Ill. App. 3d 906, 913 (finding state's attorney immune from a state law suit for defamation based on comments "arising from the performance of his duties"). And because the State's Attorney is the "leader of law enforcement in the community," commenting to the public on criminal cases is within the scope of his employment. *Id.* at 914. Here Patterson accuses Devine and Troy of making defamatory statements concerning his prosecution and pardon. He argues that these comments are not within the scope of their duties because the comments were made in the interest of protecting Devine's former clients rather than in the interest of pursuing Devine's and Troy's duties and obligations to the State. However, Devine's and Troy's personal motivation for commenting is irrelevant. Patterson has not alleged that Devine or Troy made any defamatory comments unrelated to the state's prosecution of him or his subsequent pardon. Accordingly, Devine's and Troy's allegedly defamatory statements are not actionable.

Patterson's defamation claim under Illinois law is untimely with respect to Byrne and cannot be brought against Devine and Troy because their statements are protected by prosecutorial privilege. Defendants' motion to dismiss Count X is granted.

-43-

**J.** **Count XI – IL Conspiracy and § 1983 Conspiracy**

Patterson claims in Count XI that all individual defendants conspired to falsely imprison, maliciously prosecute, defame, and intentionally inflict emotional distress on him. In addition, in each of his claims for damages under § 1983 Patterson alleges that defendants conspired with each other to violate his constitutional rights. Defendants argue that the conspiracy allegations are untimely and otherwise infirm. Both arguments are without merit. First, Patterson's conspiracy claims are based on his underlying state tort law and federal § 1983 claims and their accrual is determined by the same analysis that applies to each individual claim. *Hobley*, 2004 WL 1243929, at *8; *Castillo v. Zuniga*, No. 01-616, 2002 WL 398519, at *10 (N.D. Ill. Mar. 14, 2002). Thus, Patterson's conspiracy claims based on Counts I (right to fair trial), III (coercive interrogation), IIIA (torture and excessive force), V (*Monell* claim against the City of Chicago), VIII (malicious prosecution), and IX (IIED) are timely for the same reasons as are the underlying claims.[6]

Second, Patterson has sufficiently pleaded claims for conspiracy under federal and state law. To state a claim for conspiracy Patterson must "indicate the parties, general purpose, and approximate date, so that defendant has notice of what he is charged with." *Walker*, 288 F.3d at 1007. Federal notice pleading rules do not require

---

[6] The court has dismissed Counts II (§ 1983 false imprisonment), IV (access to courts), VI (*Monell* claim against Cook County and Cook County State's Attorney's Office), VII (IL false imprisonment), and Count X (defamation), so Patterson's conspiracy claim cannot be based on these underlying actions no matter when the claims accrued.

him to provide direct evidence of the agreement between the conspirators or of the overt acts performed in furtherance of the conspiracy. In Count XI and in ¶60-63 Patterson identifies each individual defendant as part of the conspiracy and alleges that they agreed to violate his constitutional and state law rights and committed overt acts in furtherance of this agreement. He also describes defendants' alleged efforts to torture and abuse him and others; fabricate and conceal material evidence used to convict him; testify falsely and lie to prosecutors, judges, and defense counsel about the torture and fabrication of evidence against him; and suppress all of these actions throughout his trial and post-conviction proceedings until the day he was pardoned. Patterson's assertions are more than adequate to place defendants on notice of the charges against them. Defendants' motion to dismiss Count XI is denied.

**K.      Count XII – IL Respondeat Superior and Count XIII – 745 ILCS 10/9-102**

In Counts XII and XIII (mislabeled as a duplicate Count XII in the complaint) Patterson seeks to hold defendants City of Chicago, Cook County, and the Cook County State's Attorney's Office accountable for the violations of federal constitutional and state tort law committed by their employees, the individual defendants, under color of office. Defendants' only argument for dismissing these two claims is that the City of Chicago, Cook County, and the Cook County State's Attorney's Office cannot be held liable as employers where none of Patterson's allegations state a colorable claim under state law against any of the individual defendants. As fully explained herein, Patterson has stated claims for malicious prosecution, IIED, and conspiracy against each of the individual defendants. This means that defendants City of Chicago and

Cook County State's Attorney's Office, as employers of the individual defendants, may be held liable for actions committed by their employees in the scope of employment. Defendant Cook County, though not an employer of any individual defendant for purposes of *respondeat superior* liability (see subsection E, *supra*, at 36-37), nevertheless may be required to pay judgments entered against county officials in their official capacities. *See Robinson v. Sappington*, 351 F.3d 317, 339 (7th Cir. 2003); *Pucinski v. Cook County*, 737 N.E.2d 225, 228 (Ill. 2000). Thus, the *respondeat superior* claim in Count XII is dismissed as to defendant Cook County, but remains as to the City of Chicago and the Cook County State's Attorney's Office; and since all three defendants may be required to pay damages on behalf of their employees under Illinois law, defendants' motion to dismiss Count XIII is denied in its entirety.

## III. CONCLUSION

Defendants' motions to dismiss are ***granted*** with respect to Count II (§ 1983 false imprisonment), Count IV (§ 1983 access to courts), Count VI (§ 1983 *Monell* claim against Cook County and Cook County State's Attorney's Office), Count VII (IL false imprisonment), and Count X (IL defamation). Count XII (IL *respondeat superior*) is dismissed as against Cook County only.

Defendants' motions to dismiss are ***denied*** with respect to Count I (§ 1983 right to fair trial), Count III (§ 1983 coercive interrogation), Count IIIA (§ 1983 torture and excessive force), Count V (§ 1983 *Monell* claim against the City of Chicago), Count VIII (IL malicious prosecution), Count IX (IL IIED), Count XI (IL conspiracy), Count XII (IL

-46-

*respondeat superior*) as against the City of Chicago and the Cook County State's Attorney's Office, and Count XIII (745 ILCS 10/9-102).

Defendant Troy's separately filed motion to dismiss based on collateral estoppel is denied.

Defendants shall answer Patterson's complaint on or before September 7, 2004.

ENTER ORDER:

_____
Joan B. Gottschall
United States District Judge

DATED: August 5, 2004