UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

AARON PATTERSON,

**FILED**

Plaintiff,

JAN 2 0 2005

No.    03 C 4433

vs.

JUDGE JOAN B. GOTTSCHALL
United States District Court Judge Gottschall

Former Chicago Police Lt. JON BURGE,          )
The City of Chicago, et. al.,                 )
                                              )
          Defendants.                         )

## PLAINTIFF'S RESPONSE TO DEFENDANT CITY'S MOTION TO "BAR DISCOVERY AND TRIAL ON THE *MONELL* CLAIMS AGAINST IT"

The City, having previously failed to convince the Court to "structure" discovery by deferring *Monell* discovery until the end of the discovery process, now, some 14 months later, after a wealth of *Monell* related discovery has been obtained, re-clothe their long standing obligation to satisfy any judgment against the Defendants under 745 ILCS 10/9-102 in a unilateral "stipulation" that purportedly provides the basis for "bar[ring] discovery and trial on the *Monell* claims against it." This bald attempt to nullify Plaintiff's *Monell* claims by offering to "stipulate" to an indemnification that it is already required to provide flies in the face of the direct cause of action against the municipality which is provided by *Monell* itself, and undermines an important component of a § 1983 remedy - - - deterrence of unconstitutional conduct by municipalities and the reformation of unconstitutional policies and practices of the municipality and its policy makers.

Particularly here, where the related policies and practices alleged are so egregious, longstanding, and continuing, the City, who has admitted to the heart of these allegations in prior proceedings, should not be permitted to evade liability for these policies and practices by facilely offering a woefully insufficient "stipulation" rather than an admission of wrongdoing. Moreover, the proposed "stipulation," if accepted by the Court, raises numerous complicating issues with regard to the City's status, role, rights, and obligations during discovery, trial, and

1

appeal, and would trample on the Plaintiff's right to be the "master" of his case and to seek and obtain, in one unified trial, liability against any and all Defendants, jointly and severally, who do not judicially concede their wrongdoing. For these and the related reasons more fully discussed below, the City's Motion to Bar must be denied.

I.     **History of the *Monell* Proceedings**

On June 23, 2003, Plaintiff Aaron Patterson brought suit, alleging that he was repeatedly tortured and physically abused by a contingent of Area 2 detectives, under the supervision and with the participation of supervisors Jon Burge and John Byrne, and that as a direct result of that torture, he was charged, convicted and sentenced to death for crimes he did not commit. He further alleged that his prosecution and confinement was continued, in part, by the actions and inactions of City of Chicago and Cook County policymakers, including former police Superintendents Leroy Martin and Terry Hillard, former Office of Professional Standards Director Gayle Shines, and Cook County States Attorney Richard Devine. Additionally, he alleged that his injuries were caused by longstanding unconstitutional and illegal *de facto* policies, practices and customs of the City of Chicago and its Police Department, including:

- Using physical coercion, including torture, during interrogations in order to obtain confessions and wrongful convictions, at Area 2 and 3, under the supervision of Defendants Burge and Byrne;
- Fabricating confessions, filing false reports, giving false statements and testimony, and suppressing evidence concerning interrogations conducted and confessions obtained by torture and coercion, pursuing and obtaining wrongful prosecutions on the basis of confessions obtained during these interrogations, and covering up the true nature of said interrogations and confessions, at Area 2 and 3, under the supervision of Burge and Byrne;
- The police code of silence in cases where officers engaged in police torture and other unconstitutional and coercive interrogations at Area 2 and Area 3 under Burge and Byrne.

Plaintiff's Complaint, ¶¶ 77 (a), (b), and (e). Additionally, Plaintiff alleged:

The pattern and practice of torture and abuse at Area 2, the cover-up of said abuse and the wrongful prosecutions and convictions which resulted therefrom, were well known within Area 2 including by the Commanders, which included Leroy Martin, as well as to the successive Superintendents, including Martin and Hillard, and to the successive Directors of OPS, including Shines, the Chiefs of Detectives, including Hillard, and to other policy making, command, and supervisory personnel, who participated in the cover-up and suppression of evidence and the wrongful prosecution and conviction of the Plaintiff and other torture victims.

Plaintiff's Complaint, ¶78.

On October 27, 2003, the City moved to "structure discovery" by staying all *Monell* discovery until discovery on the underlying claims was completed. In so moving, the City grounded its motion on the same propositions that they assert here:

> Should the individual defendants current or formerly employed by the City be liable for a constitutional violation, the City is obligated to indemnify them (by virtue of both its contract with the Fraternal Order of Police and 745 ILCS 10/9-102) by paying any judgement for compensatory damages for acts committed in the scope of their employment. Additionally, in the event plaintiff was awarded compensatory damages against the officers, he would not be entitled to recover additional compensatory damages even if he prevailed on his policy claim against the City.

City's Motion to Structure Discovery, p. 5, Docket # 131.

This Court denied the City's Motion from the bench without further briefing. Minute Order of 10/31/03, Docket # 132. The case then proceeded with discovery and to resolution of the voluminous motions to dismiss. In neither of the extensive motions to dismiss filed by the City did it seek to obtain dismissal of the *Monell* claims on the basis asserted here. In fact, the City conceded the legal sufficiency of the *Monell* claims against it, choosing instead to unsuccessfully argue that if the underlying claims were dismissed, so too should the *Monell* claims.

In the past year, the City has produced over 100 boxes of documents for inspection, which contain approximately 250,000 pages of documents. Conversely, the Plaintiff has produced 25 boxes of documents, containing about 40,000 pages of transcripts and documents. The vast majority of these materials are pertinent to Plaintiff's Area 2 *Monell* claims, as set forth above. Additionally, after *Monell* discovery in the four torture cases was consolidated, nearly thirty consolidated depositions have been taken of Area 2 Defendants and fellow supervisors and detectives. A substantial potion of each deposition has been devoted to questions concerning the numerous individual Area 2 torture cases that comprise the pattern alleged in the *Monell* claim, as well as direct questions concerning the existence of the alleged practices of torture, fabrication, and continuing coverup at Area 2. Additionally, Plaintiff's counsel has done extensive investigation, taking statements from seven additional torture victims and from five African-American Area 2 detectives who broke the code of silence. The majority of what

remains to be done in order to complete *Monell* discovery consists of motions to compel withheld torture documents and the depositions of several policymaking Defendants and other related witnesses.

Plaintiff has already amassed a compelling body of uncontested evidence in support of his interrelated policy and practice claims that includes prior judicial admissions by the City and by the detectives who have broken the code of silence. This evidence, most of which has been discovered and/or developed during the past year of discovery, includes the following:

- Repeated binding admissions by the City's and Superintendent Martin's lawyers in the Burge Police Board hearings, that the evidence established:
    - an "astounding pattern or plan . . . to torture certain suspects, often with substantial criminal records, into confessing to crimes or to condone such activity;"
    - a "pattern of almost identical acts of torture directed towards persons suspected of violent crimes;"
    - that Burge and his men "generally engaged in these similar practices," and
    - that they used "methods of torture through electric shock, bagging, and holding a gun to a suspect's head" which "establishes a pattern of and plan to torture these suspects in these similar ways to elicit confessions to violent crimes;"[1]
- Findings made by the City's OPS in 1990 that there was systemic torture under Burge at Area 2, and various subsequent findings by OPS investigators and judicial admissions by the City that from 1973 to 1985 fourteen suspects were tortured and abused by Burge, Byrne and his men in pursuit of confessions; [2]
- The sworn statements of five Area 2 African-American detectives that torture and abuse under Burge and Byrne was an "open secret," that one walked in on a torture scene, that two saw what they thought was Burge's torture box, that several overheard screams coming from the interrogation rooms, that they all heard detectives at Area 2 discuss the abuse, that one heard it described as the "Vietnam treatment," and that several felt they were ostracized because they did not participate in the abuse;[3]

---

[1] See, Superintendent's Memorandum In Opposition, filed on January 22, 1992 in the *Matter of Charges Filed against Respondents Jon Burge, et. al.,* 1856-58, pp. 1, 17, 22, 28, attached hereto, in pertinent part as Exhibit A.

[2] See, OPS Special Project Conclusion Reports and Findings, November 2, 1990 (Goldston Report), attached in pertinent part as Exhibit B; OPS investigators' findings in CR #'s 188617, 134723, 142201, 126802, 203390, and 142217; and Memorandum in Opposition, attached as Exhibit A..

[3] See the following sworn statements: Doris Byrd, dated November 9, 2004; William Parker, dated October 4, 2004; Sammy Lacey, dated October 12, 2004; and Walter Young, dated November 2, 2004; and the affidavit of Melvin Duncan, dated May 20, 2004.

- The negative inferences that can be drawn from the invocation of the Fifth Amendment at their consolidated depositions by Burge, Byrne, and some 25 other Area 2 detectives and supervisors, on all questions concerning their involvement in the numerous documented acts of torture, as well as to whether there were patterns and practices of torture, fabrication of evidence, and the code of silence at Area 2 and 3;
- Police documents, suppressed by the City for many years, which show that in 1984, the OPS Director informed the Superintendent of 11 cases of electric shock that had arisen during the previous year, and which included the Orange and Cannon cases;[4]
- Admissions, both in notes and in public testimony before the City Council, by Superintendent Martin, that a code of silence existed within the Police Department;[5]
- A 2002 recommendation by the Mayor's Chief of Staff that the City sue, rather than defend, Burge, and the rejection of that proposal by the Corporation Counsel and her Assistant;[6]
- The existence of more than 100 separate known victims of alleged torture and abuse at Area 2 and Area 3 under Burge and Byrne.[7]

Now, some fourteen months and thousands of attorneys hours later, the City, in an obvious attempt to avoid impending liability, has moved to "bar" the remaining *Monell* discovery, and trial on the *Monell* claims against it by unilaterally "stipulating" to what they are already required to do under 745 ILCS 10/9-102 and the FOP contract - - - indemnify the officer for any compensatory damages that are imposed against them. In this "stipulation," the City denies liability under *Monell* by denying the existence of any and all of the policies, practices and customs alleged, by denying causation, and by denying the "requisite degree of culpability," while offering the following contingent waiver if a constitutional violation is found against the individual Defendants:[8]

The City specifically waives its right under *Monell* . . . not to be held liable for damages

---

[4] See documents attached as Group Exhibit B, and as Exhibits I, J, and K to Plaintiff's Response to City of Chicago's Motion to Bar the Consolidated Depositions of Richard M. Daley, et. al.

[5] See, e.g. 10/10/89 testimony of Leroy Martin before the City Council, pp. 368-69, attached as Exhibit Y to Plaintiff's Response to City's Motion to Bar the Depositions of Richard M. Daley, et. al.

[6] See e-mails, Georges to Givens, Given to Georges, 1/10/02, attached as Sealed Exhibit A to "Plaintiff's Response to City's Motion to Bar the Depositions of Richard M. Daley, et. al.

[7] See listing of cases known to Plaintiff's counsel, attached hereto as Exhibit C.

[8] While the "Stipulation," says "City employees," (see "Stipulation," ¶5) the City repeatedly limits it to the individual Defendants in its Motion. See Motion to Bar, pp. 2, 5.

under § 1983 without proof that the city by its policy, custom or practice, and with the requisite degree of culpability, caused the alleged constitutional violation.

Proposed "Stipulation," ¶¶ 4, 5. Additionally, the City purports to reserve "any defense it may have to the claims in this case except as specifically stated above," and to "retain the right to move to alter or amend any judgment, move for judgment as a matter of law reversing said judgment, appeal, or seek any other post-trial relief from said judgment based on any grounds not inconsistent with this stipulation." *Id.*, ¶6 .

## II.    The City's "Stipulation" has no Legal Force or Effect and Offers Nothing More Than What the Statute Already Provides.

The City's unilateral "stipulation" and "waiver" carries no legal force and can not be foisted on an unwilling plaintiff. *See, e.g., United States v. Williams*, 238 F.3d 871, 875-76 (7th Cir. 2001); *J.F. Edwards Const. Co. v. Anderson Safeway*, 542 F. 2d 1318 (7th Cir. 1976); *Identiseal Corp. of Wisc. v. Positive Identification Sys.*, 560 F.2d 298, 302 (7th Cir. 1977). The City has chosen not to file an Amended Answer in which it admits to Plaintiff's *Monell* allegations of policy and practice, causation, and mental state,[9] which would be the only permissible and legally binding way to proceed, absent the Plaintiff's agreement to stipulate.[10] If it had made these admissions, then, after entry of summary judgment against the City, its motion might have merit. In stark contrast, however, the City, just as the parties are about to embark on the final, critical phase of *Monell* discovery,[11] instead attempts to force a "stipulation" and waiver on Plaintiff, a "stipulation" which admits nothing, denies any wrongdoing, and reserves all rights to itself, in a brazen attempt to rob the Plaintiff of his fundamental right to pursue, prove, and prevail, in a unified trial, against the central wrongdoer in this immensely important case.

---

[9]Nor has the City even admitted to color of law or scope of employment, as is alleged in Plaintiff's 745 ILCS 10/9-102 state law claim.

[10]The City's proffered "stipulation" and "waiver" is not a permissible responsive pleading under Fed.R.Civ.P. 7(a). *See Haven v. Polska*, 215 F.3d 727, 732 (7th Cir. 2000) ("No other pleading shall be allowed" under Rule 7).

[11]At the writing of this response, and at the insistence of the various City lawyers invoking the City's motion to bar, the taking of all noticed and consolidated depositions has ground to a halt, from policymaking Defendants and witnesses to FED. R. EVID. 404(b) Area 2 witnesses.

6

Moreover, this "stipulation" is merely an attempt to formalize what the statute already requires in order to re-present the same position which the City unsuccessfully argued in its Motion to Structure Discovery before the parties had embarked on fourteen months of intensive *Monell* related discovery. Plaintiff respectfully rejects the City's offer to "stipulate," choosing instead to be the "master of his complaint and proof,"[12] and to proceed, as is guaranteed by the Supreme Court and 42 U.S.C. §1983, on his independent *Monell* claim against the City. Not only would it be untenable, as a matter of legal and equitable right, to grant the City's motion, but it would also create a myriad of nightmarish litigation possibilities that would turn judicial economy and fairness squarely on its head.

### III. The City's Attempt to Bar Plaintiff's *Monell* Claims Contravenes The Purpose and Intent of § 1983 and § 1988 and the Supreme Court's Establishment, in *Monell*, of a Direct Cause of Action Against Municipalities.

With its unilateral "stipulation," the City attempts, with one broad stroke, to nullify the longstanding § 1983 cause of action against municipalities which was established in 1978 by the Supreme Court in *Monell* in all circumstances where the municipality is obligated, or agrees to, indemnify its agents. To do so in these four notorious torture cases,[13] where the policies, practices, and customs of torture, fabrication and cover-up alleged are so widespread, longstanding, and continuing, and are established, *inter alia*, by proof obtained and developed through over a year of extensive discovery in this case, is particularly offensive to *Monell* and its progeny and would operate to defeat the important deterrent and reformatory component of §1983 where it is most important - - - to directly deter the municipality itself. Moreover, it would also operate to defeat the purpose and intent of §1988, by robbing the Plaintiff of the right

---

[12]The principle that a plaintiff is the master of his complaint is a firmly established one. *See, e.g., Holmes Group, Inc. v. Vornado Air Circulation Systems, Inc.*, 535 U.S. 826, 831 (2002); *Garbie v. Daimler Chrysler Corp.*, 211 F.3d 407, 410 (7th Cir. 2000); *Gilmore v. Southwestern Bell Mobile Systems, Inc.*, 156 F. Supp. 2d 916, 920 (N.D. Ill. 2001) (Hart, J.). The same is true with regard to controlling proof at trial, where, as a general matter, the plaintiff has the right to tell his story with such descriptive richness as he sees fit. *United States v. Williams*, 238 F.3d 871, 875-76 (7th Cir. 2001); *Identiseal Corp. of Wisc. v. Positive Identification Sys.*, 560 F.2d 298, 302 (7th Cir. 1977); *Old Chief v. United States*, 519 U.S. 172, 186-87 (1997).

[13]The City has also filed the same motion in the *Hobley, Orange* and *Hobley* cases.

to seek prevailing party status against the City, and thereby obtaining a fully compensatory attorneys' fee award that would include all the hours expended establishing the existence of the alleged policies.

## A.

In *Monell v. Dept. of Soc. Serv. of New York*, 436 U.S. 658 (1978), the U.S. Supreme Court recognized that plaintiffs may sue municipalities for independent, non-derivative liability whenever they are injured by unconstitutional policies, practices, or customs. *Id.* at 693-701. Significantly, the exact same indemnification was available to the *Monell* plaintiffs as is available here, yet the Supreme Court nonetheless established a §1983 cause of action against municipalities.[14]

Subsequently, in *Owen v. City of Independence*, 445 U.S. 622 (1980), the Supreme Court further underscored the independent nature of a *Monell* claim against a municipality by holding that the City of Independence could be held liable for its unconstitutional policies even when the individual municipal defendants were adjudged to have qualified immunity. In denying a qualified immunity defense to the City, the Supreme Court relied upon the important deterrent effect which is incorporated in a §1983 action, and underscored the special importance such deterrence plays when the defendant is a municipality:

> [§1983] was intended not only to provide compensation to the victims of past abuses, but to serve as a deterrent against future constitutional deprivations....The knowledge that a municipality will be liable for all of its injurious conduct, whether committed in good faith or not, should create an incentive for officials who may harbor doubts about the lawfulness of their intended actions to err on the side of protecting citizens' constitutional rights."

*Owen*, 445 U.S. at 651-52.

In a further pronouncement which prophetically applies here, the Court stated:

---

[14] *See* N.Y. Gen. Mun. § 50-j:"[E]very city, county, town, village authority or agency shall be liable for, and shall assume the liability to the extent that it shall save harmless, any duly appointed police officer . . for any negligent act or tort." Subsequent to the decision, an amendment was added to exempt New York City from the provision.

How "uniquely amiss" it would be, therefore, if the government itself — "the social organ to which all in our society look for the promotion of liberty, justice, fair and equal treatment, and the setting of worthy norms and goals for social conduct" — were permitted to disavow liability for the injury it has begotten. See Adickes v. Kress & Co., 398 U.S. 144, 190 (1970) (opinion of BRENNAN, J.). A damages remedy against the offending party is a vital component of any scheme for vindicating cherished constitutional guarantees, and the importance of assuring its efficacy is only accentuated when the wrongdoer is the institution that has been established to protect the very rights it has transgressed.

*Owen*, 445 U.S. at 650.

In the intervening 25 years since *Monell* and *Owen*, numerous Courts in this District, as well as the Seventh Circuit, have adjudicated *Monell* claims against the City of Chicago, the County of Cook, and other local municipalities, despite the Illinois indemnification statutes and union contracts. This is so because those Courts, either explicitly or implicitly, recognized that the *Monell* claim was not derivative, such as *respondeat superior*, but rather existed as a direct claim against the municipality for its own constitutional deprivations pursuant to policy and practice. For example, in the case of *Jones v. City of Chicago*, 856 F.2d 985 (7th Cir. 1988), the Seventh Circuit first expressly noted that the City had a duty to indemnify any judgments against its officers, stating:

> The City of Chicago is liable to Jones under section 1983 if a custom or policy of the City was a cause of the plaintiff's injury. The issue has little, probably no, practical significance. . . . [S]ince the City indemnifies its employees for damage awards made against them in respect of the torts they commit in the course of their employment, Jones will collect his judgment in full whether or not the City is liable."

*Id.* at 995. After expressly recognizing that Jones' *Monell* claim did not provide him any greater damages or collectibility than did his verdict against the individual Area 2 detectives and supervisors, the Seventh Circuit went on to hold that the City of Chicago's unconstitutional "street files" policy subjected it to liability under *Monell* and upheld a direct *Monell* judgment against it. *Id.* at 995-96. See also, *e.g., Willis v. City of Chicago*, 999 F2d 284 (7th Cir. 1993) (judgment for nominal damages against the City pursuant to an unconstitutional detention policy upheld); *Kincaid v. Rusk*, 670 F.2d 737 (7th Cir. 1982) (nominal damage award for

9

unconstitutional jail policy upheld against Sheriff in his official capacity).

Several other Courts of Appeals have also upheld the principle that *Monell* provides a separate claim against a municipality, even if no additional compensatory damages are obtainable, often while relying on the deterrent component of §1983. In *Amato v. City of Saratoga Springs*, 170 F.3d 311 (2d Cir. 1999), the District Court tried the plaintiff's claims against the individual police officer on a bifurcated basis, reserving for later the plaintiff's policy claim against the City. After the plaintiff obtained only nominal damages in the first trial, the District Court dismissed the municipal policy claim, apparently reasoning that a trial against the City was unnecessary since it could yield no more than the nominal damages already awarded. *Id.* at 316-17. Citing *Carey v. Piphus*, 435 U.S. 247, 317 (1978), the Second Circuit reversed, holding that "a litigant is entitled to an award of nominal damages upon proof of a violation of a substantive constitutional right even in the absence of actual compensable injury." *Amato*, 170 F.3d at 317. Nominal awards, the court emphasized, "can be of great significance to the litigant and to society." *Id.* The court explained that a judgment against a municipality can be a catalyst for change, even when such a judgment does not increase the City's monetary exposure:

> The ability to promote an individual official's "scrupulous observance of the Constitution" is important. *Perhaps even more important to society, however, is the ability to hold a municipality accountable where official policy or custom has resulted in the deprivation of constitutional rights.* A judgment against a municipality not only holds that entity responsible for its actions and inactions, but also can encourage the municipality to reform the patterns and practices that led to constitutional violations, as well as alert the municipality and its citizenry to the issue. In short, a finding against officers in their individual capacities does not serve all the purposes of, and is not the equivalent of, a judgment against the municipality.

*Id.* at 317-19. (Emphasis added).

Similarly, in both *Larez v. City of Los Angeles*, 946 F.2d 630, 640 (9th Cir. 1991) and *Ruvalcaba v. City of Los Angeles*, 167 F.3d 514, 524 (9th Cir.1999), the Ninth Circuit Court of Appeals held that the plaintiffs, after winning the first phase of the bifurcated trial against the individual officers and obtaining damages, could proceed against the City in a second trial, with only nominal damages at stake, on the "separate and distinct constitutional wrong" provided by the policy and practice alleged. In *Larez*, the plaintiff

10

had prevailed on his claim against the individual officers for an unreasonable search
accompanied by excessive force, obtained a fully compensatory damage award, then, in a
second trial, prevailed against the police chief and the City of Los Angeles for their
"unconstitutional policies or customs of excessive force, illegal searches including
official tolerance for the destruction of property during such searches, and inadequate
citizen complaint procedures which have the effect of encouraging the excessive use of
force." *Larez*, 946 F.2d at 635. In *Ruvalcaba*, the plaintiff prevailed in a bifurcated trial
against the individual officers on his claim of excessive force during a confrontation with
the canine wielding defendant police officer, and received a fully compensatory damage
award. The plaintiff had further alleged interrelated unconstitutional policies and
practices of "training canine officers to strike suspects who resist the dog attacks,
improperly selecting officers prone to excessive force to become canine officers, and
inadequately training canine officers to limit the amount of force they use." *Id.* at 523.
After the District Court denied plaintiff the right to proceed on the *Monell* claim, and
after he accepted payment of his judgment, plaintiff pursued his appeal. The Ninth
Circuit, following *Larez*, again found the *Monell* policy and practice claim to be "separate
and distinct" from the underlying claims against the officer, and remanded for a *Monell*
trial with the plaintiff limited to nominal damages.

Courts in the Northern District of Illinois have also recognized this point. In
*Medina v. City of Chicago*, 100 F. Supp. 2d 893 (N.D. Ill. 2000), the City sought to
postpone the trial of the municipal policy claims arising out of an alleged police beating
by relying on the same indemnification provisions that they urge here. Rejecting the
City's arguments, Judge Kennelly noted that "there are . . . non-economic benefits that
one can obtain from suing a municipality that are less likely when the plaintiff pursues (or
is permitted to pursue) only the individual officer." *Id.* at 896. Those benefits, Judge
Kennelly recognized, include achievement of the reformative and deterrent purposes of
Section 1983: "a judgment against a police officer (*even one paid for by the municipality*)
may be less likely to prompt the municipality to act to prevent future violations than a
judgment naming the municipality itself as responsible based on its policies and

11

customs." *Id.* (emphasis added). Moreover, both Judges Norgle and Hart have recently rejected motions to bar discovery and trial brought by the City that were based on almost identical proposed "waivers" or "stipulations" as the City has presented here. See, *Fox v. Tortoriello*, 02-C-2438, Minute Order of 10/16/03, attached as Exhibit D;[15] *Johnson v. City of Chicago*, 03-C-6620, Minute Order of 6/30/04, attached as Exhibit E.[16]

### B.

The existence of an independent, non-derivative *Monell* claim has also been recognized by numerous Courts of Appeals in several circumstances where a constitutional claim against the named police officers was not established. In each of these circumstances, the Courts have consistently held that *City of Los Angeles v. Heller*, 475 U.S. 796, 798-99 (1986) (per curiam), relied upon by the City, did not apply, and that the plaintiff could proceed on his *Monell* claim against the municipality. One such circumstance arises when the individual defendants are awarded qualified immunity. In

---

[15]While Judge Norgle denied the motion without comment, Judge Hart relied on the fact that, like here, the defendants also included high ranking police officials sued in their individual capacities, making much of the discovery and proof on the *Monell* claim co-terminus with the underlying claims against the officers.

[16]The City cites one Seventh Circuit case and three District Court orders in support of its position. First, it is important to note that these cases are all relatively pedestrian individual claims with boilerplate policies and practices, in stark contrast to *Patterson* and the other torture cases which are quintessential *Monell* policy and practice cases that raise extremely serious questions of systemic torture, fabrication of evidence, and continuing cover-up. In *Treece v. Hochstetler*, 213 F. 3d 360 (7th Cir. 2000), the policy and practice alleged is not even specified, and the plaintiff lost on her underlying claim at trial against the named individual defendant officer. On appeal, the Seventh Circuit affirmed the dismissal of the City of Naperville on the basis of *Heller*, and, also affirmed the bifurcation of the case because of the District Court's "considerable discretion" in discovery matters. *Id.* at 364-65. In *Lopez v. City of Chicago*, Judge Der-Yeghiayan's order was in direct contradiction to Judge Darrah's earlier decision denying the City's motion to stay discovery and to "sever" the *Monell* claims, in which Judge Darrah specifically noted the disadvantages of the bifurcation of the case because of the District Court's proposal, stating: "a finding of liability against individual public employees, as compared to a finding of liability against a municipality, may decrease the likelihood of the municipality's acting to prevent future violations when that municipality is, or is not, named in a judgment." *Lopez v. City of Chicago*, 2002 WL 335346 (N.D. Ill. 2002) at *7. In *Wawryniuk, v. City of Chicago*, 03 C 4291, Minute Order of 4/30/04, Judge St. Eve expressly found that the City had **admitted** to the *Monell* policy and practice and causation elements, whereas here the City expressly **denies** these elements. In *Kunz v. City of Chicago*, 2003 WL 21960360, (N.D. Ill.), a garden variety excessive force case, Judge Zagel simply refused to recognize that *Monell* provides an independent claim against the City.

*Doe v. Sullivan County, Tenn.*, 956 F.2d 545, 553-54 (6th Cir. 1992), a jail excessive force case, the Sixth Circuit Court of Appeals, so held, stating:

> The Court in Heller was careful to point out that the officer in that case had not claimed qualified immunity and, thus, that the jury's verdict established with legal certainty that Heller had not suffered a constitutional deprivation. Heller, 475 U.S. at 799, 106 S.Ct. at 1573; . . . Thus, Heller simply reaffirmed that a determinative issue in §1983 claims against municipalities is whether the plaintiff has suffered a deprivation of his constitutional rights. To read Heller as implying that a municipality is immune from liability regardless of whether the plaintiff suffered a constitutional deprivation simply because an officer was entitled to qualified immunity would, we are convinced, represent a misconstruction of its holding and rationale.

*Doe*, 956 F.2d at 554. Accord *Kuha v. City of Minnetonka*, 328 F.3d 427, 440 (8th Cir. 2003); *Medina v. City and County of Denver*, 960 F.2d 1493, 1499-1500 (10th Cir. 1992).

Similarly, several Courts of Appeals have also recognized an independent *Monell* right of action against the municipality even in the absence of a finding that sa particular defendant violated the plaintiff's rights. In *Garcia v. Salt Lake County*, 768 F.2d 303, 310 (10th Cir. 1985, the Tenth Circuit found there to be such an independent *Monell* claim against the County where none of the individual defendants had been found liable:

> Monell does not require that a jury find an individual defendant liable before it can find a local governmental body liable. The language of § 1983 "plainly imposes liability on a government that, under color of some official policy, 'causes' an employee to violate another's constitutional rights." Monell, 436 U.S. at 692, 98 S.Ct. at 2036. Although the acts or omissions of no one employee may violate an individual's constitutional rights, the combined acts or omissions of several employees acting under a governmental policy or custom may violate an individual's constitutional rights.

Relying on *Garcia*, the Eleventh Circuit, in *Anderson v. City of Atlanta*, 778 F.2d 678 (11th Cir. 1985), similarly found that the policy and practice itself could be responsible for the constitutional violation, even where the individual defendants were not at fault, while in *Speer v. City of Wynne, Ark.*, 276 F.3d 980, 985-87 (8th Cir. 2002), the Eighth Circuit, distinguishing *Heller*, upheld a verdict against the City where the individual defendant was found not liable, reasoning that the jury could have determined that another unsued municipal official had caused the constitutional violation. Likewise,

13

in *Barrett v. Orange County Human Rights Com'n.*, 194 F.3d 341, 350 (2d Cir. 1999), the Second Circuit remanded a *Monell* claim against the County for trial because other non-defendant members of the Board of Commissioners, rather that the two Board member defendants found not liable could have caused the constitutional violation:

> We agree with our sister circuits that under Monell municipal liability for constitutional injuries may be found to exist even in the absence of individual liability, at least so long as the injuries complained of are not solely attributable to the actions of named individual defendants. Cf. City of Los Angeles v. Heller, 475 U.S. 796, 798-99 (1986) (per curiam) (where alleged constitutional injury is caused solely by named individual defendant who is found not liable, municipal liability cannot lie). It is therefore possible that a jury could find the Commission and the County of Orange liable for the alleged violations of Barrett's First Amendment rights even after finding that [defendants] Lee and Colonna are not liable.

Finally, in *Fagan v. City of Vineland*, 22 F. 3d 1283, 1291-92, (3d Cir. 1994), a case where the individual defendants were found not liable in a §1983 due process police pursuit case, the Third Circuit found there to be an independent, triable failure to train *Monell* claim against the municipality because that claim required a different mental state and relied on a different theory of recovery than did the claims against the individual officers.

It is therefore abundantly clear that *Monell* affords a plaintiff a viable independent § 1983 claim against the City for its unconstitutional policies and practices even if he prevails against the named defendants in the case, and that this independent claim survives in several different circumstances even if the plaintiff loses on his underlying claim against the named defendants. It is significant to note that in the instant case, the police officer and command Defendants have all asserted qualified immunity defenses, which the City does not, and ostensibly could not, waive as part of its "stipulation." Moreover, since the lights were turned out and Plaintiff had a typewriter cover thrust over his head, he has not been able to identify all of the officers who participated in his torture, and the Defendants, if permitted, intend to deny involvement; the jury could therefore chose to believe that unnamed Area 2 detectives, rather than the Defendants, tortured him, or that his unconstitutional treatment was systemic rather than attributable to any

14

particular Defendant. Moreover, the *Monell* deliberate indifference intent standard is separate and distinct from the standards applicable to Plaintiff's Fourth and Fourteenth Amendment claims.

## C.

The existence of a viable § 1983 cause of action against the City certainly explodes the City's argument that its "stipulation" moots the *Monell* claim against it. The issue of §1988 attorney fees also underscores both the lack of mootness and the necessity that Plaintiff's *Monell* claim against the City be litigated. Nowhere in its "stipulation" does the City agree to pay the § 1988 attorneys fees which will accrue against the individual Defendant officers if Plaintiff prevails, nor does it concede prevailing party status on Plaintiff's *Monell* claim. This is quite intentional, as the Illinois Supreme Court has held that the City does not have to indemnify their employees under 745 ILCS 10/9-102 for § 1988 attorneys fees. See, *Yang v. City of Chicago*, 195 Ill. 2d 96 (2001). Moreover, in the past fourteen months, Plaintiff's counsel has expended thousands of hours on matters which, at least in part, are attributable to *Monell* discovery. Hence, if the City's stipulation is accepted to bar Plaintiff's independent claim against the City, he will be barred from pursuing prevailing party status against the City, and it is likely that he will lose the right to pursue *Monell* related hours, and will be left with an uncollectible multi-million dollar attorneys' fees award against the individual Defendants.

## IV.    Judicial Economy Will Not Be Served by Granting the City's Motion.

Contrary to the City's assertion, the practical factors do not weigh in favor of barring the completion of *Monell* discovery and a united trial against the City. Most of the *Monell* discovery has already been completed in this and the other related cases, and much of this evidence is also FED. R. EVID. 404(b) evidence against the individual Defendants, making it admissible against the individual officers at trial. Additionally, most of the non-404(b) *Monell* evidence is also relevant to, and admissible against, the individual policymaking Defendants - - - Martin, Shines, Hillard and Needham. Hence, most of the evidence, for purposes of discovery and trial, pertains both to the City and the individual Defendants, making the City's judicial economy and prejudice arguments ring

15

hollow.

Moreover, instead of conducting one unified trial, with the Plaintiff permitted to present a compelling case where the true and complete story of systemic fault is presented, the Plaintiff, if the City's motion is granted, will be forced to present a case where the main wrongdoer is missing and his case is therefore stripped of its full evidentiary impact and moral force. Furthermore, the possibility of establishing policy and practice findings which could have subsequent collateral estoppel effect against the City in subsequently tried police torture cases - - - a boon to judicial economy - - - would also be defeated if the City's motion is granted.

Additionally, a large number of serious questions and possible problematic scenarios would arise if the City's motion is granted, including: What happens if the individual Defendants obtain qualified immunity prior to trial? What happens if the jury finds no liability against the police Defendants while concluding that there was a systemic constitutional violation? What if the jury determines that other Area 2 detectives, rather than the named Defendants, violated Plaintiff's rights? What if the Defendants are indicted and the Plaintiff wishes to drop his case against them and proceed only on the *Monell* claim against the City? If Plaintiff prevails, how will he obtain and collect a fully compensable attorneys' fees award, including compensation for the thousands of hours already spent on *Monell* related discovery? What if the City attempts to change its position on color of law and scope of employment after the individual Defendants are found liable, as they did in *Wilson v. City of Chicago*?[17] What if the police Defendants offer to settle for an amount which the City will not pay? What if the City, under its reservation of rights, decides to challenge a large compensatory verdict despite the individual Defendants' decision not to appeal because they escaped punitive damages? What right does the City have to participate in discovery and trial? Does granting of the Motion to Bar operate as a dismissal; if not, under what circumstances can Plaintiff's right to *Monell* discovery and trial be re-instated? This list could go on *ad infinitem*.

---

[17]See *Wilson v. City of Chicago*, 120 F. 3d 681 (7th Cir. 1997).

16

Suffice it to say, there is no chance that either judicial economy or basic fairness will be served by the granting of the City's Motion.

**Conclusion**

While the City's motion is cleverly framed, it is in fact a desperate attempt to avoid the final stages of discovery and the impending specter of a trial where the City and its Police Department will finally have to answer for its paramount role in thirty years of systemic torture, fabrication and cover-up at Area 2 and Area 3. *Monell* and §1983 afford the Plaintiff, as well as the public at large, that right, and it must not be stripped away by a ploy which is both readily transparent and bereft of legal, moral, and practical substance. The Defendant City's Motion to Bar must therefore be denied.

Dated: January 12, 2005

Respectfully submitted,

G. Flint Taylor
Joey L. Mogul
Michael E. Deutsch
People's Law Office
1180 N. Milwaukee
Chicago, IL 60622
773/235-0070

17

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| AARON PATTERSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No.    03 C 4433 |
| vs. | ) | |
| | ) | Judge Gottschall |
| Former Chicago Police Lt. JON BURGE, | ) | |
| The City of Chicago, et. al., | ) | |
| | ) | |
| Defendants. | ) | |

## PLAINTIFF'S RESPONSE TO DEFENDANT CITY'S MOTION TO "BAR DISCOVERY AND TRIAL ON THE *MONELL* CLAIMS AGAINST IT"

EXHIBIT A

BEFORE THE POLICE BOARD OF THE CITY OF CHICAGO

| | | |
|---|---|---|
| IN THE MATTER OF CHARGES FILED AGAINST POLICE COMMANDER JON BURGE, STAR NO. 338, CHICAGO POLICE DEPARTMENT | ) ) ) ) | Case No. 1856 |
| IN THE MATTER OF CHARGES FILED AGAINST POLICE DETECTIVE PATRICK O'HARA, STAR NO. 2888, CHICAGO POLICE DEPARTMENT | ) ) ) ) | Case No. 1857 |
| IN THE MATTER OF CHARGES FILED AGAINST POLICE DETECTIVE JOHN YUCAITIS, STAR NO. 7744, CHICAGO POLICE DEPARTMENT | ) ) ) | Case No. 1858 |

## MEMORANDUM IN OPPOSITION TO MOTION TO BAR TESTIMONY CONCERNING OTHER ALLEGED VICTIMS OF POLICE MISCONDUCT

Respondents' attempt to bar the testimony of seven additional victims of torture tactics at Area II headquarters ignores the overwhelming precedent supporting the admission of similar acts under circumstances much less compelling than these. The testimony regarding similar acts sets forth detailed accounts of torturous treatment which are almost identical to the torture suffered by Andrew Wilson. The testimony reveals an astounding pattern or plan on the part of respondents to torture certain suspects, often with substantial criminal records, into confessing to crimes or to condone such activity. The similar acts testimony would clearly be admissible in a federal or state court, and it should be admissible in this proceeding.[1]

---

[1] Indeed, in a January 16, 1992 hearing in which Judge Shadur dismissed respondents' federal lawsuit, Judge Shadur stated that he knew of nothing that would foreclose the Police Board from considering this evidence. See Exh. A at 13-15.

SP 019631

from Miami to acquire distant customers in other cities, used
specific code words in conducting drug transactions, and used a
car modified with secret compartments for transporting drugs by
courier); United States v. Harrod, 856 F.2d 996 (7th Cir. 1988)
(prior stolen check scheme and resultant plea agreement
admissible to prove modus operandi in bank theft and bank fraud
case where in both schemes, defendant submitted stolen and
forged checks to third parties, who would then deposit and
withdraw the stolen funds).

The similar acts testimony is highly probative of the
modus operandi used or condoned in the torturing of suspects to
elicit statements.  Respondents' methods of torture through
electroshock, bagging, and holding a gun to a suspect's head,
are more than sufficiently unique to establish a modus operandi
for Rule 404(b) purposes.  In addition, the testimony
establishes a pattern of and plan to torture suspects in these
similar ways to elicit confessions to violent crimes.

     B.   **Motive, Intent and Absence of Mistake or Accident**

The similar acts evidence is also admissible to show
respondents' motive and intent in torturing or condoning the
torture of Andrew Wilson and to refute their claims that Wilson
either was mistakenly injured during the arrest or was injured
by accident.  Many cases permitting the use of similar act
evidence involve situations strikingly similar to the present
case.  The Seventh Circuit has held that the intent exception
may be used not only to establish a specific intent crime, but

1185J

-17-

**SP 019647**

"may also be used, in a broader sense, to admit prior crimes 'because the repetition of the crime is itself circumstantial proof of intent, not direct proof of a propensity to commit crime.'" Young v. Rabideau, 821 F.2d 373, 379 (7th Cir. 1987) (quoting United States v. Fountain, 768 F.2d 790, 805 (7th Cir. 1985)(Swygert, J., concurring in part and dissenting in part), cert. denied, Gometz v. United States, 475 U.S. 1124 (1986)), cert. denied, 484 U.S. 915 (1987). In Young, a civil rights case brought by an inmate against two corrections officers for excessive force, the trial court admitted evidence of plaintiff's past disciplinary history. The Seventh Circuit affirmed, finding that the evidence was probative of plaintiff's intent, as well as of the lack of mistake or accident, where plaintiff contended that he did not intend to poke a guard in the face or snatch a chain out of his hand. Young, 821 F.2d at 379-80. Additionally, the court in Young cited with approval the holding in Carson v. Polley, 689 F.2d 562 (5th Cir. 1982). The court in Carson held that a deputy sheriff's performance evaluation report which showed a record of loss of temper and of hostility toward inmates on prior occasions was admissible in a civil rights action against the deputy for use of excessive force. Id. at 571-72. The court found that the report tended to show the deputy's similar intent to do harm in his conduct toward the defendant. Id.

Similarly, the Second Circuit has held that "[a] plaintiff in an excessive force case is entitled to prove by

-18-

SP 019648

extrinsic evidence of other instances that the police officer
defendant acted 'maliciously and sadistically for the very
purpose of causing harm,' . . . ." Ismail v. Cohen, 706 F.
Supp. 243, 253 (S.D.N.Y. 1989) (quoting O'Neill v. Krzeminski,
839 F.2d 9 (2d Cir. 1988)). In Ismail, a civil rights action,
the court held that evidence of the defendant police officer's
involvement in a subsequent similar incident of excessive force
was admissible in the form of the victim's testimony and the
Civilian Complaint Review Board complaint. 706 F. Supp. at
252-53. Following Huddleston, 485 U.S. at 688, the court
stated that no criminal conviction, civil judgment,
administrative finding or preliminary judicial finding by the
court was necessary before the similar act evidence could be
admitted. Ismail, 706 F. Supp. at 252-53. The evidence was
admissible to show the officer's pattern of lashing out when he
felt that a citizen was challenging his authority, as well as
his intent to abuse his public office and to lie about it
afterward. Id. at 253; see also Borenstein v. City of
Philadelphia, No. 84-2132, slip op. at 3 (E.D. Pa. July 18,
1985)(in ruling on a motion to compel discovery in a civil
rights action against police officer for unlawful arrest, court
held that officer's personnel file and records of violent
incidents or complaints involving the defendant officer had the
potential for shedding light on the officer's intent or motive
when the incident which was the subject of the suit took
place); Hurley v. Keenan, No. 79 Civ. 4772, slip op. at 9

(S.D.N.Y. May 8, 1984)(in ruling on a motion to compel discovery in a civil rights action brought by an inmate against correctional officers, the court held that reports of any administrative, criminal or civil proceeding in which one of defendants was charged with or investigated for possible abuses of the type alleged by plaintiff could be directly admissible to demonstrate intent).

Rule 404(b) has been applied similarly in other civil rights cases. In <u>Conklin v. Lovely</u>, 834 F.2d 543 (7th Cir. 1987), plaintiff alleged she was improperly discharged from her position as a county employee because of her political activities and in violation of her First Amendment rights. The court held that the testimony of another former county employee who was discharged for her patronage of the former County Prosecutor was admissible because defendants' motive in discharging the witness would be relevant to their motive and intent in discharging plaintiff. <u>Id.</u> at 550. <u>Accord</u> <u>Phillips v. Smalley Maintenance Services, Inc.</u>, 711 F.2d 1524, 1532 (7th Cir. 1983)(in sexual harassment action brought against employer, testimony of another female former employee that she was subjected to similar treatment admissible to show motive, intent or plan of defendant).

Courts have been equally liberal in admitting evidence of similar bad acts to show intent or motive in criminal cases. In <u>United States v. Taggatz</u>, 831 F.2d 1355, 1359-60 (7th Cir. 1987), in which defendant was charged with knowingly

and unlawfully executing a scheme to defraud a federally insured savings and loan in connection with a check-kiting scheme, the court held that evidence of a prior check-kiting scheme was admissible to show intent, as well as a plan, knowledge, and absence of mistake or accident.  In <u>United States v. Khorrami</u>, 895 F.2d 1186 (7th Cir.) <u>cert. denied</u>, 111 S. Ct. 522 (1990), defendant was charged with mailing threatening communications and making threatening phone calls to the Jewish National Fund.  The court upheld the admission of tape recordings of other threatening telephone calls made by defendant to the Jewish National Fund which were not charged in the indictment, because they demonstrated a pattern of threatening phone calls and were relevant to defendant's identity and intent.  <u>Id.</u> at 1194-95.  <u>See also</u> <u>United States v. Mills</u>, 895 F.2d 897 (2d Cir. 1990)(in challenge to convictions for conspiracy and counterfeiting offenses, court upheld admission of evidence that defendant intentionally engaged in prior counterfeiting activity to show defendant intended to do so in the instance for which he was convicted), <u>cert. denied</u>, 110 S. Ct. 2216 (1990); <u>United States v. Ross</u>, 886 F.2d 264 (9th Cir. 1989)(in upholding defendant's convictions of conspiring with his wife to defraud, making false statements, and improperly using his wife's social security number, court held that evidence that defendant improperly used his wife's social security number 13 years earlier was admissible to show intent and to negate a claim of mistake), <u>cert. denied</u>, 110 S. Ct. 1818 (1990).

SP 019651

The similar acts testimony in this case clearly establishes respondents' motive and intent in torturing or condoning the torture of Wilson. Respondents generally engaged in these similar practices in order to coerce a confession to a serious crime. In addition, the testimony refutes respondents' claims that Wilson was mistakenly injured during his arrest or that he was accidentally injured when he fell down the steps or in the squadrol on his way to the lockup. There is no question that the evidence is admissible for these purposes.

C. Opportunity and Knowledge

Evidence is also admissible under Rule 404(b) when it demonstrates a defendant's opportunity to commit an act, or his knowledge of particular practices. In United States v. Covelli, 738 F.2d 847 (7th Cir.), cert. denied, 469 U.S. 867 (1984), the court upheld the trial court's admission of testimony regarding defendant's prior possession of a small caliber pistol in defendant's prosecution for committing robbery by means of force and violence and for transporting stolen goods. The trial court ruled that under Rule 404(b) the evidence was probative of defendant's possession of the murder weapon, his opportunity to commit the crime, and the ultimate identification of him as the robber. Id. at 855. The court emphasized that "evidence of prior possession of a weapon can be used to prove opportunity and identification even where it cannot be directly identified as the weapon used in the crime." Id.

**SP 019652**

-22-

In <u>United States v. Cooper</u>, 942 F.2d 1200 (7th Cir. 1991), an appeal from a drug conspiracy conviction, the court ruled that evidence of a prior drug transaction was admissible under Rule 404(b) to show a defendant's opportunity to acquire and distribute cocaine, his knowledge of the distribution network, and his intent to take part in the conspiracy. Similarly, the court has permitted the admission of evidence of a prior uncharged drug transaction to show defendant's access to large quantities of cocaine and his ability to attract customers, and to rebut defendant's assertion that he had never had anything to do with cocaine transactions. <u>Zapata</u>, 871 F.2d at 621. <u>Accord</u> <u>United States v. Shukitis</u>, 877 F.2d 1322, 1329 (7th Cir. 1989); <u>Montoya</u>, 891 F.2d at 1284.

In a trial in which defendant was charged with knowingly disposing of property pledged to Farmers Home Administration (FHA), evidence of prior grain sales was relevant to show defendant's familiarity with the practice of selling property through third parties to avoid FHA requirements. <u>United States v. Studley</u>, 892 F.2d 518, 527 (7th Cir. 1989). The evidence was also relevant to show defendant's knowledge of how to dispose of pledged property while avoiding detection. <u>Id.</u>; <u>see</u> <u>also</u> <u>United States v. Falco</u>, 727 F.2d 659, 664 (7th Cir. 1984) (evidence of defendant's repeated contact with and knowledge of stolen goods is admissible to show defendant's knowledge that the goods involved in the present case were stolen).

SP 019653

The similar acts testimony is admissible because it shows the physical existence of one or more electroshock devices at Area II, prior and subsequent to Wilson's arrest, and Burge's possession of and familiarity with the use of the devices. It is also admissible to show knowledge of that technique and of the bagging technique, about which respondents deny knowing, and of the technique of putting a gun to the head of a victim.

D. <u>Identity</u>

Finally, the testimony regarding similar acts is admissible to establish the identity of the perpetrator of the acts. In <u>Covelli</u>, 738 F.2d at 855, the court ruled that evidence regarding defendant's past possession of a pistol was admissible as probative of the ultimate identification of him as the perpetrator of an armed robbery in which a victim was killed. Similarly, in <u>Khorrami</u>, 895 F.2d at 1194, the court held that tapes of prior harassing phone calls were relevant to establishing defendant's identity with respect to the phone calls underlying the charges in the instant case. In this case, the "prior and charged offenses are so strikingly similar that the same person or persons probably had a hand in both." <u>Connelly</u>, 874 F.2d at 416; <u>see</u> <u>also</u> discussion of <u>modus operandi</u> <u>supra</u> at 16-17.

Respondents cannot seriously dispute that Wilson's injuries were sustained while he was in police custody. However, they have consistently maintained that Wilson's

SP 019654

injuries were inflicted by persons other than themselves.
Thus, identity of the officers engaging in the torture is a
crucial issue, and the Superintendent is entitled to offer
similar acts evidence to support the identification of these
officers as the perpetrators.

V. **The Prior Bad Acts Are Strikingly Similar And Occurred Close Enough In Time To Be Relevant To Wilson's Torture.**

A. **The Similarity Between The Acts Alleged By Wilson And The Acts Alleged By The Similar Victims Is Striking.**

There is no question that the similarities between
Wilson's testimony and the similar victims' testimony is more
than sufficient to meet the Rule 404(b) standard. Burge was
the main perpetrator of the torture in almost all of the cases
and, when he was not the principal, he was still involved. In
the case of all but one of the victims, the victim was picked
up and taken to Area II where he was then interrogated
regarding his knowledge of or involvement in a serious
offense. Although Donald While was taken instead to Area I, he
was taken there and interrogated by Area II detectives. All of
the victims were black and generally had significant criminal
histories.

Also similar was the way in which several victims were
threatened with consequences if they refused to make a
statement. After an initial refusal, the punishment would
begin and then would become stronger and more painful as the
refusals to speak persisted. The most striking similarities,

however, are found in the methods of torture used on the suspects. Wilson was electroshocked by Yucaitis using the black box and by Burge who used the black box and a curling-iron looking device, was "bagged" and beaten, and was threatened with a gun placed in his mouth. Jones, Holmes, Poree, Powell and Orange were similarly electroshocked by Burge. Holmes, Powell, White, and Mumin were all "bagged" to the point where they lost or almost lost consciousness. Burge pointed a cocked gun at Jones' head, hit Poree in the head with a pistol, and placed a revolver containing one bullet to Mumin's head and snapped it three times slowly. White had a gun placed in his mouth. Additionally, each of the victims was slapped around and punched.

Burge's statements to the victims were also very similar. Burge told both Jones and Mumin that nobody would ever believe their word against his. As he did in relation to Wilson, he referred to the absence of marks on Mumin's body. He said "Fun time" as he approached Wilson and Poree with the black box, and laughed when he "bagged" Mumin. He told Wilson he would "fry his black ass" and Jones he would "blow his black head off."

As the case law cited above aptly demonstrates, these actions or the condoning of these actions by respondents are overwhelming in their similarity. Clearly they are more than similar enough to be relevant to the pending charges.

1185J

**SP 019656**

B.    The Similar Acts Occurred Close Enough In
Time To Be Relevant To Wilson's Torture.

The similar acts occurred close enough in time to be
relevant to to this proceeding, especially given the close
similarities between Wilson's testimony and the testimony of
the similar victims.  Andrew Wilson was tortured at Area II on
February 14, 1982, and all other acts to which the similar
victims will testify occurred within the period from 1973 to
1985.  "Questions about 'how long is too long' do not have
uniform answers; the answers depend on the theory that makes
the evidence admissible."  United States v. Beasley, 809 F.2d
1273, 1277 (7th Cir. 1987).  Thus, in Falco, the court held
that two thirty-year-old convictions, a twenty-year-old
conviction, and a five-year-old conviction, all relating to
stolen merchandise, were admissible to establish defendant's
knowledge that the goods underlying the current charges were
stolen.  727 F.2d at 665.  The court stated:

> It is the pattern of conduct represented by
> the prior convictions, and not the age of
> each separately considered, that is critical
> to their relevance here.  Despite the gaps
> between the convictions, a pattern emerges
> that tends to establish defendant's
> familiarity with transactions or shipments
> of stolen goods that makes it more probable
> that defendant knew the goods in this case
> were stolen.

Id.

In Ross, the court upheld the admission of evidence
that defendant improperly used his wife's social security
number thirteen years before the acts in the case.  886 F.2d at

SP 019657

267.  Like the court in <u>Falco</u>, the <u>Ross</u> court held that
"[g]iven the similarity of the offenses, the prior act was not
so remote as to require exclusion." <u>Id.</u>; <u>see also</u> <u>Harrod</u>, 856
F.2d at 1002 (prior acts evidence of five-year-old stolen check
scheme and two-year-old stolen bond scheme were so similar in
character to the acts charged in the indictment that they could
not be said to be too remote in time); <u>United States v.</u>
<u>DeCastris</u>, 798 F.2d 261, 265 (7th Cir. 1986)(determining that
use of prior acts occurring ten years before the crime charged
is permissible); <u>Chaimson</u>, 760 F.2d at 807 (government's
evidence of delivery of a bribe payment five years before the
bribe payments charged are close enough in time to be
admissible under Rule 404(b)).

Given the similarities between the serious offenses
charged and the offenses to which the similar victims will
testify, there is no question that the offenses are close
enough in time to be relevant to this case.  Taken the offenses
in sequence, they reveal a pattern of almost identical acts of
torture directed toward persons suspected of violent crimes.
While the sequence spans twelve years, each offense is close
enough to the next to connect it to the relevant pattern of
behavior.  Moreover, Melvin Jones' and Donald White's testimony
will demonstrate that they were tortured just days before
Andrew Wilson was tortured.  The similar acts evidence is
relevant, and therefore is admissible.

SP 019658

VI. The Similar Acts Evidence Should Be Admitted
Because There Is Sufficient Evidence To Support
A Finding By The Court That The Similar Acts
Were Committed By One Or More Respondents.

In Huddleston, the Supreme Court held that the
district court need not make a preliminary finding that the
Government has proved the other acts by clear and convincing,
or even by a preponderance of the evidence. 485 U.S.
at 687-89. Rather, evidence of similar acts should be admitted
"if the jury can reasonably conclude that the act occurred and
that the defendant was the actor." Id. In fact, to grant
respondents' request for a preliminary evidentiary hearing as
to each offered witness would be directly contrary to the
Supreme Court's holding that no preliminary showing by the
proponent is necessary before the evidence may be admitted for
a proper purpose. Id. The court or, in this case, the Police
Board simply engages in a relevance analysis under Fed. R. Evid
104(b). Id. Moreover, similar acts are admissible even if the
perpetrator was never indicted or convicted (or presumably
disciplined) in connection with those offenses. See Wright,
943 F.2d at 750-52; United States v. Rivera-Medina, 845 F.2d
12, 15-16 (1st Cir.), cert. denied, 488 U.S. 862 (1988).

In this nonjury case, the Board could certainly reasonably
conclude that respondents also tortured the similar victims by
means of electroshock, bagging, and/or placing a gun to a
suspect's head, as the proffers of testimony show.
Respondents' request for preliminary hearings should be denied
and the similar acts evidence should be admitted.

SP 019659

VII. Balancing The Probative Value Of The Other Acts
Evidence Against Its Prejudicial Effect Is
Inapplicable In A Nonjury Proceeding.

"Excluding relevant evidence in a bench trial . . . on
the basis of 'unfair prejudice' is a useless procedure." Gulf
States Utilities Co. v. Ecodyne Corp., 635 F.2d 517, 519
(1981). Under Federal Rule of Evidence 403, the trial judge
determines and weighs the improper inferences a jury might draw
from similar acts evidence and balances them against the
probative value and necessity of the evidence. Id. However,
it is assumed that a court in a bench trial is able to exclude
improper inferences from his own decision-making process. Id.

The Hearing Officer and the Police Board are fully
capable of ascertaining the relevance of the similar victims'
testimony while simultaneously avoiding any prejudicial effect
on their decisions. Respondents' requested evidentiary
hearings as to each offered witness would be an unnecessary
waste of time. The Board should follow the general rule for
bench trials and allow the similar acts to testify. See also
United States of America v. Bilugan, No. 90-5852, 1991 U.S.
App. LEXIS 14270, at *6 (4th Cir. July 9, 1991)(the fact that
the trial was held without a jury diminishes the role of Rules
403 and 404(b)); Carter v. Hewitt, 617 F.2d 961, 972 n. 13 (3d
Cir. 1980)(nonjury trials present a much smaller danger of
prejudice than jury trials); Van Alen v. Dominick & Dominick,
Inc., 560 F.2d 547, 552 (2d Cir. 1977)(the prudent course in a
bench trial is to admit records and testimony based on them

SP 019660

into evidence, even if they are doubtfully admissible);

Anderson v. Whittaker Corp., 692 F. Supp. 734, 737 n. 3 (W.D.

Mich. 1987)(the Rule 403 balance requires a different result in

a bench trial); People v. Reed, 209 Ill. App. 3d 575, 568

N.E.2d 334, 339 (1st Dist. 1991)(in a bench trial, the court is

presumed to have considered only competent evidence),

app. denied, 139 Ill. 2d 602, 575 N.E.2d 920 (1991).

Even if the Board decides that it must balance the

probative value of the similar acts evidence against any

potentially prejudicial effects, the balance clearly tips in

favor of admission. Because all relevant evidence is

inherently prejudicial, it should not be excluded unless its

probative value is substantially outweighed by the danger of

unfair prejudice. Montoya, 891 F.2d 1273. As the

Superintendent has shown, the similar acts testimony is

probative of respondents' modus operandi, pattern and plan, of

respondents' motive and intent, of the absence of mistake or

accident, of respondents' opportunity and knowledge, and of the

identity of respondents. Moreover, necessity is a

consideration in balancing probity and prejudice. United

States v. Cardenas, 895 F.2d 1338, 1343 (11th Cir. 1990);

United States v. Dolliole, 597 F.2d 102, 106 (7th Cir.),

cert. denied, 442 U.S. 946 (1979). Although the Superintendent

will offer the credible and compelling testimony of Andrew

Wilson himself, as well as medical and expert testimony, the

similar victims' testimony is important for countering the

SP 019661

testimony of the parade of police officers who will testify that they saw and heard nothing. Indeed, as the testimony of the similar victims shows, respondents counted on the fact that their testimony would be believed over that of a convict when they persisted in their pattern of torture. They should not be permitted now to hide behind their allegations of prejudicial effect to secure exclusion of that telling evidence.

### Conclusion

For the alternative and independent reasons stated above, respondents' motion to bar testimony concerning other alleged victims of police misconduct should be denied.

Dated: January 22, 1992          Respectfully submitted,

Daniel E. Reidy
June K. Ghezzi
JONES, DAY, REAVIS & POGUE
225 West Washington Street
Chicago, Illinois 60606
(312) 782-3939

Special Corporation Counsel to
LeRoy Martin, Superintendent of
Police

SP 019662

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

AARON PATTERSON,                          )
                                          )
    Plaintiff,                        )
                                          )       No.     03 C 4433
    vs.                               )
                                          )       **Judge Gottschall**
Former Chicago Police Lt. JON BURGE,      )
The City of Chicago, et. al.,             )
                                          )
    Defendants.                       )

### PLAINTIFF'S RESPONSE TO DEFENDANT CITY'S MOTION TO "BAR DISCOVERY AND TRIAL ON THE *MONELL* CLAIMS AGAINST IT"

### EXHIBIT B

OFFICE OF PROFESSIONAL STANDARDS        02 November 1990

TO:        LeRoy Martin
            Superintendent of Police

FROM:      Gayle Shines
            Chief Administrator
            Office of Professional Standards

SUBJECT:   Special Project Conclusion Reports
            (The Burge Investigation)

On 27 March 1990, OPS Investigators Francine Sanders and Michael Goldston were assigned to re-investigate the allegations, captured under CR# 123543, that excessive force had been used against Andrew Wilson in February 1982, while he was in the custody of Area 2 personnel for the murders of Chicago Police Officers Fahey and O'Brien. One of the named accused officers was Jon Burge, who was at that time a lieutenant at Area 2.

An additional part of this assignment was to determine if there was systematic abuse at Area 2 during that period, and if so, to determine the culpability, if any, of Area 2 Command Personnel.

Investigator Goldston's research addressed the latter issue and his report and supporting data are contained in the first section of his binder.

Investigator Sanders' review of the original CR investigation focussed on the circumstances surrounding Andrew Wilson's alleged mistreatment, and her report and findings are contained in the second section of this binder.

Both Investigators have done a masterful job of marshalling the facts in this intensive and extensive project and their conclusions are compelling.

*Gayle Shines*
Gayle Shines
Chief Administrator
Office of Professional Standards

GS/jk

Attachments

X64056

CHICAGO POLICE DEPARTMENT
OFFICE OF PROFESSIONAL STANDARDS

SPECIAL PROJECT

SECTION I    -    REPORT OF INVESTIGATOR MICHAEL GOLDSTON, STAR #73,
OFFICE OF PROFESSIONAL STANDARDS, RE: HISTORY OF
ALLEGATIONS OF MISCONDUCT BY AREA TWO PERSONNEL

SECTION II   -    REPORT OF INVESTIGATOR FRANCINE SANDERS, STAR #28,
OFFICE OF PROFESSIONAL STANDARDS, RE: ANALYSIS OF
WILSON CASE

X64058

**SECTION I**

X64060

**OFFICE OF PROFESSIONAL STANDARDS**          **28 SEPTEMBER 1990**

TO:            Chief Administrator
               Office of Professional Standards,

FROM:          Investigator Michael GOLDSTON, Star #73

SUBJECT:       Special Project Conclusion Report.


        As directed, this report is being submitted to
present the result of my collection and analysis of available
information in the course of the above captioned project.

        I used a variety of sources to obtain and
corroborate data. As usual, some sources were more reliable than
others.  The article House Of Screams which appeared in the
Chicago Reader served as a sound starting point.  The names which
appeared in that article also figured prominently in my research.
The City's Corporation Counsel files provided a wealth of
material that I used to identify individuals as well as verify or
augment information on previously identified individuals.  Two
sources for which I originally had high hopes proved to be
disappointments.  The People's Law Office contributed a number
of names, but offered little in the way of supporting
information.  The Public Defender's Office, which I understood
had a database of cases relevant to this project, was also of
little help.  In fact, that office did not have such a database
and any research had to be conducted by hand.  Even then, there
was no guarantee that all pertinent information on an individual
would be available since their files are cannibalized for their
purposes.  When those purposes are served, the files are often
not reconstructed.

        My first order of business was to start a
computer database of individuals who came to my attention as
alleged victims.  I have submitted printouts of that database in
the past with status reports.  In the interim, I have modified
the database to reflect truly germane data.    Previously,
witnesses were included as individual records.  Now they appear
in a new column entitled "(WITNESS(ES)" as part of the
appropriate record for the alleged victim.  All available
information is recorded in the database, but for some individuals
there was a distinct dearth of information.  Those cases account
for the gaps in the database.  As part of this report, I am
including a printout of the modified database in two forms;
sorted alphabetically, and, by date of the alleged incident.
Ongoing research during this project resulted in the
identification of some alleged incidents which did not involve
Area 2 personnel.  Those have been deleted from the database.

                                        X64061

I have also created individual files in this office for each individual identified. Those files have been updated as additional information has become available. The types of documents that are part of the individual files include, but are not limited to; CR investigative files, Detective Division reports, Arrest Reports, Criminal Histories, depositions, court transcripts, and medical records.

At your direction, I conducted an "intersection study" to determine the identity of individuals who met certain criteria. The result of that study appears as a separate index of this report. Information that has been added since the last submission of the "intersection study" report is indicated in highlighted and bracketed form. An updated version of the grid which accompanied the previous report is included also.

In the process of analyzing the data produced during this endeavor, credibility of the individuals and sources was paramount. The credibility of some individuals was suspect as a result of their relationships to other individuals (gang affiliation, shared criminal history, familial, etcetera). There were also a number of individuals who were contacted by the People's Law Office. The manner in which the PLO broached the subject of abuse in these cases is questionable. There were examples of their representatives initiating the contact by relating the nature of their business, which would include information that some other individual alleged physical abuse at the hands of Commander BURGE for example. The next question asked would be, "Were you ever physically abused by Jon BURGE?" BURGE had some contact with practically each person with whom the PLO spoke and each had, at the least, been suspected of committing a serious offense. Taking these facts into consideration, any response by these individuals had to be taken with the proverbial grain of salt. Others were quite credible as a result of how they related what allegedly happened to them and being supported by corroborating evidence such as medical records. In fact, some individuals were so credible that civil suits filed by them resulted in settlements. In one case, a conviction was reversed based on information given in a motion to suppress which had originally been denied.

Ultimately, an opinion must be posited based on the two questions that initiated this project. The first being, "Is there evidence that personnel assigned to Area 2 are guilty as regards the practice of systematic abuse of individuals in their custody?" The second is, "If such systematic abuse did occur, is there evidence that Area 2 command personnel were aware of such abuse and condoned same?"

**OFFICE OF PROFESSIONAL STANDARDS**          **28 SEPTEMBER 1990**
**SPECIAL PROJECT CONCLUSION REPORT**                  **PAGE 3**

In the matter of alleged physical abuse, the preponderance of the evidence is that abuse did occur and that it was systematic. The time span involved covers more than ten years. The type of abuse described was not limited to the usual beating, but went into such esoteric areas as psychological techniques and planned torture. The evidence presented by some individuals convinced juries and appellate courts that personnel assigned to Area 2 engaged in methodical abuse.

The number of incidents in which an Area 2 command member is identified as an accused can lead to only one conclusion. Particular command members were aware of the systematic abuse and perpetuated it either by actively participating in same or failing to take any action to bring it to an end. This conclusion is also supported by the number of incidents in which the Area 2 offices are named as the location of the abuse.

The essence of this report is included as a number of appendices:

Appendix A - Sources (names of individuals on whom information was obtained listed beneath source)

Appendix B - Database Spreadsheet (sorted in alpha order by name of victim)

Appendix C - Database Spreadsheet (sorted in order by Date of Incident)

Appendix D - Intersection Study

Appendix E - Intersection Grid

Appendix F - Statistical Analysis

Investigator Michael GOLDSTON, #73

APPROVED:

Leonard BENEFICO
Coordinator of Operations

XF4063

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| AARON PATTERSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No.    03 C 4433 |
| vs. | ) | |
| | ) | Judge Gottschall |
| Former Chicago Police Lt. JON BURGE, | ) | |
| The City of Chicago, et. al., | ) | |
| | ) | |
| Defendants. | ) | |

## PLAINTIFF'S RESPONSE TO DEFENDANT CITY'S MOTION TO "BAR DISCOVERY AND TRIAL ON THE *MONELL* CLAIMS AGAINST IT"

EXHIBIT C

**KNOWN BURGE, AREA 2 AND 3 TORTURE VICTIMS 1972-1991 (12/10/04)**

| DATE | VICTIM | ALLEGED TORTURE METHODS | OFFICERS |
|---|---|---|---|
| 8/5/72 | Rodney Mastin, Lindsey Smith, Clarence Hill | vicious beatings, hit in head with ash tray | Burge, Listkowski, Houtsma |
| 1972 or 1973 | Unknown - -witnessed by Det. Bill Parker | screaming, pants down, hiding implements, handcuffed to hot radiator | Burge plus 2 dets. (Area 2) |
| 5/30/73 | Anthony Holmes, a.k.a. Satan | bagged, beaten, electric shock | Burge, Pienta, Yucaitis, Wagner, Hoke, Listkowski, Gaffney (Area 2) |
| 12/1973 | Howard Collins | beaten, Russian Roulette, noose around neck | Burge and Hoke (Area 2) |
| 1973 | Lawrence Poree | shown black shock box, "this is what we got for niggers like you" | Burge, Hoke, (Wagner, Corless) (Area 2) |
| 1973 | Lawrence Poree | electric shock to testicle, armpits, arm, beaten | Burge, Hoke (Area 2) |
| 9/25/77 | Virgil Robinson | beaten with flashlight and police helmet, gun in mouth at railroad tracks | Dignan, McGuire, Yucaitis (Area 2) |
| 8/7/79 | Lawrence Poree, Leroy Sanford | electicshocked, beaten beaten | Burge, Wagner, Corless, Basile, Gallagher (Area 2) |
| 11/13/79 | James Lewis Edward James | beaten, threatened with horror chamber, ear cupped, kidnaped from Memphis | Burge, Wagner, Corless, Basile Gallagher (Area 2) |

| | | | |
|---|---|---|---|
| 9/20-21/79 | George Powell | electric-shocked, bagged, beaten | Burge, Corless, Basile, Hoke, (Area 4) O'Hara (Area 4) (Area 2 and 4) |
| 9/22/-9/24/79 | Ollie Hammonds | beaten, threatened with electric shock, held incommunicado without food or bathroom | Burge, Basile |
| 9/29/79 | Willie Porch | beaten, threatened with a gun, pistol whipped, hung by handcuffs | Burge, Gorman (Area 2) |
| 9/29/79 | Timothy Thompson Tony Thompson Raymond Golden | beaten and threatened | Burge, Gorman (Area 2) |
| 2/23/80 | Michael Coleman | beaten to the body, kicked in groin, stitches pulled out with tweezers | Burge, Pienta, Dwyer, Basile, Corless (Area 2) |
| 2/23/80 | Derrick King | beaten with a baseball bat to the body and with a phonebook | Burge, Pienta, Dwyer, Basile, Corless (Area 2) |
| 2/20/81 | William Bracy | beating, stomping on handcuffs, kicking on groin | Hoke, O'Callaghan |
| 11/13/81 | Sylvester Green | bagged, beaten to body and head | Burge, Grunhard, McCabe, McNally (Area 2) |

| | | | |
|---|---|---|---|
| 2/5/82 | Melvin Jones | electric shock, threatened with a gun, beaten | Burge, Flood, McGuire, McWeeney (Area 2) |
| 2/9/82 | Larry Milan (deceased) | bagging, beating | Unidentified officers under Burge's command during manhunt for Andrew Wilson (at Area 1) |
| 2/9/82 | Paul Mike | beaten on bottoms of feet and testicles | Unidentified officers under Burge's command during manhunt for Andrew Wilson (at Area 1) |
| 2/9/82 | Walter Johnson | bagging, beating | Unidentified officers under Burge's command during manhunt for Andrew Wilson (at Area 1) |
| 2/9/82 | Roy Brown | bagging, beating | Unidentified officers under Burge's command during manhunt for Andrew Wilson (at Area 1) |
| 2/9/82 | Alphonso Pinex | beating, threats | Unidentified officers under Burge's command during manhunt for Andrew Wilson (at Area 1) |
| 2/10/82 | Donald White  Dwight Anthony | beaten to the body and head while bagged, threatened with a gun  beaten | Burge, Yucaitis, O'Hara, Hill, McKenna (Area 2) |
| 2/13/82 | Donnell Traylor | bagging, threats, beating | Burge (Area 2) |
| 2/14/82 | Andrew Wilson | bagged, threatened with a gun, beaten to body and head, electric shock | Burge, Yucaitis, Pienta, McKenna, Hill (Area 2) |
| 2/14/82 | Jackie Wilson | threatened with electric shock and a gun | O'Hara, McKenna |

| Date | Name | Description | Officers |
|---|---|---|---|
| 6/9/82 | Michael Johnson | beaten, threatened with a gun, electric shock | Burge (Area 2) |
| 9/10/82 | Lee Holmes | bagged, beaten to the body, beaten with a flashlight and rubber hose | Byrne, Dignan Dioguardi (Area 2) |
| 9/10/82 | Stanley Wrice | beaten to body, and hit with a flashlight and black jack | Byrne, Dignan, Dioguardi (Area 2) |
| 9/10/82 | Rodney Benson | beaten with piece of rubber with tape on both ends and flashlight on groin, back, knee, chest and stomach, threatened with hanging, like they had other "niggers" | Byrne, Dignan, Dioguardi (Area 2) |
| 9/10/82 | Bobby Williams | beaten on thighs and groin with long black flex object with ball on end | Byrne, Dignan, Dioguardi (Area 2) |
| 1/21/83<br>4/26-28/83 | Alonzo Smith<br>James Andrews<br>David Fauntleroy | beaten to the body while bagged<br>beaten, beaten with flashlight<br>beaten to head, back, ribs | Byrne, Dignan (Area 2)<br>McWeeny, Madigan<br>Mc Weeny, Madigan<br>(Pienta, Gorman) |
| 9/2/83 | Jerry Mahaffey | beaten to the body while bagged, threatened with a gun, kicked in the groin | Byrne, Lotito Grunhard, Boffo, Leracz (Area 2) |
| 9/2/83 | Reginald Mahaffey | beaten to the head while bagged, beaten to the body, kicked in the groin | Byrne, Yucaitis, Grunhard, Boffo, Leracz (Area 2) |
| 10/28/83 | David Bates | beaten to the body while bagged, kicked in the groin | Byrne, Grunhard, Dwyer (Area 2) |
| 10/28/83 | Gregory Banks | beaten to the body while bagged, threatened with a gun, beaten with a flashlight | Byrne, Dignan, Grunhard, Dwyer (Area 2) |
| 11/2/83 | Darrell Cannon | threatened with a gun, Russian roulette, electric shock, hung by his cuffs, racial epithets | Byrne, Dignan, McWeeny, Grunhard (Area 2) (Madigan) |
| 11/18/83 | James Cody | beaten to the body with a flashlight, electric shock, beating | Paladino, Basile, McNally (Area 2) |

| 11/25/83 | Leonard Hinton | beaten to the body while bagged, electric shock | Burge, Krippel, Bajenski, Mokry (Area 2) |
|---|---|---|---|
| 1/1/1984 | Eric Smith | beaten with a stick | Dignan, Kushner (Area 2) |
| 1/12/84 | Leroy Orange | beaten to the body while bagged, electric shock, squeezed testicles | Burge, Flood, Bajenski McGuire, McWeeny, Madigan. McCabe, McNally (Area 2) |
| 1/12/84 | Leonard Kidd | Electric shock, beating | Burge, Flood, Bajenski, McGuire, McWeeny, Madigan, McCabe, McNally (Area 2) |
| 1/28/84 | Lavert Jones | beaten to the body and beaten with a telephone book | Byrne, Dignan, Yucaitis (Area 2) |
| 1/28/84 | Thomas Craft | beaten with a flashlight, choked, foot crushed | Dignan, Yucaitis (Area 2) |
| 4/84 | Stephen Cavanero | phone book placed on head, hit on phone book with mag flashlight | Burge, Dwyer, Maslanka? (Area 2) |
| 5/24/84 | Franklin Burchette | threatened with electric shock | Burge, McDermott, DiGiacomo, Solecki (Area 2) |
| 6/7/84 | Phillip Adkins | beaten to the body, beaten with a flashlight | Byrne, Yucaitis, Boffo Dignan, Lotito (Area 2) |
| 6/24/84 | Robert Billingsley | beaten, kicked, gagged with paper in throat, whipped with phone books | Dwyer (Dignan, Lotito, Yucaitis) (Area 2) |

| | | | |
|---|---|---|---|
| 10/29-30/84 | Terry Harris | choked, arm twisted, held in underwear overnight, threatened | Burge, Sgt. Wilson, Marley, Mazlanka, McGuire, Mokry (Area 2) |
| 11/2-4/84 | Stanley Howard | beaten to the body while bagged, slapped and kicked | Byrne, McWeeny, Boffo, Lotito, Paladino, Glynn (Area 2) |
| 3/21/85 | Jesse Winston | Hanging while in custody | Byrne, Dwyer, Yucaitis, Grunhard (Area 2) |
| 5/31/85 | Lonza Holmes | beaten to the body, beaten with a phone book | Burge, Madigan Dignan (Area 2) |
| 8/28/85 | L.C. Riley | beaten to the body | Madigan, Dwyer (Area 2) (McWeeny) |
| 10/9/85 | Mearon Diggins | beaten to the body, beaten with a flashlight | Pienta, Marley, Pederson, Paladino, Burge |
| 10/30/85 | Shadeed Mumin | bagged, threatened with a gun | Burge, Paladino, McDermott (Area 2) |
| 4/30/86 | Aaron Patterson | beaten to the body while bagged, threatened with a gun | Burge, Byrne, Pienta, McWeeny, Madigan, Pederson, (Area 2) |
| 4/30/86 | Eric Caine | ear cupping, beating | Pienta, Madigan, Brownfield (Area 2) |
| 7/21/86 | Stephen Bell | beaten to the head and body, beaten with a phone book | Byrne, Dignan, Boffo, Yucaitis, Hines (Area 2) |
| 7/21/86 | Michael Tillman | bagged, beaten to body and head, threatened with a gun, beaten with a flashlight and phone book | Byrne, Dignan, Boffo, Yucaitis, Hines (Area 2) |

| 8/10/-<br>8/12/86 | Clarence Trotter | slammed against the wall, physical and mental brutality and held incommunicado for 36 hours | Madigan, Brownfield, Nitsche (Area 2) |
|---|---|---|---|
| 10/13/86 | Terrence Houston<br>Darrell Cleveland | beaten to the body, electric shock, beaten with a flashlight | Pienta, Malblocki, Hayes, John Lotito (4th Dist. and Area 2) |
| 11/12/86 | Andrew Maxwell<br><br>Jerry Thompson<br><br>Jeffrey Howard | beaten to the body<br><br>kicked, beaten with flashlight<br><br>kicked, beaten | Paladino, Glynn, Basile, McDermott<br>Basile, Glynn, Paladino<br>Glynn, Basile, Paladino |
| 1/6/87<br><br><br>11/6/87<br><br>12/87 | Madison Hobley<br><br><br>Robert Smith<br><br>Philip Walker | beaten to the body while bagged<br><br><br>beaten<br><br>kicked, beaten, cuffed to steaming radiator, called "nigger," coerced into falsely naming someone as murderer | Lotito, Dwyer, Burge McWeeney, Paladino (Area 2)<br><br>Dwyer, Rice (Area 2)<br><br>Kill (Area 3), Garrity (Polygraph) |
| 4/8/88<br><br>6/24/88 | Grayland Johnson<br><br>Donald Torrence | beaten, and bagged<br><br>beaten | Kill, Byrne (Area 3)<br><br>Paladino, Maslanka (Area 3) |
| 8/25/88<br><br><br>4/89 | Ronald Kitchen<br><br><br>Stephen Riley | beaten to the body, beat with a phonebook, black jack, and phone receiver<br><br>beating, threat of electric shock | Burge, Kill, Smith, Byron (Area 3)<br><br><br>O'Brien (Area 3) |
| 4/19/90<br><br>9/21/90<br><br><br>4/91 | Tony Anderson<br><br>Cortez Brown<br><br><br>Unknown 14 year old | beaten on ribs with nightstick, gun to head<br><br>beaten about body<br><br><br>electric shock | at Area 2; Paladino, Mazlanka (from A 3), McDermott, Gallagher (A2)<br><br>Paladino, Maslanka (Area 3) |

| 6/5/91 | Ty Shaun Ross | beating; electric shock on thighs, repeatedly called "nigger" | McCann, Caesar, McWeeny, (Area 3) |
|---|---|---|---|
| | Terrence Brooks | beating, choking, shocking of witnesses | Kill, Maslanka, O'Brien (Area 3) |
| 9/25/91 | Marcus Wiggins, Jesse Clemons Imari Clemons | some beaten, some electric shock | Paladino, Maslanka, Kill, O'Brien, supervised by Burge and Byrne (Area 3) |
| 9/28/91 | Michael Peterson | choking, beating, kicking, attempt to burn with cigarette | Paladino, Maslanka, O'Brien |
| | Travis Richardson | slamming head on table | same, Byrne approved arrest (Area 3) |

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

AARON PATTERSON, )
)
    Plaintiff, )
)   No.    03 C 4433
    vs. )
)   **Judge Gottschall**
Former Chicago Police Lt. JON BURGE, )
The City of Chicago, et. al., )
)
    Defendants. )

## PLAINTIFF'S RESPONSE TO DEFENDANT CITY'S MOTION TO "BAR DISCOVERY AND TRIAL ON THE *MONELL* CLAIMS AGAINST IT"

EXHIBIT D

Minute Order Form (06/97)

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Charles Norgle | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 02 C 2438 | **DATE** | 10/16/2003 |
| **CASE TITLE** | | Fox vs. Tortoriello, et al. | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

Discovery Motions Involving Policy Issues on Plaintiffs' § 1983 Claim Against City of Chicago

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
  ☐ FRCP4(m)  ☐ Local Rule 41.1  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Status hearing held. For reasons stated on the record, Plaintiffs' Motion to Lift the Court Stay on Monell Discovery [41-1] is granted and City of Chicago's Motion to Bar Discovery of Policy Issues on § 1983 Claim Against City [43-1] is denied. Jury Trial set for March 2, 2004 at 10:00 a.m. Final Pre-trial Order including jury instructions due on February 17, 2004. It is so ordered.

*Charles R Norgle*

(11) ☐ [For further detail see order (on reverse side of/attached to) the original minute order.]

| | No notices required, advised in open court. | | | |
|---|---|---|---|---|
| | No notices required. | | | |
| | Notices mailed by judge's staff. | | | |
| | Notified counsel by telephone. | | | |
| ✔ | Docketing to mail notices. | | | 52 |
| | Mail AO 450 form. | | | |
| | Copy to judge/magistrate judge. | | | |
| | courtroom deputy's initials | | Date/time received in central Clerk's Office | |

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

AARON PATTERSON,                          )
                                          )
    Plaintiff,                            )
                                          )          No.    03 C 4433
    vs.                                   )
                                          )          Judge Gottschall
Former Chicago Police Lt. JON BURGE,      )
The City of Chicago, et. al.,             )
                                          )
    Defendants.                           )

## PLAINTIFF'S RESPONSE TO DEFENDANT CITY'S MOTION TO "BAR DISCOVERY AND TRIAL ON THE *MONELL* CLAIMS AGAINST IT"

EXHIBIT E

Minute Order Form (06/97)

## United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | William T. Hart | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 03 C 6620 | **DATE** | 6/30/2004 |
| **CASE TITLE** | Johnson vs. City of Chicago | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m)  ☐ Local Rule 41.1  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).

(10) ■ [Other docket entry]  In light of the amendment adding claims against defendants Cline and Hillard, there is no significant difference between discovery needed for those claims and discovery needed for the "Monell" claims against the City.  Defendant City's motion to bar discovery [24-1] is denied. No opinion is expressed as to the continuing effect of the City's waiver nor any effect such waiver might have on the trial itself. The parties shall consider waiting to conduct the depositions of Cline and Hillard until after other discovery is completed and a determination that such depositions are still necessary.

(11) ☐ [For further detail see order (on reverse side of/attached to) the original minute order.]

| | | | |
|---|---|---|---|
| | No notices required, advised in open court. | | number of notices |
| | No notices required. | | |
| | Notices mailed by judge's staff. | | JUL 0 1 2004 |
| | Notified counsel by telephone. | | date docketed |
| ✓ | Docketing to mail notices. | | |
| | Mail AO 450 form. | | |
| | Copy to judge/magistrate judge. | | |
| cw | courtroom deputy's initials | date/time received in central Clerk's Office | mailing deputy initials |

U.S. DISTRICT COURT
CLERK
2004 JUN 30 PM 5: 17
FILED

59