# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| AARON PATTERSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 03 C 4433 |
| | ) | |
| v. | ) | Judge Joan B. Gottschall |
| | ) | Magistrate Judge Geraldine Soat Brown |
| JON BURGE et al., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

The People's Law Office and Standish Willis (collectively, the "PLO"), prior counsel for plaintiff Aaron Patterson ("Patterson"), have moved for adjudication of their attorneys' lien against a portion of the settlement funds derived from Patterson's suit against former Chicago Police Lieutenant Jon Burge ("Burge") and the other City of Chicago defendants[1] (collectively the "City defendants"). Avila & Tomic LLP and Barry & Loewy LLP (collectively "Avila"), also former counsel for Patterson, and who succeeded the PLO, have also moved for attorneys' fees under their contingency agreement with Patterson in the amount of $1,666,500, which corresponds to one-third of the settlement. For the reasons set forth below the PLO is granted $980,986 in attorneys' fees in *quantum meruit*. Avila is granted $685,514, which is the remainder of the $1,666,500 portion of the settlement allocated to attorneys' fees. The remainder of the settlement award currently held by the court is to be paid to Patterson. Avila's motion to

---

[1] Specifically, the City defendants include the City of Chicago, Richard M. Daley, Terry Hillard, Thomas Needham, Leroy Martin, Gayle Shines, Burge, John Byrne, James Pienta, William Marley, Raymond Madigan, William Pederson, Daniel McWeeny, and Joseph Danzl.

strike portions of the PLO's motion to adjudicate attorneys' fees is denied as moot. Avila's motion to conduct limited discovery of the PLO attorneys is also denied.

## I. BACKGROUND

Patterson was found guilty in the Circuit Court of Cook County of the 1986 murders of Vincent and Rafaela Sanchez and sentenced to death. In 1992, Patterson's conviction and sentence were affirmed by the Illinois Supreme Court. *People v. Patterson*, 610 N.E.2d 16, 50 (Ill. 1992). However, in 2000, the Illinois Supreme Court held, *inter alia*, that Patterson was entitled to an evidentiary hearing on his claim that his trial counsel was ineffective in failing to present evidence that his confession was involuntary. Furthermore, the court held that new evidence concerning a systemic pattern of torturing suspects at Chicago Police Department Area 2 Headquarters (where Patterson gave his confession) also entitled Patterson to an evidentiary hearing on his claim that his confession was coerced via torture. *People v. Patterson*, 735 N.E.2d 616 (Ill. 2000). On January 2003, George Ryan, the then-Governor of Illinois, relying on evidence that Patterson's confession was coerced by torture and that Patterson was actually innocent, granted Patterson a pardon, and he was released that very day.

On June 26, 2003, Patterson filed the instant case against numerous defendants, including Burge and other Chicago Police officers and officials, the City of Chicago, the Cook County State's Attorneys Office, and assorted individual state's attorneys, alleging, *inter alia*, violation of his constitutional rights under 42 U.S.C. § 1983 and malicious prosecution. On March 10, 2008, Patterson and the City defendants entered into a settlement agreement and filed a stipulation of dismissal. As part of the settlement agreement, the City defendants agreed to pay Patterson the sum of $5 million. The issue

presently before the court centers upon a dispute between two sets of Patterson's attorneys: the PLO, which represented Patterson during the latter phases of his criminal case and from the initiation of this case until its withdrawal as Patterson's counsel on February 9, 2006; and Avila, which represented Patterson from August 25, 2006 until March 20, 2008, when they, too, withdrew as his counsel.

At the initiation of the instant case, Patterson and the PLO entered into a retainer agreement (the "PLO retainer") that stated that stated in relevant part:

> 3. If there is a recovery, either through settlement or trial, the client agrees to pay his lawyers a contingency fee of 33 1/3% (one-third) of the total amount recovered, including attorneys' fees if awarded.
> …
>
> 5. In the event that the client obtains other lawyers to represent him in this matter prior to its final resolution, the replaced attorney or attorneys shall be entitled to a fee of the reasonable value of services provided based upon the number of hours spent by such attorney or attorneys multiplied by the hourly rate of such attorney or attorneys.

The PLO represented Patterson until it withdrew from the case on February 9, 2006. According to the PLO, a tentative settlement agreement had been reached with the City defendants in late 2005, in which the PLO offered Patterson a guaranteed net minimum award of $2.4 million after fees, costs, and the repayment of a loan that Patterson had earlier taken out. The PLO claims that it bought this offer to Patterson four times in January of 2006, and that each time Patterson refused the offer, stating further that he would not settle for any amount. The PLO claims that Patterson's constantly shifting position on settlement, his conduct during depositions, his failure to heed counsel's advice, his uncooperative attitude (Patterson is reported to be an emotionally volatile individual), and his final, repeated assertion that he would not settle for any amount, resulted in the PLO concluding that the attorney-client relation had irretrievably

broken down, and it consequently filed a motion to withdraw, which was granted by the court.

Patterson was present in court during the hearing at which the PLO moved to withdraw. Transcript of Record at 3, Patterson v. Burge, No. 03 C 4433 (Feb. 9, 2006). Patterson did not explicitly object to the withdrawal of the PLO as his counsel, stating that he "would like to hear them say in open court individually that each one of them wants to withdraw so it can be on the record." *Id.* at 4. Patterson made it clear that he wanted his attorneys' withdrawal on the record, and suggested that the court should revisit the contingency fee arrangements he had made with the PLO, a suggestion which the court declined at that time. [2] *Id.* at 5-6. Patterson then expressed the desire to proceed *pro se* while seeking new counsel, rather than have the court appoint an attorney for him, and he asked the court to direct the PLO to hand over to him all of the evidence as soon as possible. *Id.* at 7-9. The hearing transcript confirms that Patterson was not reluctant to let his attorneys withdraw, but rather that he personally wished to ensure that their withdrawal was on the record, and that he was concerned that the PLO might still attempt to collect its contingency fee after the case was resolved.

On August 25, 2006, Patterson engaged Avila to represent him in the ongoing case. [3] Patterson and Avila signed a contract, which stated in relevant part:

> The Client agrees that Avila and Tomic LLC shall be entitled to 33.33% of any Recovery ultimately received. The 33.33% recovery that Avila and

---

[2] At the hearing, Patterson stated: "Maybe the contract should be renegotiated, too. If they're taking 33 1/3 percent, and then they just decided that they want to be off the case because I refused to make a settlement, then maybe we should discuss how the contract should be renegotiated?" Transcript of Record at 6, Patterson v. Burge, 03 C 4433.

[3] Wallace "Gator" Bradley, a self-styled "urban translator," has also filed a motion to intervene in this case, seeking compensation from Avila. Bradley's motion has not yet been ruled upon. Since his fee dispute in this case concerns his services to Avila in procuring and assisting with Patterson's representation, and not against Patterson's award directly, the court need not address Bradley's claim at this time.

Tomic LLC shall be entitled to receive shall be free of any and all other attorney's liens or fees associated with this case.

…

[I]f Client decides to terminate representation with Avila & Tomic LLC and subsequently receives a settlement in this case after said termination than (sic) Avila & Tomic LLC will have a right to a portion of the settlement recovery not only for the Quantum Meruit amount of time in this case but also for a percentage of the settlement amount due to the value of Avila & Tomic in this case.

Avila continued to represent Patterson through the time at which the settlement agreement with the City defendants was reached and the stipulation to dismiss the case against the City defendants was filed. Avila subsequently withdrew as Patterson's counsel on March 20, 2008.[4]

Presently before the court are the PLO's motion for adjudication of its attorney's lien against Patterson, Avila's cross-motion for attorney's fees in the form of its 33 1/3% contingency fee, Avila's motion to strike several portions of the PLO's motion as containing hearsay, and Avila's motion for limited discovery of the PLO. The court addresses each of these motions in turn.

## II. ANALYSIS

Under Illinois law, trial judges have broad discretion in matters of attorneys' fees due to the advantage of their close observation of the attorney's work and the trial judge's deeper understanding of the skill and time required in the case. *Will v. Northwestern Univ.*, 881 N.E.2d 481, 505 (Ill. App. Ct. 2007); *Mirabal v. Gen. Motors Acceptance Corp.*, 576 F.2d 729, 730 (7th Cir. 1978). While the burden of proof is upon the attorney to establish the value of his services, the trial court "is not limited to the evidence presented in arriving at a reasonable fee but may also use the knowledge it has acquired

---

[4] Patterson's case against the Cook County defendants continues at the present.

in the discharge of professional duties to value legal services rendered." *Johns v. Klecan*, 556 N.E.2d 689, 695 (Ill. App. Ct. 1990).

**A. PLO's Motion to Adjudicate Its Attorney's Lien and Avila's Cross-motion for Attorney's Fees.**

As an initial matter, both sides concede that the PLO may not collect the 33 1/3% contingency fee specified by the PLO retainer with respect to the $5 million settlement by the City defendants. When a client terminates an attorney working under a contingency fee contract, the contract ceases to exist and the contingency term, whether or not the client prevails, is no longer operative. *Wegner v. Arnold*, 713 N.E.2d 247, 250 (1991); *Callahan*, 578 N.E.2d at 988. However, a discharged attorney is entitled to be paid a reasonable fee on a *quantum meruit* basis for those services rendered prior to discharge. *Will*, 881 N.E.2d at 504; *Rhoades v. Norfolk & W. Ry. Co.*, 399 N.E.2d 969, 975 (Ill. 1979). Under this theory, a trial court literally awards the attorney, as the term indicates, "as much as he deserves." *Wegner*, 713 N.E.2d at 250 (quoting *Kannewurf v. Johns*, 632 N.E.2d 711, 717 (Ill. App. Ct. 1994)). Therefore, the question that initially presents itself is whether the PLO, which was not discharged but which rather withdrew from representing Patterson prior to finalization of the settlement, may receive attorneys' fees on a *quantum meruit* basis.

Avila argues that it should not. According to Avila, any recovery in *quantum meruit* should properly be denied because the PLO withdrew from representing Patterson without good cause and "engaged in a series of unprofessional actions that sought to sabotage Patterson's case." Avila Resp. Brief 4. Avila contests the PLO's claim that its motion to withdraw was based upon "irreconcilable differences that [made] it impossible to represent Patterson." PLO's Mot. for Leave to Withdraw at 1. Avila argues that there

is no evidence indicating any good cause for the PLO's withdrawal, but rather, that the PLO coldheartedly "fired" or "abandoned" Patterson at a time when he was desperate for cash and was highly motivated to settle.[5]

The PLO, on the other hand, has asserted in its brief that the principal reason for its withdrawal from representing Patterson was Patterson's repeated refusal to accept any amount of money in settlement from the City defendants. Avila retorts that there was never any such settlement offer from the City defendants, and that the PLO's evidence thus consists entirely of falsifications and inadmissible hearsay evidence.

However, the PLO's argument that Patterson rejected a settlement offer of $4 million from the City defendants is directly supported by the record and, fatally for its argument, Avila's accusations of falsification are undermined by the admissions of Patterson, its own then-client. Although the PLO did not advance a reason in open court for seeking to withdraw, Patterson himself stated the reason during the motion hearing. During that proceeding, Patterson stated: "Maybe the contract should be renegotiated, too. If they're taking 33 1/3 percent, and then they just decided that they *want to be off the case because I refused to make a settlement*, then maybe we should discuss how the contract should be renegotiated?" Transcript of Record at 6, Patterson v. Burge, 03 C 4433 (Feb. 9, 2006) (emphasis added); *see also* Avila's Resp. to PLO's Mot. for Adjudication of Attorney's Lien, Ex. E at 6. Patterson therefore stated in open court that the PLO wanted to withdraw from the case because he refused to make a settlement with the City defendants. Moreover, in a letter filed with the court, Patterson wrote, "The other issue concerns the amount allegedly offered to me to settle in January 2006 —

---

[5] The court notes that on March 20, 2008, Avila withdrew as Patterson's counsel citing irreconcilable differences with Patterson.

which was $4 million.  And my response to offer which included (sic), Why the rush?"

Letter from Aaron Patterson, Patterson v. Burge, 03-C-4433, Docket no. 860 (Feb. 9,

2006).  Again, Avila's argument to the contrary notwithstanding, its own client

represented directly to the court, on the record, that the PLO withdrew because he refused

to settle for $4 million.  Thus, there is sufficient evidence that the PLO withdrew because

Patterson refused to accept an offer of $4 million dollars from the City defendants.[6]

An attorney who withdraws from a case with good cause may recover reasonable

expenses on a *quantum meruit* basis.  *Kannewurf*, 632 N.E.2d at 715; *Reed Yates Farms,

Inc. v. Yates*, 526 N.E.2d 1115, 1121 (Ill. App. Ct. 1988).  Moreover, evidence that a

decision by the plaintiff to refuse to allow his attorney to negotiate a possible settlement,

at a time when her professional judgment was that a settlement was not only possible but

in the plaintiff's best interests, can permit the court to conclude that the plaintiff's refusal

forced a complete breakdown in the attorney-client relationship.  *Kannewurf*, 632 N.E.2d

at 715; *see also Leoris & Cohen P.C. v. McNiece*, 589 N.E.2d 1060, 1064 (Ill. App. Ct.

1992); *Reed Yates Farms*, 526 N.E.2d at 1121.  In the instant case, there is sufficient

evidence that the PLO withdrew because Patterson refused to settle his case against the

City defendants for $4 million, a settlement which the PLO, which had litigated not only

Patterson's civil case from its inception until their withdrawal but also much of the

preceding criminal case out of which the instant action flowed, felt, in their professional

judgment, that it was in his best interest to accept.  That refusal precipitated a complete

---

[6] Avila has also filed a motion, addressed below, to strike portions of the PLO's Memorandum in Support
of its Motion for Adjudication of its Attorney's Lien as hearsay.  Avila's motion to strike the alleged
hearsay is a tactical move attempting to exclude any evidence that there was a settlement offer from the
City defendants at the time the PLO withdrew from the case as a way of undermining the PLO's claim that
it withdrew for good cause.  However, Avila's motion notwithstanding, Patterson, in open court, and in his
court filing of February 14, 2008, provided evidence that the City defendants made a settlement offer of $4
million five months prior to Avila's taking the case.

breakdown of the attorney-client relationship, and the PLO therefore withdrew with good cause. Given these circumstances, the PLO may seek recovery of reasonable fees on a *quantum meruit* basis.

Next Avila asserts that even if the PLO can assert a claim based in *quantum meruit*, Avila is nevertheless entitled to its full contingency fee of 33 1/3% and that any recovery by the PLO must be from the remainder of the settlement funds, i.e., Patterson's portion of the settlement.[7] In support of this contention, Avila cites a single case, *In re Estate of Callahan*. 578 N.E.2d 985 (Ill. 1991). However, Avila's citation to this case is inapposite and its reliance upon it is misplaced. In *Callahan*, a discharged attorney sought recovery in *quantum meruit* for work performed on a case that was neither adjudicated nor settled. 578 N.E.2d at 986. The court ordered that the attorney's claim in *quantum meruit* was to be paid from the assets of the client's guardianship estate. *Id.* at 986-87. *Callahan* teaches, therefore, that a discharged attorney can seek recovery in *quantum meruit*, for work performed on a client's behalf, against the client's estate in the absence of any adjudication or recovery. It does not stand for the proposition, as Avila would have the court believe, that a discharged attorney must seek damages in *quantum meruit* against the plaintiff's portion of a recovery, while a successor attorney is permitted to recover its entire contingency fee.

Avila also argues that the PLO is barred from seeking any portion of Avila's contingency fee because, according to Avila, the so-called "'comparison/apportionment method' of fee determination has been rejected by Illinois courts." Avila's Resp. to PLO's Mot. for Adjudication of Attorney's Lien 22. Avila cites principally to *Loggans &*

---

[7] Unsurprisingly, Patterson also objects vehemently to this argument. An attempt before Judge Aspen in the autumn of 2007 to mediate attorneys' fees between the PLO and Avila foundered.

*Assocs., v. Estate of Magid*, 589 N.E.2d 603 (Ill. App. Ct. 1992), in support of its contention that the PLO's fees in this case should be taken from Patterson's portion of the settlement. Once again, Avila's use of the case is inapposite, if not an outright misrepresentation; indeed, it entirely mischaracterizes the nature of the "comparison/apportionment method" to support its argument. In *Magid*, the court analyzed the utility of the comparison/apportionment method, which consists of calculating the appropriate fees due to the discharged and successive attorneys by determining what percentage of the work in a given case was performed by each counsel and then applying that fraction to the total contingency fee paid. 589 N.E.2d at 612. The court finally rejected that method of calculation and upheld the method established in *Johns v. Klecan*, 556 N.E.2d 689 (Ill. App. Ct. 1990). 589 N.E.2d at 612. The method described in *Johns* consists of determining "the amount of total time spent on cases in performing legitimate services for the client and then multiplying that time by a reasonable hourly rate." 556 N.E.2d at 684. Such an analysis, the court continued:

> [I]s … the best method to determine the reasonable value of a discharged attorney's services. That approach avoids the problems inherent in the comparison/apportionment approach. It is much easier for a trial court to undertake [this] approach than to place a value on the perhaps widely varying services performed by attorneys *vis-à-vis* the client's ultimate recovery.

*Id.* (internal citations omitted). Using this method of calculation, the *Magid* court determined that the discharged attorney was entitled to no fees for her work beyond those she had already received from another settlement in the same suit. 589 N.E.2d at 613. But what *Johns* and *Magid* do *not* stand for is the notion that Avila is entitled in this case to its entire one-third contingency fee and that any *quantum meruit* claim brought by the

PLO against the contingency fee is therefore barred and must be sought instead against Patterson's recovery.

On the contrary, Illinois law states that the proper method for determining a discharged (or withdrawn for good cause) attorney's fees and successive attorneys' fees is to determine one party's fee in *quantum meruit* and subtract that amount from the contractual contingency fee, awarding the remainder to the other attorney. *Wegner*, 713 N.E.2d at 253; *see also Johns*, 556 N.E.2d at 696; *Tobias v. King*, 406 N.E.2d 101, 104 (Ill. App. Ct. 1980). In the instant case, the PLO, which represented Patterson from June, 2003 through January, 2006, has sought recovery in *quantum meruit* from Avila, the successor counsel, which stubbornly contends that it is entitled to the entire contingency amount. The court rejects Avila's contention. It will therefore proceed by evaluating the PLO's claim in *quantum meruit*, subtracting the calculated amount from the total contingency fee of $1,666,500 (one third of the $5 million settlement award), and awarding that amount to the PLO.[8] The remainder of the one-third contingency fee will be awarded to Avila.

Before proceeding further, the court addresses the PLO's proposal that attorneys' fees in this case be capped at 38% of the $5 million settlement amount. PLO's Mem. in Supp. of Mot. for Adjudication of Attorneys' Fees at 16. The PLO proposes this as a way of avoiding "excessive" attorneys' fees, and the court agrees that avoiding excessive fees is a necessary aim of these proceedings. However, the court has been furnished with no idea of how the PLO came up with a figure of 38% of the total settlement as a

---

[8] Avila has submitted no factual data that would allow the court to determine the value of its own fees, insisting that it should receive the entire one-third contingency fee. Consequently, the court awards the remainder of one-third of the settlement award allocated to attorneys' fees to Avila after subtracting the PLO's fees determined in *quantum meruit*.

"0reasonable" one, and the PLO offers neither logic nor law in support of increasing the attorneys' joint recovery to this percentage.

The court sees things differently. Patterson contracted with both parties for a contingency fee of 33% of all funds received, whether via settlement or adjudication. The PLO agreed in its contract with Patterson that, if it were succeeded in the case by other attorneys, it would seek recovery in *quantum meruit*. The court sees no legal or equitable justification for increasing the contracted-for percentage. Indeed, such a precedent would ultimately encourage attorneys to "jump ship," knowing that they were entitled (if the case were ultimately successful for the plaintiff) to a slice of the recovery pie growing ever larger for the attorneys and ever smaller for the plaintiff. The court holds, therefore, that the total recovery by the PLO and Avila together should not exceed 33% of the $5 million settlement.

In making its *quantum meruit* determination, the trial court assesses a number of factors: (1) the time and labor required, and the attorney's skill and standing; (2) the nature of the cause; (3) the novelty and difficulty of the subject matter; (4) the attorney's degree of responsibility in managing the case; (5) the usual and customary charge for that type of work in the community; (6) and the benefits resulting to the client. *See Callahan*, 578 N.E.2d at 990. The PLO argues that, employing these criteria, it should receive $1,432,572 of the total contingency fee of $1,666,500, leaving a mere $233,928 for Avila as its portion of the fees. The PLO's fee computation is based on the sum of: (1) 1,799.8 hours of work billed by attorney G. Flint Taylor ("Taylor") at a rate of $525 per hour; (2) 1201.9 hours of work billed by attorney Joey L. Mogul ("Mogul") at a rate of $325 per hour; (3) 148.4 hours of work billed by attorney Michael E. Deutsch ("Deutsch") at a rate

of $525 per hour; and (4) 95.75 hours of work billed by attorney Ben H. Elson ("Elson")
at a rate of $200 per hour. The PLO states that some of the billed hours were on matters
consolidated with another police torture case (*Orange v. Burge*, 04 C 0168) and that those
hours are therefore divided in half. The four attorneys have each submitted affidavits
with attached appendices containing their time sheets detailing the hours expended on the
case.

The court finds that, applying the criteria established above: (1) this case, with its
sensational aspects, and considering the history of difficulties between Patterson and his
attorneys, required extensive time and effort on the part of the PLO, which conducted
much of the discovery. The number of hours submitted by the PLO lawyers, experienced
civil rights litigators are, with some exceptions, not unreasonable; (2) the cause at issue is
important, but not unique: two other lawsuits against the same City defendants are being
litigated for the respective plaintiffs by the PLO, permitting consolidation of effort and
hours; (3) although the case was unusual, it was not, given the final resolution of the
criminal case and the events succeeding it, extraordinarily difficult from a legal
standpoint; (4) the PLO, a relatively small office, had its leading attorneys investing a
great deal of time in this high profile case; (5) the hourly rates claimed by the PLO
lawyers are extremely high by the standards of the legal community for this type of work;
and (6) the PLO was successful in initially negotiating a settlement for Patterson, which
he rejected, but later accepted when it was increased by $1 million.

The court finds the PLO's claim for $1,432,572 to be excessive. As an initial
matter, Avila argues, and the PLO does not contest, that the PLO, in addition to both the
instant case and *Orange v. Burge*, represents the plaintiff in another contemporaneous

torture victim case against the City defendants, *Cannon v. Burge*, (05 C 2192), which was filed at approximately the same time as the instant case.  Any consolidated hours billed by the PLO attorneys should therefore be multiplied not by one-half but rather by one-third.  Moreover, the hourly rates charged by the PLO attorneys are too high when compared to comparable lawyers doing comparable work at that time.

The party requesting attorney's fees bears the burden of substantiating the reasonableness of the hourly rates sought.  *See Estate of Borst v. O'Brien*, 979 F.2d 511, 515 (7th Cir. 1992).  The determination of an attorney's "reasonably hourly rate" should be based on the "market rate" for the services rendered.  *Spegon v. The Catholic Bishop of Chicago*, 175 F.3d 544, 554-55 (7th Cir. 1999) (citing *People Who Care v. Rockford Bd. of Educ., Sch. Dist. No. 205*, 90 F.3d 1307, 1310 (7th Cir. 1996)).  If the court cannot determine the attorney's actual billing rate because the attorney accepts cases on contingency fee bases and has no fee-paying clients, the court should look to the next best evidence of the attorney's market rate: rates similarly experienced attorneys in the community charge paying clients for similar work, as well as evidence of fee awards the attorney has received in similar cases.  *Spegon*, 175 F.3d at 555.  Specifically, an attorney who maintains a contingent fee practice should submit affidavits from comparable attorneys attesting to the rates they charge paying clients for similar work. *Small v. Richard Wolf Med. Instruments Corp.*, 264 F.3d 702, 707 (7th Cir. 2001).

The PLO spends a great deal of time in its several briefs detailing the time and effort expended, and the small returns it realized, in defending and eventually exonerating Patterson from the criminal charges that precipitated this case.  Although making for compelling reading, those details are largely irrelevant to the issue presently at bar: only

the hours worked on the instant civil case are relevant to the *quantum meruit* calculation. Taylor, an experienced attorney with an extensive history of civil rights litigation, avers that in the 1990s he received compensation at an hourly rate of between $250 and $350 per hour. He advances $525 per hour as a reasonable hourly rate based upon his experience and the other factors listed *supra*. The PLO has also filed affidavits from Steven Saltzman, an attorney in private practice serving on the Chicago Commission on Human Relations and the Cook County Commission on Human Rights; Clyde Murphy, Executive Director of the Chicago Lawyers' Commission for Civil Rights Under the Law, Inc.; and Robin Potter, an attorney in private practice, all in support of Taylor and the other PLO lawyer's proposed hourly billing rates.[9] Taylor provides no other comparative data, other than the supporting affidavits, to support his contention that the billing rate for senior partners of a small, public-interest law firm have increased by approximately 57% between the late 1990s and the interval 2003-2006.

Nevertheless, the court finds, based upon recent cases in this district, that $400 per hour for Taylor (and Deutsch, who is similarly situated) would have been a more reasonable rate for such an attorney in the interval during which the PLO represented Patterson. *See, e.g., Thomas ex rel. Smith v. Sheahan*, --- F. Supp. 2d ----, No. 04 C 3563, 2008 WL 2266314, at *28 (N.D. Ill. June 2, 2008) (awarding attorneys' fees in civil rights case in range between $250 and $350 per hour); *Romaine ex rel. Romaine v. City of Chicago*, No. 05 C 2643, 2007 WL 2570347, at *4 (N.D. Ill. Aug. 30, 2007) (reasonable rate for an experienced civil rights attorney set at $350 per hour). Likewise, the court

---

[9] In his affidavit, Saltzman does not provide any data concerning his own billing rates. Murphy avers that he is currently seeking a rate of $520 per hour for himself and $330 per hour for an associate admitted in 1998. Murphy Aff. ¶5. Potter avers that he has received between $325 and $495 per hour and that his associates have billed at between $235 and $330 during the time period relevant to this case. Potter Aff. at 6-9.

finds that $300 per hour is a reasonable rate for Mogul, an attorney with nine years' experience at the PLO (at the time the PLO withdrew), and $120 per hour is a reasonable rate for Elson, who had less than a year's post-law school experience at the time the PLO withdrew from representing Patterson. The court has increased what it considers the reasonable rate for the PLO over these recent cases on the strength of the affidavits of the PLO's fellow attorneys and considering the importance of the instant case.

Finally, the court disallows the following billed items by Mogul as being unrelated to the civil case, but as rather pertaining to Patterson's federal criminal charges:

| Date | Case | Item | Minutes |
|------|------|------|---------|
| 8/5/04 | Patterson | Federal Criminal case | 120 |
| 8/6/04 | Patterson | Federal Criminal case | 420 |
| 8/9/04 | Patterson | Discussion with GFT, with MED, Tommy Brewer, meeting with Tommy and Demitrus, read fed crim complaint, call with Kurt on deps | 360 |
| 8/10/04 | | Discussion with Tommy, Demitrus, Calls to Jane, Nancy, Robert, Jennifer for bond court date | 360 |
| | | **Total:** 1260 minutes (21 hours) | |

Therefore, given the court's revised hourly rates, and billing all consolidated hours at one-third rather than one-half as the PLO suggests, the court arrives at the following figures for the PLO's *quantum meruit* claim:

> **Taylor**: 1093.1 hours (work pertaining to the *Patterson* case alone) + 470.6 hours (1413.3 hours consolidated with the other cases x 0.333) = 1564 hours x $400 per hour = $625,480.

**Mogul**: 854.9 hours (work pertaining to the *Patterson* case alone) + 108.6 hours (326 hours consolidated with the other cases x 0.333) = 963.5 hours x $300 per hour = $289,050.

**Deutsch**: 119.2 hours (work pertaining to the *Patterson* case alone) + 19.4 hours (58.4 hours consolidated with the other cases x 0.333) = 984.5 hours x $400 per hour = $55,440.

**Elson:** 83.9 hours (work pertaining to the *Patterson* case alone) + 7.9 hours (23.7 hours consolidated with the other cases x 0.333) = 91.8 hours x $120 per hour = $11,016.

**Total: $980,986**

Subtracting this sum from the total contingency award of $1,666,500 yields a remainder of $685,514 as Avila's attorneys' fees in this case.[10]

Avila claims that most of the PLO's submitted hours are fraudulent and both sides hurl a great deal of invective at each other, accusing each other of various forms of professional misconduct. However, the court has reviewed with considerable care the affidavits and timekeeping records submitted by the PLO attorneys and their references and, within the restrictions cited above, does not find them to be unreasonable. Furthermore, given that contingent fee cases often do not generate the same degree of billing specificity that hourly billing does, the PLO has met its burden of establishing its reasonable fees, subject to the modifications of the court. *See Farfaras v. Citizens Bank and Trust of Chicago*, 433 F.3d 558 (7th Cir. 2006).

Moreover, the PLO claims that it performed the lion's share of the discovery and depositions taken in these related cases, with only minimal participation by Avila once it appeared on behalf of Patterson. Avila provides no factual evidence to the contrary, nor does it specifically dispute the truth of that assertion, but merely provides conclusory

---

[10] The court observes, parenthetically, that this calculation corresponds nicely with Magistrate Judge Brown's observation that Avila was entering the case when it was at "the end of Act Two or the beginning of Act Three." Transcript of Record at 14-15, Patterson v. Burge, 03 C 4433 (June 23, 2006)

statements such as: "[Avila] worked diligently *for nearly 20 months*, expended enormous amounts of time and resources, attended numerous depositions, and fought many discovery battles and motions all in efforts to prosecute this case." Avila's Sur-Reply at 16 (italics and underline in original). However, apart from conclusory statements of hard work and dedication to its client's cause, Avila adduces no factual information to demonstrate, as it claims, that it performed the majority of the litigation in this case. The court also notes in passing that whereas Avila has litigated diligently with respect to recovering its claimed contingency fee, it has been somewhat less diligent with respect to representing its client. Specifically, in the ongoing suit against the County defendants, Avila responded inadequately to the County defendants' post-discovery Requests to Admit, failed to respond to the County defendants' numerous requests for clarification of those responses, and ignored briefing schedules set by both Magistrate Judge Brown and this court, failing to submit any responsive briefs whatever on behalf of their client when the County defendants moved to have their requests to admit be deemed as admitted. In the meantime, Avila filed no fewer than 18 motions, responses, sur-responses and associated documents (exclusive of notices of presentment) concerned with defending their claims for attorneys' fees.

The court therefore denies Avila's motion for an award of its one-third contingency fee in its entirety and adjudicates the PLO's attorney's lien thus: the PLO is granted $980,986 in attorneys' fees in *quantum meruit*. Avila is granted $685,514, which is the remainder of the $1,666,500 (one-third) portion of the $5,000,000 settlement allocated to attorneys' fees. The remainder of the settlement award is to be paid to Patterson.

**B. Avila's Motion to Strike Certain Portions of the PLO's Motion to Adjudicate as Hearsay**

Avila has also moved to strike from the PLO's motion certain statements that the PLO includes in its motion and its Exhibit C, arguing that they are hearsay. Specifically, the alleged hearsay statements were made by Mara Georges ("Georges") and appeared in a *Chicago Tribune* article, which the PLO quotes and appends as Exhibit C to its motion, to the effect that a settlement offer was made by the City defendants before the PLO withdrew as Patterson's attorney. Avila has also moved to strike the portions of the PLO's motion which quotes Magistrate Judge Michael Mason of this district to the effect that the City was willing to make a settlement offer of $16.5 million to the four torture plaintiffs, including Patterson.

This motion to strike is part of Avila's vain and disingenuous attempt to prove that there was no settlement offer whatever made by the City defendants prior to Avila's appearance as Patterson's attorney. However, even assuming, *arguendo*, that the statements are hearsay, and would therefore be inadmissible as testimony at a hearing, Patterson's own words, as quoted from the record, *supra*, and as reflected in the exhibits to Avila's own response brief, fatally undermine Avila's argument. Patterson clearly and unequivocally indicates that there was indeed a $4 million settlement offer from the city defendants and that the PLO withdrew because Patterson would not settle for any amount at that time. The court did not, nor did it need to, consider any of the alleged hearsay statements in its analysis above, and Avila's motion is therefore denied as moot.

**C. Avila's Motion to Conduct Limited Discovery of the PLO**

Finally, Avila seeks to conduct discovery of the PLO lawyers as part of its effort to prove that the PLO's billing records are fraudulent. Avila argues that it has a "right to a hearing" on the matter of fees, citing both *Wegner* and *Magid*. 713 N.E.2d at 247; 589 N.E.2d at 615. However, Avila adduces no facts or evidence, other than its unilateral assertion, that the PLO's billing is fraudulent.

Once again, Avila's reliance on *Wegner* and *Magid* to support its contention that it has a right to an in-court hearing, and therefore to conduct additional limited discovery, is misplaced. Neither case suggests that an attorney disputing a prior attorney's *quantum meruit* claim has "a right to a motion hearing" and Avila adduces no case law or Federal Rule of Civil Procedure to suggest that it has. Nor can the court find any precedent that holds that a hearing and discovery must be conducted in an attorneys' fee dispute based on *quantum meruit*. On the contrary, such an in-court hearing is generally within the court's discretion, and is usually held when there are issues not sufficiently or adequately addressed by the contesting parties' briefs. Both parties have briefed this matter exhaustively. Moreover, Avila has had access to the affidavits of the PLO attorneys seeking fees and their attached exhibits detailing their billing hours. These affidavits and exhibits, signed by the respective parties, are representations to the court under Federal Rule of Civil Procedure 11(b). It is unclear what more Avila could hope to gain through taking depositions of the PLO attorneys listed in its motion. Given the apparent futility of Avila's motion, and the fact that the court has decided herein the issue of both parties' recovery of attorneys' fees in this case, Avila's motion to conduct limited discovery of the PLO attorneys is denied.

### III. Conclusion

For the reasons set forth above, the PLO is granted $980,986 in attorneys' fees in *quantum meruit*. Avila is granted $685,514, which is the remainder of the $1,666,500 portion of the $5,000,000 settlement allocated to attorneys' fees. The remainder of the settlement amount is to be paid to Patterson. Avila's motion to strike portions of the PLO's motion to adjudicate attorneys' fees is denied as moot. Avila's motion to conduct limited discovery of the PLO attorneys is denied.

ENTER:

_____/s/_____
JOAN B. GOTTSCHALL
United States District Judge

DATED: August 4, 2008