IN THE
UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| AARON PATTERSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 03 C 4433 |
| | ) | |
| | ) | Judge Joan B. Gottschall |
| FORMER CHICAGO POLICE | ) | |
| OFFICER JON BURGE et al., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Currently before the Court are motions for summary judgment filed by Defendants Peter Troy and William Lacy. Plaintiff has responded and the Defendants have replied. For the following reasons, the Court grants Defendants' motions and dismisses the claims against Troy and Lacy.

## I.    BACKGROUND

In 1986, Plaintiff Aaron Patterson ("Plaintiff") was convicted of murdering Vincent and Rafaela Sanchez and was sentenced to death. In 1992, the Illinois Supreme Court affirmed the conviction and sentence. One of Plaintiff's claims rejected on appeal was that his confession, which was introduced at trial, was not true and was the result of a physically coercive interrogation. Plaintiff alleged that officers at the Area 2 Headquarters of the Chicago Police Department had beaten and tortured Plaintiff.

In November of 1990, the Office of Professional Standards ("OPS") of the Chicago Police Department issued a report which found that, from 1973 to 1985, there was a pattern of abuse and torture of suspects in Area 2. It is not clear whether claims specifically about Plaintiff's abuse had yet been investigated at that time. On January 10, 2003, former Illinois Governor George Ryan pardoned Plaintiff and three other death row inmates allegedly tortured by Area 2 officers.

In June of 2003, Plaintiff initiated this suit against several Area 2 police officers and against former Cook County State's Attorney Richard Devine, the Cook County State's Attorney's Office, and Assistant State's Attorneys ("ASA") Peter Troy and William Lacy (who is now a Cook County Circuit Court Judge). Plaintiff has settled with all but four of the Defendants. Only Troy, Lacy, Devine, and the State's Attorney's Office remain in the case. All four of the Defendants have filed motions for summary judgment. This opinion addresses only the motions filed by Troy and Lacy. The motions by Devine and the State's Attorney's Office are addressed in a separate opinion.

The facts of this case are discussed in greater detail in the "Facts" section of this opinion. Briefly summarized, Plaintiff alleges the following. Area 2 officers beat and tortured him when interrogating him about the Sanchez murders. The officers coerced a false confession. Troy and Lacy were called to Area 2 to take Plaintiff's statement after he involuntarily agreed to confess. Troy prepared a false statement and asked Plaintiff to sign it. When Plaintiff refused to sign it, Troy attacked Plaintiff. Troy testified at Plaintiff's criminal trial that, even though Plaintiff refused to sign the statement, he had assented to the facts of the statement. With respect to Lacy, Plaintiff alleged in his complaint that he participated in the creation of the false statement, but Plaintiff now insists that Lacy was not present.

Based upon Troy and Lacy's alleged creation of a false statement, Troy's attacking Plaintiff when he refused to sign it, and Troy's testimony about the statement at Plaintiff's criminal trial, Plaintiff's Third Amended Complaint asserts six counts: violation of his due process right to a fair trial (count I); coercive interrogation (count II); torture and physical abuse (count III); and state law claims of malicious prosecution (count V); intentional infliction of emotional stress (count VI); and conspiracy

(count VII).[1]  For the reasons stated below, the Court grants Troy and Lacy's summary judgment motions and dismisses the claims against them.

## II.   Summary Judgment Standard

### A.  Federal Rule of Civil Procedure 56(c)

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c)(2); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Spath v. Hayes Wheels Int'l-Ind., Inc.*, 211 F.3d 392, 396 (7th Cir. 2000). In determining the existence of a genuine issue of material fact, the court construes all facts in the light most favorable to the nonmoving party and draws all reasonable inferences in favor of that party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).  When addressing a motion for summary judgment, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."  *Id.* at 255.

If the moving party meets its burden of showing that there are no issues of material fact, the nonmoving party has the burden "to go beyond the pleadings and affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact."  *Borello v. Allison*, 446 F.3d 742, 748 (7th Cir. 2006) (internal quotation marks and citations omitted); *Celotex*, 477 U.S. at 322-26; *Johnson v. City of Fort Wayne*, 91 F.3d 922, 931 (7th Cir. 1996).  A genuine issue of material fact is not demonstrated by the mere existence of "some alleged factual dispute between the parties," *Anderson*,

---

[1] The Third Amended Complaint also alleges claims of respondeat superior (count VIII) and indemnification (count IX) against Devine and the State's Attorney's Office, which the Court addresses in its other opinion entered this same date.  Lastly, Plaintiff's claim of a unconstitutional policy against the City of Chicago (count IV) has settled.

477 U.S. at 247, or by "some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Rather, a genuine issue of material fact exists only if a reasonable finder of fact could return a decision for the nonmoving party based upon the record. *See Anderson*, 477 U.S. at 252; *Insolia v. Phillip Morris Inc.*, 216 F.3d 596 (7th Cir. 2000).

**B.      N.D. Ill. Local Rules 56.1 and 56.2**

Because Plaintiff is a *pro se* litigant, the Defendants served him with a "Notice to *Pro Se* Litigant Opposing Motion for Summary Judgment" as required by Northern District of Illinois Local Rule 56.2. The notice explains the consequences of failing to respond properly to a motion for summary judgment and to a statement of material facts. (R. 16, Defs.' Rule 56.2 Notice.)

The purpose of a Local Rule 56.1 Statement is to identify the relevant evidence supporting the material facts, not to make factual or legal arguments. *See Cady v. Sheahan*, 467 F.3d 1057, 1060 (7th Cir. 2006). The parties' statements assist the court by "organizing the evidence, identifying undisputed facts, and demonstrating precisely how each side propose[s] to prove a disputed fact with admissible evidence." *Bordelon v. Chicago Sch. Reform Bd. of Trs.*, 233 F.3d 524, 527 (7th Cir. 2000). Specifically, Local Rule 56.1(a)(3) requires the moving party to provide "a statement of material facts as to which the moving party contends there is no genuine issue." *Ammons v. Aramark Uniform Servs., Inc.*, 368 F.3d 809, 817 (7th Cir. 2004). The nonmoving party must then admit or deny every factual statement proffered by the moving party and concisely designate any material facts that establish a genuine dispute for trial. *Schrott v. Bristol-Myers Squibb Co.*, 403 F.3d 940, 944 (7th Cir. 2005).

A litigant's failure to respond properly to a Rule 56.1 Statement results in the court considering the uncontroverted statement as true. *Raymond v. Ameritech Corp.*, 442 F.3d 600, 608 (7th Cir. 2006). No responses or "evasive denials" allow the court to assume that uncontested facts in a Rule 56.1

Statement are true. *Bordelon v. Chicago School Reform Bd. of Trustees*, 233 F.3d 524, 528 (7th Cir. 2000). Moreover, a plaintiff's *pro se* status does not absolve him from complying with these Local Rules. *See McNeil v. United States*, 508 U.S. 106, 113 (1993); *Greer v. Board of Ed. of City of Chicago*, 267 F.3d 723, 727 (7th Cir. 2001).

With respect to Defendants Troy's and Lacy's motions for summary judgment, both Troy and Lacy filed Rule 56.1 Statements of Facts. (R. 1104, Troy Rule 56.1 Statement of Fact ("SOF"); R. 1106, Lacy SOF.) Plaintiff filed responses to both SOFs. (R. 1151, Pl. Resp. to Troy SOF; R. 1131, Pl. Resp. to Lacy SOF.) Plaintiff also filed his own Statement of Facts for both Troy's and Lacy's motions for summary judgment, (R. 1132 and 1152, Pl.'s SOFs), Troy and Lacy responded to both of Plaintiff's SOFs. (R. 1146, Lacy Resp.; R. 1165, Troy Resp.)

With the summary judgment standards set out above in mind, the Court now turns to the record in this case. This Court notes that several of Plaintiff's statements of fact state arguments and not facts, *see generally* (R. 1132 and 1152), and the Court need only consider Plaintiff's statements to the extent they comply with Local Rule 56.1. The Court also notes that Defendant Troy's and Lacy's SOFs do not provide all of the facts pertaining to the interrogation of Plaintiff. *See generally* (R. 1104 and 1106.) Given that the record must be viewed in a light most favorable to Plaintiff, the Court may look to Plaintiff's deposition and other evidence describing the Area 2 events for facts not specifically addressed by the parties.

### III. Facts

The summary judgment evidence in this case shows the following. On April 19, 1986, Chicago police officers discovered the bodies of Vincent and Rafaela Sanchez in their home in Chicago, Illinois. (R. 1104, Troy SOF ¶ 7; R. 1151, Pl.'s Resp. to Troy SOF ¶ 8.) According to Defendants Troy and

Lacy, Marva Hall informed police officers that Plaintiff had admitted to killing the Sanchezes and had attempted to sell her a shotgun and a chainsaw taken from the Sanchez home. (R. 1104, Troy SOF ¶ 9; *see also* R. 1104, Exh. C, *People v. Patterson*, 154 Ill.2d 414, 429-30 (1992).) Contrary to Defendants' contention, Plaintiff submits affidavits from Marva Hall, in which recants her earlier testimony and states that she never told officers that Plaintiff confessed to the murders or that Plaintiff had attempted to sell her a shotgun after the Sanchez murders. (R.1151, Pl.'s Resp. to Troy SOF ¶¶ 8-9; *see also* R. 1151, Exh. D.) Plaintiff was found hiding in the attic of a building near the Sanchez home several days after the murders. (R. 1104, Troy SOF ¶ 11.) He was arrested on outstanding warrants for crimes unrelated to the murders and was taken to Area 2 for questioning about the Sanchez murders. (R. 1104, Troy SOF ¶ 12; R. 1151, Pl.'s Resp. ¶ 12.)

According to Plaintiff, at Area 2, he was placed in a room and was handcuffed either to a bar on the wall or behind his back. (R. 1104, Exh. B, Pl.'s Depo. 291-92.) Several officers were in the room and asked him questions about the Sanchez murders. Plaintiff responded by telling officers that he was not involved and further told officers where he was and who he was with at the time of the murders. (*Id.* at 292-305.) Plaintiff testified in his deposition that no matter how many times he responded to the officers' questions, "it was going nowhere. . . . they didn't want to believe anything I was saying." (*Id.* at 305.) Plaintiff states that he was then beaten. Plaintiff recalls there being six to seven officers in the room. The light was turned off and one officer put a gray plastic bag (believed to be a typewriter cover) over Plaintiff's head and pressed the bag against Plaintiff's face. At the same time, other officers kicked and beat Plaintiff in the chest; another officer put his hands around Plaintiff's neck; and other officers began hitting him. During this beating, the officers repeatedly stated that Plaintiff was going to do what the officers wanted him to do. (*Id.* at 313-17; 326, 329.) When he

6

refused to cooperate, the beating continued for a minute or so.  (*Id.* at 311-12.)  The light was turned

on and officers stated that they would beat Plaintiff again if he did not do as they said.  Plaintiff was

beaten again, "this time it was a little bit longer."  (*Id.* at 312.)  When again asked if he was going to

answer their questions and cooperate, Plaintiff replied, "Anything you say."  (*Id.*)  Plaintiff asked for

water, but he was brought bourbon.  Officers then told him that an ASA was coming and that Plaintiff

was to tell him that he committed the murders.  (*Id.*)  When the officers left to get the ASA, Plaintiff

took a paper clip from the table and scratched on the bench where he was sitting.  (*Id.* at 360.)  Plaintiff

wrote:

> I lie about murders.  Police threaten me with violence.  Slapped and suffocated me with
> plastic.  No lawyer.  No deal.  No phone.  Signed false statement to murders. . . .

(R. 693, Third Amended Complaint, ¶ 26.)

Plaintiff states that ASA Kip Owen entered the interrogation room with Detective Jon Burge.

Owen told Plaintiff that he heard that Plaintiff wanted to make a statement.  Plaintiff asked if Burge

could step out of the room, which he did.  (R. 1104, Exh. B, Pl.'s Depo. 367-72.)  Plaintiff then asked

for an attorney; Owen responded that he thought Plaintiff wanted to make a statement; Plaintiff replied

that he did not want to confess and that officers had beaten him.  (*Id.* at 372-73.)  Owen then opened

the door and said to Burge that Plaintiff did not want to confess, but instead, complained that he had

been beaten.  (*Id.* at 373.)  Owen then left.  (*Id.*)  Burge entered the room and, placing his gun on the

table, told Plaintiff that he "was fucking up" and that he would get a beating worse than the one before

if he did not cooperate.  Burge then left the room.  (*Id.* at 380.)  Officers entered the room and either

asked questions about the Sanchez murders or made statements about the murders, to which Plaintiff

again replied, "whatever you say."  (*Id.* at 383-91.)

Sometime later, ASA Lacy, the Felony Review Unit attorney for Area 2, was contacted. Assistant State's Attorneys assigned to the Felony Review Unit respond to calls from a police department when a suspect is in custody and officers are considering filing charges. (R. 1093-3, Lacy SOF ¶ 21.) The ASA reviews and evaluates the evidence, interviews suspects and witnesses, and memorializes suspects' statements in handwritten or court reported form. (*Id.*) Troy accompanied Lacy to Area 2 because Lacy was inexperienced with taking statements in murder cases. According to Lacy and Troy, both of them entered the interrogation room to speak to Plaintiff . (R. 1104, Troy SOF ¶¶ 23-30; R. 1093-3, Lacy SOF ¶ 30.) Although Plaintiff remembers Troy entering the room with a person Plaintiff did not know, (R. 1104, Exh. B, Pl.'s Depo. 395), Plaintiff repeats throughout his deposition and pleadings that Lacy was never present. (*Id.* at 703-04; R. 1131, Pl.'s Resp. to Lacy SOF, ¶¶ 30, 37, 45.)

According to Troy, he read Plaintiff his *Miranda* warnings, which Plaintiff stated he understood. (R. 1104, Troy SOF ¶ 32.) Troy asked police detective, Lieutenant Madigan, to leave, at which time Troy asked Plaintiff how he had been treated. Plaintiff stated that he had been treated well; had not been beaten or coerced; and had been fed and allowed to use the bathroom. (R. 1104, Troy SOF ¶¶ 38-39; R. 1104, Exh. F, Troy Depo. 157, 223-24.) Plaintiff denies that Troy asked him about how he had been treated (R. 1151, Pl. Resp. ¶¶ 38, 39), but Plaintiff does not indicate that he told Troy that he had been beaten. (R. 1104, Exh. B, Pl.'s Depo. 393-424.) According to Troy, he then conducted an interview, with Lacy present, during which Plaintiff admitted to killing the Sanchezes. (R. 1104, Troy SOF ¶¶ 35, 42; R. 1104, Exh. F, Troy Depo. 153-54.) Troy then asked Plaintiff if he would memorialize his confession in either a written statement or a court reported statement. (R. 1104, Troy SOF ¶ 42.) Plaintiff agreed to sign a handwritten statement, and Troy drafted the statement. (*Id.* at ¶

43.)  According to Plaintiff, he never told Troy that he committed the murders.  (R. 1104, Exh. B, Pl. Depo. 396.)

Troy and Plaintiff differ as to when the statement was drafted.  According to Troy, he drafted it once Plaintiff agreed to sign a written statement.  Troy contends that Plaintiff then read and agreed with the statement's contents but asked to make several phone calls before signing it.  (*Id.* at ¶¶ 43-44.) According to Plaintiff, he and Troy discussed Plaintiff signing a written statement; Plaintiff asked that he first be allowed to make some phone calls; and he was brought the statement by Troy after Plaintiff made phone calls and was brought to another room.  (R. 1104, Exh. B, Pl. Depo. 396-401.)  Troy contends that he drafted the statement in Plaintiff's presence (R. 1104, Troy SOF ¶ 43), while Plaintiff states that Troy drafted it in another room.  (R. 1151, Pl. Resp. to Troy SOF ¶ 43; R. 1104, Exh. B, Pl. Depo. 415-16.)

The parties agree that Plaintiff promised to sign the statement after being allowed to make several phone calls.  After unsuccessfully attempting to call his father and mother, Plaintiff called his grandmother and godmother, and he briefly spoke to each.  (R. 1104, Troy SOF ¶ 47.)  Plaintiff also called E. Duke McNeal, a criminal defense attorney.  Mr. McNeal refused to come to the station and refused to represent Plaintiff unless he paid a retainer of $10,000.  But, McNeal advised Plaintiff not to say or sign anything.  (R. 1104, Troy SOF ¶ 48; *see also* R. 1104, Exh. B, Pl.'s Depo. 407-08.)

Plaintiff states that, after the calls, he was brought to another interrogation room and handcuffed to the wall.  (R. 1104, Exh. B, Pl.'s Depo. at 415.)  Troy entered the room with the statement.  Plaintiff read the first few lines of the statement and refused to sign it.  Troy reminded Plaintiff that he had said that he would sign the statement if he was allowed to make phone calls.  Plaintiff responded, "I lied," and said that he was not going to sign the statement because it was not true.  (*Id.* at 417.)  According

to Plaintiff, "[Troy then] grabbed me on my collar, throat, and tried to choke me." (*Id.*) Plaintiff "scrunched [his] neck up and [Troy] wasn't able to get his hands around [Plaintiff's neck]." (*Id.*) Troy then pushed Plaintiff's head or body up against the wall and yelled at Plaintiff that he had written the statement for nothing and that Plaintiff was going to wish that he had signed it because Troy would have officers make up more stuff about Plaintiff. (*Id.* at 418.) Plaintiff stated that Troy then "stepped back and kicked [Plaintiff] in [his] leg." (*Id.*) Plaintiff testified that Troy then "asked me if I wanted to pow wow (fight) with him" to which Plaintiff simply looked at Troy as if he were crazy. (*Id.* at 421-22.)

Despite Troy's attack and insistence, Plaintiff still refused to sign the statement. Troy then left. (*Id.* at 483.) Sometime after Troy left, Plaintiff was charged with murder. (R. 1104, Troy SOF ¶ 50; Exh. F, Troy Depo. 257.) The unsigned statement was introduced at Plaintiff's criminal trial. Troy testified at Plaintiff's criminal trial that Plaintiff agreed with the statement's contents, but refused to sign it. (R. 1104, Exh. C, *People v. Patterson*, 154 Ill.2d at 433; R. 1150, Pl. Resp., Exh. F, Copy of Pl's Statement.) Troy then testified as to the statement's contents. (R. 1104, Exh. C, *People v. Patterson*, 154 Ill.2d at 433.)

The statement indicates that Troy and Detective Madigan were present; the statement does not mention Lacy. (R. 1150, Pl. Resp., Exh. F.) The statement conveys the following information: On April 19, 1986, Plaintiff, Eric Caine, and Mike Arbuckle went to the Sanchez house to get guns and drugs. Caine and Arbuckle went inside while Plaintiff waited outside. Plaintiff went inside because they were taking too long. Plaintiff stabbed Mr. Sanchez in the chest and stomach with a knife. Plaintiff got tired of listening to Mrs. Sanchez's crying and stabbed her. Caine ran away while Plaintiff

stabbed Mr. Sanchez because Caine was weak and a coward. The statement further states that Plaintiff was allowed a series of phone calls. (*Id.*)

Eric Caine, Plaintiff's codefendant and alleged coconspirator, also confessed. (R. 1104, Exh. D, May 1986 Police Report, 4-7.) Caine testified at trial, as did Plaintiff, that Caine's confession was coerced. Caine stated that a police officer had prepared notes for Caine to sign; the officer told Caine that he could go home if he signed them; and, after Caine refused, the officer hit Caine in the face several times, causing his eardrum to pop. (R. 1151, Pl.'s Resp. to Troy MSJ, Exh. C, transcript of Caine's testimony.) Caine then signed the notes. (*Id.*)

## IV. DISCUSSION

Plaintiff's Third Amended Complaint, the complaint that now controls this case, asserts nine claims. Of the nine claims, six are alleged against Troy and Lacy: (1) Plaintiff was deprived of his right to a fair trial based upon Troy and Lacy's fabrication of Plaintiff's confession and by Troy giving false testimony at Plaintiff's trial (count I); (2) Troy and Lacy engaged in coercive interrogation (count II); (3) Troy physically abused Plaintiff (count III); and state law claims that Troy and Lacy (4) maliciously prosecuted Plaintiff (count V); (5) intentionally inflicted emotion distress on Plaintiff (count VI); and (6) conspired with others to maliciously prosecute Plaintiff and inflict emotional harm on him. (Count VII). Although Plaintiff's complaint alleges that Lacy participated in interviewing Plaintiff and the preparation of the statement, Plaintiff now contends that Lacy was not present.

Defendants Troy and Lacy, in separate motions, present similar grounds for summary judgment. They contend that: (1) they are both entitled to absolute prosecutorial immunity for the claim that they prepared a false statement because such action occurred while they were acting in their role as advocates for the state, (2) they are entitled to qualified immunity because, according to their assertion, the fabrication of evidence, by itself, is not a constitutional violation; (3) the claim of excessive force

with respect to Troy's alleged kicking and attempted choking of Plaintiff is time-barred; (4) Troy is entitled to absolute testimonial immunity with respect to his testimony at Plaintiff's criminal trial; (5) collateral estoppel bars Plaintiff's § 1983 claims because the Illinois Supreme Court in affirming the conviction rejected Plaintiff's assertions that his statement was coerced and fabricated, as well as his claim that Troy beat him; and (6) Plaintiff is judicially estopped from making assertions contrary to those made in pleadings submitted to the Illinois Supreme Court in his criminal proceedings. Defendant Lacy additionally argues that he is entitled to summary judgment because Plaintiff now contends that Lacy was never present at Area 2.

Because the Third Amended Complaint's allegations are against not only Troy and Lacy, but also the Area 2 officers, who have settled and are no longer in this suit, several issues require clarification. The complaint's inclusion of the Area 2 officers with Troy and Lacy for Plaintiff's claims of a coerced confession suggests that Plaintiff may have been alleging that Troy and Lacy engaged in the coercive techniques used by the officers. (R. 693, Third Amended Compl. ¶¶ 74-83.) A closer reading of the complaint (*id.* at ¶¶ 29-34), as well as the summary judgment motions and evidence, clarifies that Plaintiff is alleging that Troy (1) drafted a false statement, (2) then used force (pushed, attempted to choke, and kicked Plaintiff) in an effort to have him sign the statement, and (3) later gave false testimony at Plaintiff's trial about the statement. Any suggestion in the complaint that Troy's use of force coerced the statement is misleading. As more fully explained below, Troy's use of force occurred after the statement had been written and, thus, contributed nothing to its creation. Although Troy allegedly used force to get Plaintiff to sign the statement, Plaintiff never signed it and the statement introduced at trial was unsigned.

Accordingly, the discussion on prosecutorial immunity focuses on the allegation that Troy created a false statement. This opinion's sections A1(c) "Troy's Alleged Coercion of Plaintiff's

Statement" and "C. Time-Bar" address the allegation that Troy used physical force against Plaintiff. And, section "E. Testimonial Immunity" addresses the claim that Troy provided false trial testimony.

## A.     Prosecutorial Immunity

Troy and Lacy contend that they are entitled to absolute prosecutorial immunity with respect to the drafting of the statement because they were acting in their roles as advocates for the state when they prepared the statement. This Court agrees.

Prosecutors are absolutely immune from 42 U.S.C. § 1983 civil liability for core prosecutorial actions, such as "initiating a prosecution and . . . presenting the State's case." *Imbler v. Pachtman*, 424 U.S. 409, 431 (1976). Absolute immunity applies for a prosecutor's conduct that is "intimately associated with the judicial phase of the criminal process. " *Burns v. Reed*, 500 U.S. 478, 486 (1991); *Houston v. Partee*, 978 F.2d 362, 365 (7th Cir. 1992). However, only qualified immunity, the norm for governmental officials and police officers, applies for a prosecutor's conduct when he acts not as an advocate for the state, but instead, as an investigator or administrator. *See Buckley v. Fitzsimmons*, 509 U.S. 259, 273 (1993). Absolute immunity completely shields a litigant from civil liability. Qualified immunity protects an individual from civil liability insofar as his or her "conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Kompare v. Stein*, 801 F.2d 883, 886 (7th Cir. 1986).

A functional test is used to determine the type of immunity (absolute or qualified) that applies. "The nature of the function performed, not the identity of the actor who performed it" controls the type of immunity that applies. *Buckley*, 509 U.S. at 269. If the prosecutor acted in the role of advocate for the state, absolute immunity applies. If instead, he acted in the role of an investigator, only qualified immunity applies. *Id.*; *see also Van de Kamp v. Goldstein*, 129 S. Ct. 855, 861 (2009).

Prosecutorial immunity does not simply apply to the bringing of charges and the presentment of the state's case. "Preparation, both for the initiation of the criminal process and for a trial, may require the obtaining, reviewing, and evaluating of evidence." *Imbler*, 424 U.S. at 431 n.33; *see also Buckley*, 509 U.S. at 273 (part of a prosecutor's role as "advocate for the State involve[s] actions preliminary to the initiation of a prosecution" and "include the professional evaluation of the evidence assembled by the police"). A prosecutor's taking of a statement of a suspect following interrogation is considered part of a prosecutor's advocacy role of evaluating and preparing evidence. *Hunt v. Jaglowski*, 926 F.2d 689, 692-93 (7th Cir. 1991); *Andrews v. Burge*, 660 F. Supp. 2d 868, 878 (N.D. Ill. 2009). When determining whether absolute or qualified immunity applies, courts have focused on whether the prosecutor participated only in the taking of the statement or whether he also participated in the interrogation leading to the statement.

In *Hunt v. Jaglowski*, 926 F.2d at 692-93, a prosecutor was called to a police station to record the statement of a suspect. The suspect confessed after officers physically coerced him to do so, and the suspect told the prosecutor that he had been beaten. Observing that the prosecutor was not present during the interrogation, the Seventh Circuit concluded that he remained in his advocacy role when taking the statement. *Id.* at 693*; see also Boyd v. Village of Wheeling*, No. 83 C 4768, 1985 WL 2564 (N.D. Ill. Sept. 12, 1985) (Grady, J.) (absolute immunity applied to prosecutor who was not present during interrogation but participated only in the taking of the suspect's statement after the suspect told the prosecutor that he had been beaten). In *Andrews v. Burge,* absolute immunity applied for a prosecutor who interviewed and recorded a statement from the suspect following a physically coercive interrogation, in which the prosecutor took no part and about which the prosecutor was unaware. *Andrews*, 660 F. Supp. 2d at 878; *see also Lanza v. City of Chicago*, No. 08 C 5103, 2009 WL 3229407 at *3-5 (N.D. Ill. Oct. 1, 2009) (Andersen, J.).

Courts that have applied only qualified immunity have found that the prosecutor joined in the interrogation process. In *Williams v. Valtierra*, No. 00 C 5734, 2001 WL 686782 at *2 (N.D. Ill. Jun 18, 2001) (Kennelly, J.), the suspect agreed to confess after she was beaten by officers. When the ASA arrived and presented the suspect with a confession to sign, the suspect requested medical attention and use of a bathroom. The prosecutor refused the suspect's requests until she signed the confession, which she did. *Id.* at *1. Judge Kennelly "decline[d] to hold that prosecutors can join coercive interrogations as active participants and be absolutely shielded from civil liability." *Id.* at *3; *see also Hill v. City of Chicago*, No. 06 C 6772, 2009 WL 174994 at *11 (N.D. Ill. Jan. 26, 2009) (St. Eve, J.) (where there were issues of fact as to whether the prosecutor joined in police officers' coercion of a confession, summary judgment on the issue of absolute immunity could not be granted): *Orange v. Burge,* No. 04 C 168, 2008 WL 4443280 at *10 (N.D. Ill. Sept. 29, 2008) (only qualified immunity applied for an ASA who "was personally involved in Orange's ongoing interrogation, . . . [and] coached Orange regarding [his] false confession").

The function of a Felony Review Unit ASA – evaluating evidence to determine whether to file charges, interviewing an accused after he or she has confessed, and recording a confession – is clearly part of prosecutor's role as advocate for the State. *Andrews v. Burge*, 660 F.Supp. 2d at 878; *Buckley*, 509 U.S.. at 273 (a prosecutor's role as advocate "must include the professional evaluation of the evidence assembled by the police and appropriate preparation for its presentation at trial or before a grand jury after a decision to seek an indictment has been made"); *see also Spiegel v. Rabinovitz*, 121 F.3d 251, 257 (7th Cir. 1997). The summary judgment evidence in this case demonstrates that Troy and Lacy (to the extent he was at all involved) acted within their roles of Felony Review attorneys with the obtaining of Plaintiff's statement.

### 1. Absolute Immunity as Applied to Troy

### a.    Troy's Taking of Plaintiff's Statement

Viewing the evidence in a light most favorable to Plaintiff, none of Troy's actions leading to the statement placed him in the role of investigator.  Troy was not present during Area 2 officers' interrogation of Plaintiff.  Troy did not participate in the alleged torture and coercion of Plaintiff.  *Cf. Orange,* 2008 WL 4443280 at *10 (ASA "was personally involved in [the] interrogation, . . . [and] coached Orange regarding [his] false confession").  Nor did Troy obtain the confession by withholding medical attention or by other coercive means.  *Cf. Williams*, 2001 WL 686782 at *1.  Rather, Troy arrived at Area 2 after Plaintiff confessed.  Troy was present to memorialize Plaintiff's confession and evaluate the evidence already gathered.  Prior to drafting Plaintiff's statement, Troy interviewed Plaintiff about his role in the offense.

Troy's actions, at this point, are essentially the same as the actions of the prosecutor in *Hunt*, *Andrews*, and *Boyd*.  *See Hunt*, 926 F.2d at 69-92; *Andrews*, 660 F. Supp. 2d at 873; *Boyd*, 1985 WL 2564.  The only difference in Plaintiff's case is the allegation that Troy himself drafted the statement, as opposed to the statement in *Hunt* and *Andrews*, which was recorded by a court reporter.  However, there is little, if any, distinction between a prosecutor writing a statement believed to be false and assisting a suspect give a recorded statement believed to be false.  Both actions by a prosecutor produce an illegally obtained confession.

Plaintiff's allegation that Troy drafted a false confession does not remove Troy's taking of Plaintiff's confession from the realm of prosecutorial immunity.  The Court must still determine the role Troy played at the time he drafted the statement.  While "a prosecutor's fabrication of false evidence during the preliminary investigation of an unsolved crime" is not protected by absolute immunity, *Buckley,* 509 U.S. at 275, the fabrication of evidence performed while a prosecutor acts within his role

16

as advocate is covered by absolute immunity. *Gordon v. Devine*, No. 08 C 377, 2008 WL 4594354 at *12 (N.D. Ill. Oct. 14, 2008) (Aspen, J.) (prosecutor entitled to absolute immunity for fabricating evidence to obtain a stipulation at trial); *see also Heidelberg v. Hammer,* 577 F.2d 429, 432 (7th Cir. 1978) (prosecutor had absolute immunity for claim that he falsified a police line-up report during the prosecution); *Yarris v. County of Delaware,* 465 F.3d 129, 138-39 (3d Cir. 2006) (whether prosecutorial immunity applies for an alleged fabricated confession depends upon "whether the fabrication of [the] confession occurred during the preliminary investigation of an unsolved crime, as in *Buckley*, or after the ADAs had decided to indict [the accused] and had begun working as the state's advocates").

At the time Troy prepared the statement, Troy was acting in his role as advocate for the state. "It is within the proper role of an advocate for the State to take a court reported statement, as well as to see and hear the defendant give the statement." *Andrews*, 660 F. Supp. 2d at 878. "The prosecutor acts within his core functions when he evaluates the evidence gathered by police and, in the case of a confession, takes steps to see that the words of the defendant are properly preserved." *Id.; see also Imbler*, 424 U.S. at 431 n.33; *Buckley,* 509 U.S. at 273. A holding that would not allow Plaintiff to challenge Troy's taking of the statement, but allows Plaintiff to challenge Troy's drafting of the statement, would run counter to the purpose of absolute immunity. *See Buckley*, 509 U.S. at 283 (Justice Kennedy concurring in part and dissenting in part) ("a criminal defendant turned civil plaintiff c[annot] simply reframe a claim to attack the preparation" of evidence in order to avoid otherwise absolutely immune action).

Accordingly, the summary judgment evidence shows that Troy was acting in his role as advocate when he drafted Plaintiff's statement and, thus, Troy is thus entitled to absolute immunity for the claim that he drafted a false statement. The knowing creation of an untrue confession is certainly

despicable and possibly criminal, thus allowing for the bringing of criminal charges. *Imbler,* 424 U.S. at 429 (absolute civil immunity does not protect against being criminally charged). However, with respect to § 1983 damages, absolute immunity applies, and the claim against Troy that he drafted a false statement is dismissed. This case presents the dilemma that exists in most prosecutorial immunity cases – alleged deplorable and unconstitutional actions by a prosecutor. As noted by Justice Breyer, quoting Chief Judge Learned Hand, "a prosecutor's absolute immunity reflects a 'balance' of 'evils.' '[I]t has been thought in the end better . . . to leave unredressed the wrongs done by dishonest officers than to subject those who try to do their duty to the constant dread of retaliation.'" *Van de Kamp v. Goldstein*, 129 S. Ct. at 859-60 (quoting *Gregoire v. Biddle*, 177 F.2d 579, 581 (2d Cir. 1949)).

The Court concludes that Troy was acting in his advocacy role when he drafted the statement. Troy is thus entitled to absolute immunity with respect to Plaintiff's count I claim that Troy drafted a false confession. With respect to Plaintiff's other count I assertion that Troy's alleged false testimony deprived Plaintiff of his right to a fair trial, the Court addresses that claim in section "D. Testimonial Immunity" of this opinion.

b. **Prosecutorial Immunity and Plaintiff's State-Law Claims of Malicious Prosecution, Intentional Infliction of Emotional Distress, and Conspiracy**

For the same reasons as stated above, absolute immunity applies to Plaintiff's state-law claims of malicious prosecution, conspiracy, and intentional infliction of emotional distress. *White v. City of Chicago*, 369 Ill. App. 3d 765, 861 N.E.2d 1083 (2006). With respect to claims of malicious

prosecution, intentional infliction of emotional distress, and conspiracy, Illinois courts apply the prosecutorial immunity analysis announced in *Imbler* and *Buckley*. *White*, 369 Ill.App. 3d at 769-72; *see also Gordon*, 2008 WL 4594354 at **16-17 (noting that Illinois court previously applied only public official immunity to malicious prosecution and related claims, but now apply the absolute immunity analysis announced in *Imbler*). Accordingly, Troy is entitled to absolute immunity with respect to Plaintiff's claims of malicious prosecution (count V), intentional infliction of emotional distress (count VI), and conspiracy (count VII).

### c. Troy's Alleged Coercion of Plaintiff's Statement

Plaintiff's Third Amended Complaint alleges that Troy, along with Area 2 officers, engaged in coercive interrogation of Plaintiff. (R. 693, Third Amended Compl. ¶¶ 29, 77-79.) As noted above, it is unclear whether Plaintiff's claim that he was coerced to confess was alleged against the Area 2 officers only. Regardless of whether Plaintiff intended to allege that Troy engaged in coercion with the obtaining of the confession, such an allegation is unsupported by the record. Prior to the drafting of the statement, Troy engaged in no coercive actions. Troy arrived at Area 2 after Plaintiff confessed. Troy and Plaintiff discussed only whether Plaintiff would make a recorded statement or sign a handwritten one and whether Plaintiff would be allowed phone calls before signing a statement. Also, Plaintiff repeatedly testified in his deposition that he never admitted to the murders to Troy. Although there are allegations that Troy kicked, pushed, and attempted to choke Plaintiff, such actions occurred in an effort to have Plaintiff sign the statement, which he never did. Plaintiff may assert an excessive force claim for such abuse, which is addressed in the section "C" of this opinion, but allegations about Troy's use of force have no relation to the creation of the statement.

Accordingly, the claim that Troy coerced Plaintiff to confess (count II) is unsupported by the record and is dismissed.

## 2.    Lacy's Participation

The reasons stated for applying absolute immunity for Troy and for finding no coercion by him also apply to Lacy.  For the same reasons as stated above, counts I, II, IV, V, VI, and VII against Lacy are dismissed.  The Court addresses separately the claims against Lacy given Plaintiff's insistence that Lacy was not present.  In Plaintiff's response to the summary judgment motions and in his deposition testimony, he emphatically denies that Lacy was in the room when Troy interviewed Plaintiff and when Troy presented Plaintiff with the statement.  According to Plaintiff,  "Lacy did <u>not</u> sign on as a witness to false/fabricated written confession because he was <u>not</u> present."  (R. 1130, Pl.'s Resp. to Lacy MSJ, Exh. C ¶¶ D, I.) (emphasis in original).  Although Plaintiff alleged in his Third Amended Complaint that both Troy and Lacy coerced Plaintiff and created his statement, he now contends that Lacy "is being sued because, in his effort to act in concert to hide torture and duress by detectives, he <u>falsely</u> placed himself in interrogation room to help his 'friend' Peter Troy give validity to a false/fabricated confession to get me falsely charged with a crime I did not commit."  (R. 1130, Pl.'s Resp. to Lacy MSJ, Exh. C ¶ I.)

Plaintiff's current theory of liability against Lacy differs from the theories set forth in his complaint.  "A plaintiff may not amend his complaint through arguments in his brief in opposition to a motion for summary judgment." *Speer v. Rand McNally & Co.*, 123 F.3d 658, 665 (7th Cir. 1997); *Whitaker v. T.J. Snow Co.*, 151 F.3d 661, 664 (7th Cir. 1998).  Furthermore, Plaintiff's contentions that Lacy seeks to cover up Troy's actions do not refer to Lacy's actions in Plaintiff's criminal proceedings.  Rather, Plaintiff refers to Lacy's unsworn statements given to a special prosecutor in 2004 as part of

the discovery conducted for the instant § 1983 action. (R. 1104, Exh. G.) Plaintiff's claims about Lacy giving false statements with respect to these proceedings do not relate to claims asserted in this case, but instead, asserts new claims of perjury or conspiracy. Such new claims, to the extent that they are still timely, should be brought in a separate action.

Plaintiff's statements that Lacy was not present when Troy interviewed Plaintiff and presented him with a written confession may be considered judicial admissions. *Solon v. Gary Community School Corp*. 180 F.3d 844, 858 (7th Cir. 1999); *Keller v. United States*, 58 F.3d 1194, 1198-99 n. 8 (7th Cir. 1995). Such statements indicate that Lacy was not involved with the Area 2 events leading to Plaintiff's written confession and that any claims alleging Lacy's involvement may be dismissed.

Even if the Court looked only at Troy and Lacy's version of the facts, which state that Lacy was with Troy when he interviewed Plaintiff and when he drafted the statement, the claims against Lacy must still be dismissed as Lacy is protected by absolute immunity for the same above-stated reasons that Troy is protected. Accordingly, Plaintiff's claims against Lacy (counts I, II, V, VI, and VII) are dismissed and Lacy is dismissed from this case.

## B.    Qualified Immunity

Defendant Troy and Lacy argue that they are also entitled to qualified immunity for Plaintiff's claims that they prepared a false written confession. They contend, first, that the alleged fabrication of Plaintiff's statement does not state a constitutional violation and, second, that neither Defendant caused Plaintiff to confess to the Sanchez murders. Because the Court has determined that Troy and Lacy are entitled to absolute prosecutorial immunity, it need not address whether they are also entitled to qualified immunity.

## C.    Time-Bar

Count III of Plaintiff's Third Amended Complaint seeks damages from Defendant Troy for his physical abuse of Plaintiff at Area 2. (R. 693, Third Amended Compl. ¶¶ 80-83.) Specifically, Plaintiff alleges that Troy participated in the abuse and "attacked" Plaintiff when he refused to sign the confession. (*Id.* at ¶ 29.) Presumably, Plaintiff is referring to Troy's alleged kicking, shoving, and attempted choking of Plaintiff. Troy contends that such claims arose in 1986 and are time-barred.

Because no federal statute of limitations governs 42 U.S.C. § 1983 actions, federal courts look to the forum state's limitations period and tolling rules. *Jenkins v. Village of Maywood*, 506 F.3d 622, 623-24 (7th Cir. 2007). In Illinois, the statute of limitations for personal injury claims is two years. *Jenkins*, 506 F.3d at 623; 725 ILCS 5/13-202. Although state law governs the length of the limitations period, federal law governs the accrual date of the claim. *Sellars v. Perry*, 80 F.3d 243, 245 (7th Cir. 1996). "Section 1983 claims accrue when the plaintiff knows or should know that his or her constitutional rights have been violated." *Savory v. Lyons*, 469 F.3d 667, 672 (7th Cir. 2006) (internal quotation marks and citations omitted).

In this case, Plaintiff was aware of his claim that Troy used excessive force in 1986 when the abuse occurred. (R. 1104, Exh. C, *People v. Patterson*, 154 Ill. 2d at 444 (Plaintiff testified at his state criminal trial about the force Troy used at Area 2.) The excessive force claim against Troy for his actions in May 1986 should have been brought within two years of that occurrence.

Neither Plaintiff's conviction nor the later discovery of a report of routine torture and coercion of suspects at Area 2 tolled Plaintiff's limitations period to make his claims timely in this case. It is true that claims that affect the validity of a conviction cannot be brought until the conviction has been set aside by some means, including a governor's pardon. *Heck v. Humphrey*, 512 U.S. 477, 486-87 (1994). A civil suit for damages for such a violation thus does not accrue until the conviction has been invalidated. *Dominguez v. Hendley*, 545 F.3d 585, 588-89 (7th Cir. 2008). Plaintiff's claims of

excessive force by Troy, however, did not affect his conviction. Troy allegedly used force after the statement had been created in an attempt to compel Plaintiff to sign it, which he never did. (R. 1104, Exh. B, Pl.'s Depo. 417-22.) Troy testified about the unsigned statement. A favorable ruling on a § 1983 claim that Troy beat Plaintiff after the statement had been prepared would not have affected Troy's trial testimony. (R. 1104, Exh. C, *People v. Patterson*, 154 Ill.2d at 443, 439.) Plaintiff's pending conviction thus did not toll the limitations period. *See Wallace v.. Kato*, 549 U.S. 384, 395-97 (2007) (although claims affecting a conviction do not accrue until the conviction has been invalidated, false arrest claims and others that do not directly bear upon the validity of the conviction accrue as of the date the event occurred). Plaintiff's claim that Troy's actions, after Plaintiff gave his statement, at Area 2 constituted excessive force (count III) is therefore dismissed as time-barred. To the extent Plaintiff's state-law claims are based upon Troy's use of force, the two-year statute of limitations and the accrual date discussed above apply, and such claims are also time-barred.

## D.    Testimonial Immunity

Count I of Plaintiff's Third Amended Complaint, in addition to alleging coercion and fabrication of evidence, also alleges that Defendants provided false testimony at Plaintiff's trial. (R. 693 ¶ 75.) With respect to the remaining Defendants, only Troy testified at Plaintiff's trial. (R. 1104, Exh. C, *People v. Patterson*, 154 Ill.2d at 433, 439.) Troy argues that he is entitled to absolute immunity with respect to his trial testimony.

Under *Briscoe v. LaHue*, 460 U.S. 325, 335-36 (1983), witnesses enjoy absolute immunity from civil damages for claims related to their testimony. *See also Curtis v. Bembenek*, 48 F.3d 281, 285 (7th Cir. 1995). The absolute immunity announced in *Briscoe* applies to a prosecutor testifying in a judicial proceeding. *See House v. Belford*, 956 F.2d 711, 720 (7th Cir. 1992); *see also Manning v. Dye*, No. 02 C 372, 2003 WL 145423 at *2 (N.D. Ill. Jan. 21, 2003).

An exception to the rule of absolute testimonial immunity exists, however, for "complaining witnesses." *Cervantes v. Jones*, 188 F.3d 805, 809 (7th Cir. 1999). A complaining witness is one "who actively instigated or encouraged the prosecution of the plaintiff." *Curtis*, 48 F.3d at 286; *Finwall v. City of Chicago*, 490 F. Supp. 2d 918, 926 (N.D. Ill. 2007).

This Court noted in its prior order denying the Defendants' motion to dismiss that it could not determine if any of the Defendants were complaining witnesses. *See Patterson v. Burge*, 328 F. Supp. 2d 878, 891 (N.D. Ill. Aug. 5, 2004). Although Defendant Troy provides no discussion as to whether he was or was not a complaining witness, the Court is able to determine, based upon the summary judgment record, that he was not. Troy knew nothing about the case until he was called to Area 2 after Plaintiff confessed. Although he may have evaluated evidence in preparation for bringing charges against Plaintiff, there is no indication that Troy "actively instigated or encouraged the prosecution of the plaintiff." *See Curtis*, 48 F.3d at 286. Accordingly, to the extent that Plaintiff asserts a claim against Troy for his testimony at Plaintiff's criminal trial, Troy enjoys absolute immunity. Such immunity applies not only for Plaintiff's claims for damages based upon alleged constitutional violations but also his state law claims. *See Fonseca v. Nelson*, No.08-0435, 2009 WL 2925536, *2 (S.D. Ill. 2009) (*citing* Illinois cases).

### E. Collateral Estoppel

Defendant Troy argues that Plaintiff is barred from arguing in this Court his claim that Troy physically abused and coerced Plaintiff. Troy states that the issue of physical force and coercion were litigated in the Circuit Court of Cook County in a motion to suppress and in the Illinois Supreme Court on appeal, and that both courts rejected Plaintiff's claims. Troy contends that Plaintiff is barred by the doctrine of collateral estoppel from asserting in this Court that Troy physically abused or coerced him.

Given that the Court has already determined that the evidence does not support a claim of coercion by Troy and that the claim of physical abuse by Troy is time-barred, the Court need not address whether Plaintiff is also barred by collateral estoppel from raising this claim. The Court nonetheless notes that the application of the collateral estoppel doctrine is inappropriate in this case.

"In determining whether a prior state court judgment bars litigation of a Section 1983 claim, the federal court must apply the state court's preclusion rules." *Stevenson v. City of Chicago*, 638 F. Supp. 136, 138 (N.D. Ill. 1986); *see also Sornberger v. City of Knoxville*, 434 F.3d 1006, 1020 n.9 (7th Cir. 2006). In Illinois, "an issue litigated in a prior proceeding may not be relitigated if (1) the issue decided in the prior adjudication is identical with the one presented in the suit in question; (2) there was a final judgment on the merits in the prior adjudication; and (3) the party against whom estoppel is asserted was a party or in privity with a party to the prior adjudication." *Dunlap v. Nestle USA, Inc.*, 431 F.3d 1015, 1018 (7th Cir. 2005) (citing *Herzog v. Lexington Township*, 167 Ill.2d 288 (Ill. 1995)). Collateral estoppel, however, is unavailable when "additional evidence is discovered after the prior decision." *Sornberger*, 434 F.3d at 1020. Also, even if the technical requirements of the doctrine are met, collateral estoppel should not be applied "unless it is clear that no unfairness results to the party being estopped." *Id.* at 1023.

In this case, Plaintiff's claim that Troy physically abused and coerced him was presented to the state trial and supreme courts as part of his claim that he was beaten, tortured, and coerced to confess by Area 2 officers. (R. 1104, Exh. K, Pl. motion to suppress.) Both courts rejected Plaintiff's claims. (R. 1104, Exh. L; R. 1104, Exh. C, *People v. Patterson*, 154 Ill. 2d at 435-54.) However, with respect to the issues of physical abuse and coercion, reports of routine mistreatment of suspects at Area 2 were not available at the time of Plaintiff's trial and had only begun to surface at the time of his appeal. It appears that neither the state trial nor supreme court addressed the issue of the treatment of suspects

by Area 2 officers. Such new evidence, as well as fairness, would prevent application of the collateral estoppel doctrine to Plaintiff's current § 1983 claims.

**F.    Judicial Admissions from Plaintiff's State Post-Conviction Petition**

Defendant Troy argues that Plaintiff cannot assert in this Court that Troy used physical force against Plaintiff because he did not allege such in his state post-conviction petition. Troy contends that Plaintiff's statements in his state post-conviction petition have the effect of a judicial admission. Plaintiff's post-conviction petition, which included a lengthy description of the events that occurred at Area 2, stated with respect to Troy that "Troy came in sometime the next day. . . . Petitioner first agreed to make a statement in order to get phone calls . . ., but after the phone calls, refused to make a statement or sign a written statement which Troy had handwritten out." (R. 1104, Exh. P. ¶ 52.)

Although the Court need not decide this issue given its dismissal of Plaintiff's claims on other grounds, the Court notes that Plaintiff's above quoted statement neither refutes nor contradicts Plaintiff's allegation in this Court that Troy knowingly drafted a false statement. In both the state court petition and the complaint here, Plaintiff alleges that he refused to make a statement, but Troy wrote one out himself.

## IV.   CONCLUSION

For the reasons stated above, the Court grants Defendants Peter Troy's and William Lacy's motions for summary judgment [1092, 1093]. Plaintiff's counts I, II, III, V, VI, and VII in his Third Amended Complaint are dismissed. Troy and Lacy are dismissed from this case. Plaintiff's motion for leave to file his response to Troy's motion for summary judgment [1148] is granted.

ENTER:

_____/s/_____
 JOAN B. GOTTSCHALL
United States District Court Judge

DATED: September 27, 2010