IN THE
UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

AARON PATTERSON,                    )
                                    )
        Plaintiff,                  )
                                    )
v.                                  )       Case No. 03 C 4433
                                    )
                                    )       Judge Joan B. Gottschall
FORMER CHICAGO POLICE               )
OFFICER JON BURGE et al.,           )
                                    )
        Defendants.                 )

## MEMORANDUM OPINION AND ORDER

Currently before the court are two motions for summary judgment filed by defendants Richard

Devine and the Cook County State's Attorney's Office ("SAO"). For the following reasons, the court

grants both motions.[1]

I.      **Background**

On April 30, 1986, Patterson was arrested and transported to Area 2 Headquarters of the

Chicago Police Department by several police officer defendants after Chicago police had discovered

the bodies of Rafaela and Vincent Sanchez in their apartment in Chicago on April 19, 1986. Def.'s

R.56.1(a)(3) SMT. ("Def.'s SOF") ¶ 15. After he was brought into an interview room, Patterson was

handcuffed to a wall and questioned by Area 2 detectives about the Sanchez homicides. *Id.* ¶ 16. After

Patterson denied any involvement in the homicides, he was subjected to physical abuse[2] by Area 2

---

[1] To avoid duplication, the court refers to its Memorandum Opinion and Order addressing
defendants Troy and Lacy's motions for summary judgment, issued this same day, for its
discussion of the background of this case and the rules governing summary judgment.

[2] When ruling on a motion for summary judgment, the court views the evidence in the
light most favorable to the non-moving party and draws all reasonable inferences in the non-
movant's favor. *Omega Healthcare Investors, Inc. v. Res-Care, Inc.*, 475 F.3d 853, 857 (7th Cir.
2007).

detectives until he said he would agree with anything they said. *Id.* Patterson then refused to make a statement and was further abused by Area 2 detectives. *Id.* The Area 2 detectives, together with two Assistant State's Attorneys, "constructed false oral admissions and false written statements" which they attributed to Patterson and his co-defendant and "reduced [the] fabricated statements and coerced false admissions into official reports and communicated them to prosecuting attorneys who in turn presented this false evidence at motion hearings and during the prosecution of Aaron Patterson." *Id.* (quoting Third Amended Complaint ("TAC") at ¶¶ 33-34).

After a jury trial in the Circuit Court of Cook County, Patterson was convicted of the Sanchez murders and sentenced to death; his conviction and sentence were affirmed on direct appeal to the Illinois Supreme Court on December 4, 1992. *Id.* ¶ 17; *People v. Patterson*, 610 N.E.2d 16, 21-22 (Ill. 1992) ("*Patterson I*"). On appeal from his conviction, Patterson asserted that his confession was coerced and that the trial court erred by denying his motion to suppress and refusing to suppress Patterson's and his co-defendant's statements. *Id.* ¶ 18. The Illinois Supreme Court rejected Patterson's claim and concluded that there was no evidence that Patterson was beaten and nearly suffocated. *Id.*

Patterson filed a state post-conviction petition in which he raised several constitutional claims, including ineffective assistance of trial and appellate counsel. *Id.* ¶ 19. The trial court granted the state's motion to dismiss the petition. *People v. Patterson*, 735 N.E.2d 616, 624 (Ill. 2000) ("*Patterson II*"). On appeal, the Illinois Supreme Court concluded, in part, that Patterson's counsel was not ineffective for failing to uncover evidence related to other allegations of Area 2 torture. *Id.*; *see also* Def.'s SOF ¶ 20. The Illinois Supreme Court further concluded that, even if Patterson's counsel had sought to raise any similarity between Patterson's and Andrew Wilson's (another criminal defendant alleging torture at the hands of Area 2 officers)[3] allegations of abuse, no reasonable probability existed

---

[3] The details of Andrew Wilson's case are discussed in more detail, *infra*.

that the trial court would have found the evidence admissible, or that a decision to exclude such evidence would have been reversed on appeal. *Id.* ¶ 21; *Patterson II*, 735 N.E.2d at 632. The court noted that the Wilson incident occurred more than four years before Patterson's arrest, and that, at the time of Patterson's trial, Wilson believed that he was tortured because Area 2 police officers routinely tortured those accused of killing police officers. *Id.*

On January 10, 2003, while Patterson's post-conviction proceedings were still pending, former Governor George Ryan pardoned Patterson, along with three other death-row inmates. *Id.* ¶ 23.

Devine's Involvement with Patterson's Case

Devine served as First Assistant State's Attorney of Cook County from 1980 to 1983. *Id.* ¶ 12. In 1983, Devine left the Cook County State's Attorney's Office. *Id.* ¶ 13. During the time of Patterson's arrest, interrogation, trial and direct appeal, Devine was not employed by the Cook County State's Attorney's Office. *Id.* ¶ 25.

In 1983, Devine left the Cook County State's Attorney's Office and went into private practice at the firm of Foran, Wiss & Schultz until 1985, when he joined the law firm of Phelan, Pope & John as a partner. *Id.* William Kunkle (now a judge in the Cook County Circuit Court) also joined Phelan, Pope & John as a partner in 1985. *Id.* ¶ 30. In 1988, the City of Chicago engaged Kunkle to represent the City and several members of the Chicago Police Department, including Jon Burge, in a suit brought by Andrew Wilson against the City based on torture Wilson endured while being interrogated at Area 2. *Id.* Kunkle was the lead attorney and the originating and billing partner for Phelan, Pope & John on the Wilson case, for which he had primary responsibility and supervised a team of twenty-five lawyers and paralegals working on the litigation. *Id.* ¶ 32. Kunkle's team billed a total of 4,960.75 hours over a period of more than four years for work performed on the Wilson case. *Id.* ¶ 39. According to Kunkle, Kunkle himself was Burge's attorney and Devine did not: (1) serve as Burge's attorney; (2) act as a member of the working team on the Wilson matter; (3) have any substantive participation in the case; (4) file an appearance on behalf of Burge; (5) take part in any confidential

3

client meetings with the City of Chicago, Burge, or any other police defendants in the Wilson matter; (6) have any phone conversations with Burge regarding Wilson, or any Area 2 matters, and never sat in on any such phone conversations with Kunkle; or (7) attend Wilson's trial. *Id.* ¶¶ 33-36, 42-44.

Devine did, however, have some involvement with Wilson's civil case. Devine's involvement in the Wilson case involved consulting with other attorneys on procedural matters in federal court. *Id.* ¶ 37. In addition, Devine once appeared in court for Kunkle in the Wilson matter to secure a continuance because Kunkle was out of town. *Id.* ¶ 38. During the eleven months Devine had any involvement in the Wilson case, he billed a total of 24.5 hours on that case.

In December 1996, Devine left Phelan, Pope & John to become the elected State's Attorney for Cook County. *Id.* ¶ 14. As State's Attorney, Devine initiated a review of all claims alleging abuse at Area 2 prior to his tenure as State's Attorney. *Id.* ¶ 60. After an initial review, Devine determined that the statute of limitations would bar prosecution relating to any such claims. *Id.* Devine further directed that an outside individual be appointed to conduct a similar review; that individual confirmed Devine's conclusion. *Id.* Thereafter, a Special State's Attorney, who was appointed by the Presiding Judge of the Criminal Division of Cook County, independently reached the same conclusion. *Id.*

## II. Analysis

Patterson's TAC, which he filed after the court granted in part and denied in part motions to dismiss, asserts the following claims against Devine: violation of his due process right to a fair trial under 42 U.S.C. § 1983 (count I); state law claim of malicious prosecution (count V); intentional infliction of emotional distress (count VI); and conspiracy (count VII). Against the Cook County State's Attorney's Office, Patterson brings claims of *respondeat superior* (count VIII) and indemnification (count IX). Patterson has filed a *pro se* response to the motions currently before the court. In order to ascertain and analyze Patterson's arguments, the court has considered the TAC and Patterson's *pro se* response.

### A. Claim I – § 1983 against Devine

To prevail on a § 1983 claim, a plaintiff must prove that the defendant: (1) deprived the plaintiff of a federal constitutional right; and (2) acted under color of state law. *Reynolds v. Jamison*, 488 F.3d 756, 764 (7th Cir. 2007). In addition, "[s]ection 1983 creates a cause of action based upon personal liability and predicated upon fault. An individual cannot be held liable in a § 1983 action unless he caused or participated in an alleged constitutional deprivation." *Wolf-Lillie v. Sonquist*, 699 F.2d 864, 869 (7th Cir. 1983) (emphasis omitted).

In his TAC, Patterson targets Divine in three distinct time periods: (1) from 1981 to 1983 when Devine was the First Assistant State's Attorney of Cook County; (2) from 1988 to 1997 when Devine was in private practice; and (3) from December 1, 1996 to 2008 when Devine was the Cook County's State's Attorney. The court will address each period below.[4]

### 1. 1981 - 1983: Devine as First Assistant State's Attorney

Devine was the First Assistant State's Attorney from 1981 to 1983, which was three years before Patterson was arrested and interrogated in April 1986. Patterson has never alleged that Devine or the other defendants had any acquaintance with Patterson prior to his arrest in April 1986. Without any such evidence, Devine could not have deprived Patterson of his constitutional rights from 1981-1983. Further, it is impossible for Devine to have withheld exculpatory evidence from Patterson before Patterson was even arrested.

In an attempt to tie Patterson's case to Devine's role as First Assistant State's Attorney, Patterson points to the case of Andrew Wilson. After being arrested for the murder of two police officers in 1982, Wilson was tortured by Jon Burge and other Chicago police detectives. Patterson

---

[4] Patterson, in responding to Devine's motion for summary judgment, argues generally that the fact that he was pardoned dictates that this court should deny summary judgment. The court does not agree. Patterson attempts to use his pardon as proof that he was innocent. Ultimately, that is not a question currently before the court as Devine had no personal involvement in Patterson's arrest and interrogation. In the end, Devine's motion does not turn on whether or not Patterson was innocent or tortured into confessing.

5

claims first that Devine suppressed exculpatory information relating to Wilson's abuse and failed to investigate Wilson's allegations of abuse. These facts, even if true, go to *Wilson's* claims against Devine, not Patterson's. *See* 42 U.S.C. § 1983 (stating that violators "shall be liable to the party injured"). Second, Patterson suggests that had Devine investigated Wilson's allegations of torture in 1982-83, such an investigation would have exposed Burge and others such that they would have been terminated before Patterson was arrested in 1986 and thus Patterson could not have been tortured by them. In a similar case alleging police brutality against Area 2 police officers and involving the same allegations against Devine, Judge Holderman concluded that "[t]he chain of inferences necessary to conclude that [plaintiff] would not have been tortured in [1986] if Devine had only investigated and prosecuted Area 2 police officers for the torture of Andrew Wilson in 1982 is too tenuous to support [plaintiff's] § 1983 claim against Devine." *Orange v. Burge et al*, No. 04 C 168, 2008 WL 4425427, at *5 (N.D. Ill. Sept. 25, 2008).[5] This court agrees.[6]

Thus, with respect to the period of 1981 to 1983, which was three years *before* Patterson was even interrogated, Devine could not have violated Patterson's due process rights by failing to turn over exculpatory information, or failing to investigate Wilson's allegations of torture.

---

[5] The plaintiff in that case, Leroy Orange, filed a civil rights lawsuit against numerous defendants, including Burge, Devine and others. Like Patterson, Orange claimed that he was tortured by Burge while he was being interrogated at Area 2 in 1984 (Patterson was interrogated in 1986). The *Orange* case and this case have much in common: discovery in both cases was consolidated, Orange and Patterson were both represented (at least during part of their cases) by the same counsel, and their respective complaints contain the same general allegations against Devine.

[6] Even if Patterson's claim against Devine as the First Assistant State's Attorney (based on Devine's alleged failure to investigate torture at Area 2 and failure to turn over exculpatory evidence to Wilson) was viable, it would nonetheless fail due to absolute immunity for all the reasons explained in greater detail in the court's discussion of Devine as State's Attorney. *See* pages 9 to 12, infra. One possible scenario which might arguably fall outside of the broad reach of a prosecutor's immunity would involve a prosecutor who, perhaps in furtherance of a conspiracy to deprive a criminal defendant of his constitutional rights, acted more like a police officer than a prosecutor. Those facts, however, are not present here.

## 2.    1988-1996: Devine in Private Practice

From 1988 to December 1996, Devine practiced law at Phelan, Pope & John.  It is undisputed that Devine was in private practice during Patterson's arrest, torture, trial, conviction and direct appeal, and was not a public actor during this time.  There are two ways a private actor may be liable under § 1983: (1) if the private citizen conspired with a public employee to deprive the plaintiff of his constitutional rights; or (2) if the private citizen became a public officer *pro tem*.  *Proffitt v. Ridgway*, 279 F.3d 503, 507-508 (7th Cir. 2002).  "'To establish § 1983 liability through a conspiracy theory, a plaintiff must demonstrate that: (1) a state official and private individual(s) reached an understanding to deprive the plaintiff of his constitutional rights; and (2) those individual(s) were willful participant[s] in joint activity with the State or its agents.'"  *Reynolds*, 488 F.3d at 764 (quoting *Williams v. Seniff*, 342 F.3d 774, 785 (7th Cir. 2003)).  A private citizen acts as a "public officer *pro tem*" when he takes on a public function.  *See Proffitt*, 279 F.3d at 507-08 (explaining that if, in an emergency, the police deputized private citizens to help enforce the law, those citizens performing public functions would be considered to be acting under color of state law for purposes of § 1983).

As already explained, there is no evidence that Devine and the other defendants agreed to violate Patterson's constitutional rights before 1986.  Nor is there any evidence suggesting that Devine entered into a conspiracy to deprive Patterson of his constitutional rights with any of the other defendants during his time at Phelan, Pope & John.  The only connection between Devine and any state actor during this time (for which there is evidence in the record) is the fact that Devine's law firm represented Burge in the Wilson case and Devine billed 24.5 hours on that case.  Patterson alleges that Devine, while in private practice, personally represented Burge in the civil rights case filed by Andrew Wilson.  However, Devine has put forward evidence, unrebutted by Patterson, that it was Kunkle who represented Burge in the Wilson case, and Devine's involvement was limited to discussing procedural questions and asking for a continuance in court when Kunkle was out of town.  According to Kunkle's unrebutted testimony, Devine was not on the trial team of lawyers, did not file an appearance in the

case, did not have any substantive participation in the case, did not attend any confidential meetings with Burge, and was not involved in any teleconferences with Burge.

Patterson asserts, without support, that Devine *must* have entered into a conspiracy with Burge and nameless other defendants, and as part of that conspiracy, Devine *must* have received, and then suppressed, information that there was a practice of police brutality and torture at Area 2. "[M]ere speculation or conjecture will not defeat a summary judgment motion." *Rockwell Automation, Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh*, 544 F.3d 752, 757 (7th Cir. 2008). Patterson asks this court to assume that, because Devine's law firm represented Burge and because Devine had very limited involvement on the case, Devine himself must have conspired with Burge to deprive Patterson of evidence of a pattern of police brutality at Area 2. Without more, such as evidence of meetings or telephone conversations between Devine and Burge or others, the court cannot infer that Devine entered into a conspiracy with Burge.[7] Further, there is no evidence that Devine received evidence of a pattern of torture at Area 2 from Burge. Patterson has admitted in answers to requests to admit that he has no evidence that Devine learned about Area 2 torture from Burge. Def.'s SOF ¶¶ 50, 51.

In light of the above, Patterson's § 1983 claim against Devine for the period of 1988-1996 fails.

### 3. 1996-2008: Devine as Cook County State's Attorney

With respect to Devine's tenure as Cook County State's Attorney, Patterson alleges that Devine intentionally "suppressed highly exculpatory evidence of a pattern and practice of torture and abuse by Chicago police," TAC at 11, and that Devine is liable because he failed to investigate and even covered up the torture occurring at Area 2.

### a. Absolute Prosecutorial Immunity

Devine argues that all claims against him should be dismissed on the grounds that, even

---

[7] Nor is there any argument or facts which would support a finding that Devine became a "public officer *pro tem*"; there is no evidence that Devine, while he was in private practice, performed any public functions.

assuming Devine took the actions Patterson alleges, Devine was acting within the scope of his prosecutorial responsibilities. Patterson counters, without any explanation, that Devine's actions were investigative and thus not protected by prosecutorial immunity.

Absolute prosecutorial immunity protects prosecutors from liability "for their conduct in initiating a prosecution and in presenting the State's case, insofar as that conduct is intimately associated with the judicial phase of the criminal process." *Houston v. Partee*, 978 F.2d 362, 365 (7th Cir. 1992) (internal quotations and citations omitted). Absolute immunity applies even where the prosecutor acts "maliciously, unreasonably, without probable cause, or even on the basis of false testimony or evidence." *Henry v. Farmer City State Bank*, 808 F.2d 1228, 1238 (7th Cir. 1986). Absolute immunity addresses the concern that "[t]he public trust of the prosecutor's office would suffer if he were constrained in making every decision by the consequences in terms of his own potential liability in a suit for damages." *Imbler v. Pachtman*, 424 U.S. 409, 424 (1976). "For absolute immunity to attach, defendant prosecutors must have been acting 'as prosecutors' (*i.e.* in their 'role as advocate for the State') at the time of the complained of conduct." *Orange*, 2008 WL 4425427, at *22 (citing *Houston*, 978 F.2d at 366). Because prosecutorial immunity does not apply when a prosecutor is engaged in administrative or investigative tasks (for which only qualified immunity applies), courts use a "functional approach" to determine whether absolute immunity applies in a given case. *Burns v. Reed*, 500 U.S. 478, 486 (1991).

Turning to Patterson's main allegation against Devine – that Devine failed to turn over exculpatory evidence of a pattern of police brutality at Area 2 – the court must determine whether such a failing (assuming such a failure occurred) was prosecutorial in nature. Devine argues that a recent Supreme Court case, *Van de Kamp v. Goldstein*, 129 S.Ct. 855 (2009), is controlling here because it directly supports the conclusion that a supervisory prosecutor enjoys absolute immunity when he fails to turn over exculpatory materials to a criminal defendant. The court agrees that this case is on point, and leads inevitably to the conclusion that Patterson's claim against Devine is barred by absolute

immunity.

In *Van de Kamp*, the plaintiff was convicted of murder and "his conviction depended in critical part upon the testimony of … a jailhouse informant." 129 S.Ct. at 859. The plaintiff alleged that prosecutors in the Los Angeles County District Attorney's Office failed to provide him with potential impeachment information about this informant, which led to his erroneous conviction. *Id.* After his habeas corpus petition was granted, plaintiff brought suit under 42 U.S.C. § 1983, alleging that the prosecutors failed to disclose impeachment material under *Giglio v. United States*, 405 U.S. 150 (1972), due to "the failure of petitioners (the office's chief supervisory attorneys) adequately to train and supervise the prosecutors who worked for them as well as their failure to establish an information system about informants." *Id.* at 859. In an attempt to avoid implicating prosecutorial immunity, plaintiff brought his claims against the former District Attorney himself (who did not prosecute plaintiff's case) and his then-Chief Deputy, and characterized his claims as "administrative" rather than prosecutorial. *Id.*

The court held that absolute immunity extended to claims that *Giglio* material was not disclosed as a result of a failure to train or supervise prosecutors, or to establish an information system containing potential impeaching material. In ruling on plaintiff's claims, the Court stated that the supervisory prosecutors' failure to train, supervise and establish an information system was an admittedly "administrative activit[y]," *id.* at 861, which "rest[ed] in necessary part upon a consequent error by an individual prosecutor in the midst of trial." *Id.* at 863. Finding that both supervisory prosecutors were protected by absolute immunity, the Court held that the underlying task of deciding whether to disclose impeachment material is "directly connected with the prosecutor's basic trial advocacy duties." *Id.* In addition, it "necessarily require[d] legal knowledge and the exercise of related discretion." *Id.* at 862.

In reaching this conclusion, the Court considered a hypothetical case which bears a strong resemblance to the facts of this case. The Court stated,

We reach this conclusion by initially considering a hypothetical case that involves supervisory or other office prosecutors but does not involve administration. Suppose that [plaintiff] had brought such a case, seeking damages not only from the trial prosecutor but also from a supervisory prosecutor or from the trial prosecutor's colleagues - all on the ground that they should have found and turned over the impeachment material about [the informant]. *Imbler* makes clear that all these prosecutors would enjoy absolute immunity from such a suit. The prosecutors' behavior, taken individually or separately, would … be "intimately associated with the judicial phase of the criminal process[.]"

*Id*. at 862. In this case, the court concludes that Patterson's claim that Devine failed to turn over *Brady* material is indistinguishable from a *Giglio* claim that a supervisory prosecutor failed to turn over impeachment material. As a result, *Van de Kamp* makes clear that Patterson's claims against Devine, when he was the Cook County State's Attorney, are barred by prosecutorial immunity.[8] *See Warney v. Monroe County*, 587 F.3d 113 (2nd Cir. 2009) (holding that absolute immunity extends to prosecutors' actions taken while on direct appeal and post-conviction collateral proceedings).

In addition to enjoying absolute immunity for any failure to turn over exculpatory *Brady* material, Devine is also immune for his other prosecutorial decisions: his decision not to prosecute

---

[8] The court recognizes that it reaches a different conclusion here than it did in its ruling on Devine's motion to dismiss the second amended complaint. In that opinion, the court relied on *Houston v. Partee*, 978 F.2d 362 (7th Cir. 1992), to conclude that Devine would not be immune from suit because he did not act as the prosecutor in Patterson's criminal trial. *See Patterson v. Burge et al.*, 328 F. Supp. 2d 878, 893 (N.D. Ill. 2004). The Seventh Circuit in *Houston* rejected the prosecutors' argument that absolute immunity attaches to the prosecutor's office and not just to the individual prosecutor. 978 F.2d at 366. The Supreme Court in *Van de Kamp* concluded otherwise when it stated that a supervisory prosecutor would be immune where a criminal defendant claimed that the supervisor failed to turn over impeachment materials. Specifically, the Court noted that "We do not see how … differences in the pattern of liability among a group of prosecutors in a single office [*i.e.* distinguishing between the supervisors and the line prosecutors] could alleviate *Imbler*'s basic fear, namely, that the threat of damages liability would affect the way in which prosecutors carried out their basic court-related tasks." *Van de Kamp*, 129 S.Ct. at 862. Moreover, "… it is the interest in protecting the proper functioning of the office, rather than the interest in protecting its occupant, that is of primary importance." *Id.*

Burge or other Area 2 police officers, and his decision not to investigate further allegations of torture at Area 2 and to oppose Patterson's state postconviction petition and/or pardon. *Imbler*, 424 U.S. at 421-22. These are all decisions that were made in Devine's role as lead prosecutor for Cook County. As such, these decisions are immune from review.

### B.     State Law Claims Against Devine

In his TAC, Patterson sets forth state law claims for malicious prosecution, intentional infliction of emotional distress, and civil conspiracy against all defendants, including Devine. When all claims based on federal law have been denied, the court usually dismisses the remaining state law claims without prejudice, pursuant to its discretionary authority to relinquish supplemental jurisdiction. *Williams v. Rodriguez*, 509 F.3d 392, 404 (7th Cir. 2007). However, a court should not dismiss without prejudice if there are statute of limitations concerns, or if the state law claims are clearly without merit. *Id.* The latter applies here.

Respondent points to the case of *White v. City of Chicago*, 369 Ill. App. 3d 765 (Ill. App. Ct. 2006), to support its argument that the state law claims should also be dismissed due to absolute prosecutorial immunity. In *White*, the plaintiffs alleged that the SAO: (1) re-investigated the murder for which plaintiffs were charged and determined that the plaintiffs had no connection to the crime; (2) determined that another person had committed the murders; (3) determined that the main prosecution witness was untruthful; and (4) determined that the physical evidence did not support the charges. 369 Ill. App. 3d at 768. The SAO also allegedly conducted a second investigation that supported the findings of the original investigation. *Id.* The plaintiffs alleged that the SAO (including the State's Attorney and one of his assistants) suppressed this information and induced a prosecution witness to testify falsely before the grand jury by paying him $4,000. *Id.* While acknowledging the

severity of the allegations against the SAO defendants, the court found that the claims of wrongful imprisonment, intentional infliction of emotional distress and conspiracy were barred on the grounds of absolute prosecutorial immunity. *Id.* at 775-777. In so finding, *White* followed the contours of federal law, including *Imbler*, to determine if absolute immunity should apply. *Id.*

The bases for Patterson's state law claims are the same bases as for his Section 1983 claim. For all the reasons set forth above in finding that Devine is immune from suit with respect to the § 1983 claim, the court concludes that Devine's actions were prosecutorial in nature and thus protected by absolute immunity.

### C.    Counts VII and IX Against the State's Attorney's Office

In its motion for summary judgment on Counts VII (*respondeat superior*) and IX (indemnification), the SAO argues that both counts must be dismissed because the Eleventh Amendment bars claims against the office. Further, the SAO argues that Cook County, and not the SAO, is the proper indemnitor in the event money damages are awarded to Patterson for any actions of the SAO defendants.

"The Eleventh Amendment prohibits federal courts from deciding suits brought by private litigants against states or their agencies[.]" *Garcia v. City of Chicago*, 24 F.3d 966, 969 (7th Cir. 1994). In *Garcia*, the Seventh Circuit noted that the Illinois Supreme Court has held that state's attorneys are state officials. *Id.* (citing *Ingemunson v. Hedges*, 549 N.E.2d 1269, 1272 (1990)). A federal suit for money damages against the SAO is, therefore, a de facto suit against the State of Illinois. Without the consent of the state, the Eleventh Amendment bars any such claims against the SAO. *See Hernandez v. Joliet Police Dept.*, 197 F.3d 256, 264-65 (7th Cir. 1999) (upholding a district court's award of sanctions because there was no basis in law for plaintiff to bring federal claim against the SAO due to

the application of the Eleventh Amendment).

In addition, because all of the claims against the SAO defendants are being dismissed,[9] there is no need for indemnification in this case. In light of the above, the SAO's motion for summary judgment on Counts VII and IX is granted.

## III. Conclusion

In light of the above, the court grants the motions for summary judgment filed by defendants Richard Devine and the Cook County State's Attorney's Office.

ENTER:

_____/s/_____
JOAN B. GOTTSCHALL
United States District Judge

DATED: September 27, 2010

---

[9] For details of the dismissal of the claims against former Assistant State's Attorneys Troy and Lacy, see the court's other Memorandum Opinion and Order issued this same day.